1
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION

3    Juan Alonzo-Miranda,            *
                    Plaintiff,       *
4                                    *
     VS.                             *    CIVIL ACTION NO.:
5                                    *    5:13-CV-01057
                                     *
6    Schlumberger Technology         *
     Corporation,                    *
7                    Defendant.      *

8

9

10

11

12

13   **********************************************************
                       ORAL DEPOSITION OF
14                    JEAN-REMY BELLANGER
                          VOLUME 1
15                     AUGUST 21, 2014
     **********************************************************
16

17

18

19

20

21

22

23

24

25

EXHIBIT 1

**Page 2**

APPEARANCES:
MAREK, GRIFFIN & KNAUPP
John W. Griffin, Esq.
203 North Liberty Street
Victoria, Texas 77901
(361) 573-5500
jwg@lawmgk.com
Appearing for Plaintiff;
JACKSON LEWIS PC
William L. Davis, Esq.
500 North Akard, Suite 2500
Dallas, Texas 75201
(972) 728-3297
davisw@jacksonlewis.com
Appearing for Defendant;
Also Present: Juan Alonzo-Miranda
Goldie

JEAN-REMY BELLANGER,
The Witness; and,
JUDY L. MOORE,
Certified Shorthand Reporter and
Registered Merit Reporter

* * * * * * * * *

**Page 3**

EXAMINATION INDEX

EXAMINATION INDEX
EXAMINATION                          Page
By Mr. Griffin.................................. 6
Further by Mr. Griffin........................... 102

EXHIBIT INDEX
EXHIBIT 1   Notice - marked            5
            Referenced              22

EXHIBIT 2   U.S. Equal Employment Opportunity
            Commission Determination- - marked   5
            Referenced              32

EXHIBIT 3   Letter dated 1-18-13 to
            William L. David from Sheila
            Ward-Reyes re Alonzo-Miranda v
            Schlumberger,
            Charge No. 846 2012 66798 - marked   5
            Referenced              40
EXHIBIT 4   Fiido's Facebook page - marked       5
            Referenced              50

EXHIBIT 5   Photographs - marked        5
            Referenced              51
EXHIBIT 6   Memo dated 5-8-12 to Juan from
            Elizabeth Telford           64

EXHIBIT 7   Memo dated 5-8-12 to Dear Doctor
            from Juan Alonzo-Miranda - marked   64
            Referenced              66

EXHIBIT 8   Clarifying Accommodations Form from
            Dr. Barbara Roach - marked      74
            Referenced              76

EXHIBIT 9   Clarifying Accommodations Form from
            Ronald P. Yates            91
EXHIBIT 10  E-mail dated 7-24-12 to Juan
            Alonzo-Miranda from Elizabeth
            Telford re Request Status      94

**Page 4**

EXHIBIT 11   Letter dated 10-17-12 to Juan
             Alonzo-Miranda from Elizabeth
             Telford re Request to Bring Dog to
             Work                98

EXHIBIT 12   Clarifying Accommodations Form from
             Dr. Rochelle E. Dennis      100

EXHIBIT 13   Letter dated 11-30-12 to Juan
             Alonzo-Miranda from Elizabeth
             Telford              101

EXHIBIT 14   Miscellaneous e-mails and
             Photographs - marked      111
             Referenced              119

EXHIBIT 15   Schlumberger Oilfield Services
             Harassment-Free Workplace Policy
             and Procedures - marked      147
             Referenced              149
EXHIBIT 16   (Inadvertently skipped this number)
EXHIBIT 17   Treatment excuse slips      149

             CERTIFIED QUESTION
             Page 57, Line 19, to Page 57, Line 25

**Page 5**

DEPOSITION upon oral examination of the
Witness, JEAN-REMY BELLANGER, taken by the Plaintiff in
the above-entitled cause, wherein Juan Alonzo-Miranda is
the Plaintiff and Schlumberger Technology Corporation is
the Defendant, pending in the United States District
Court, for the Western District of Texas, San Antonio
Division, before JUDY L. MOORE, a Certified Shorthand
Reporter in and for the State of Texas and Registered
Merit Reporter, on the 21st day of August, A.D., 2014 in
the offices of Luttrell Villarreal Law Group, 400 North
Loop 1604 East, Suite 208, San Antonio, Texas, between
the hours of 10:30 o'clock a.m. and 5:02 o'clock p.m.,
pursuant to due Notice and the Federal Rules of Civil
Procedure.

* * * * * * * *

(Exhibits 1 through 5 marked.)

COURT REPORTER:  Waive the court reporter
introduction?

MR. GRIFFIN:  Waived.

MR. DAVIS:  Waived.

COURT REPORTER:  Thank you.

* * * * * * * *

6

1      JEAN-REMY BELLANGER, a witness of lawful
2 age, being first duly sworn on the above cause,
3 testified on his oath as follows:
4           EXAMINATION
5 Questions by Mr. Griffin:
6    Q. Good morning. Would you please state your full
7 name?
8    **A. My full name is Jean-Remy Bellanger.**
9    Q. And what do you prefer to be called?
10    **A. J.R., since we're in Texas.**
11    Q. So even though we've only met for the first
12 time, you won't take offense if I call you J.R. during
13 the deposition?
14    **A. No, I won't, sir.**
15    Q. Great. Tell us a little bit about your
16 background. Where were you born and raised?
17    **A. I was born in Paris, 1986, and I was raised**
18 **between Germany and western -- I spent ten years and western**
19 **Africa where my father was working in Vuknapas**
20 **(phonetic) in Benin and then completed my studies in**
21 **Paris.**
22    Q. And tell us about your studies at least from
23 the time you were 15 years old until you finished your
24 education.
25    **A. Yeah. So I did what we consider -- I mean,**

7

1 **it's a baccalaureate and the German abitur because I**
2 **went to German and French school, then went to do my**
3 **bachelor in France.**
4      **After my bachelor, I did one year of**
5 **different, let's say, trainings, one with the Ministry**
6 **of Foreign Affairs in Berlin, another one in HR with the**
7 **United Nations, and then I completed my master, two-year**
8 **master, in business administration with a focus on HR**
9 **and obtained my master degree in 2005.**
10      **And during the last year of my master, I**
11 **did what we consider an apprenticeship; that is, you**
12 **work half of the time with a company. That company was**
13 **Schlumberger at the time, and that's how I started in**
14 **the HR function with Schlumberger in Paris.**
15    Q. If you don't mind, the education you just
16 described, do you mind telling us the institutions where
17 you obtained those degrees?
18    **A. Sure. So the bachelor and the master were**
19 **obtained with Sciences Po, which is called -- It's**
20 **Institut d'etudes Politiques. This is a --**
21      COURT REPORTER: I have no idea what you
22 just said.
23      THE WITNESS: Yeah. Sorry. It's a French
24 business school where I guess, I mean, most of our
25 current presidents went, so it's one of the most known

8

1 school, compared to the London School of Economics in
2 London, if you want to have something to compare with.
3    Q. And how old were you then?
4    **A. When I completed my master?**
5    Q. Yes.
6    **A. I was 24.**
7    Q. And where was that?
8    **A. In Paris.**
9    Q. And did you say an MBA that you got?
10    **A. No, not an MB -- I mean, it's a master, yes.**
11 **You can consider it as a business, Master of Business**
12 **Administration, but it's with a special focus on last**
13 **year in HR.**
14    Q. And where was that?
15    **A. In Paris as well.**
16    Q. And what was the name of that institution?
17    **A. Still the same, Sciences Po.**
18    Q. Did you say Salzberg?
19    **A. No. Sciences Po. I mean, I can --**
20      MR. DAVIS: Can you maybe write it, maybe
21 write it down?
22      THE WITNESS: Yeah. If you want.
23    Q. Or spell it.
24    **A. S-c-i-e-n-c-e-s, Sciences, and then Po, P-o,**
25 **for politics, P-o.**

9

1    Q. P-o. Great. And you mentioned an
2 apprenticeship?
3    **A. Yes.**
4    Q. Where did the apprenticeship take place?
5    **A. In Paris.**
6    Q. And how old were you when you were taking the
7 apprenticeship?
8    **A. I started with Schlumberger -- I believe I was**
9 **24, with the apprenticeship.**
10    Q. 2004, did you say?
11    **A. Hold on.**
12    Q. Or did we misunderstand you?
13    **A. I -- No. I started my studies 2005, ended**
14 **2010. My apprenticeship during the last year of my**
15 **master took place in 2009, so September 2009, that's**
16 **where I started with Subsea, which is a segment of**
17 **Schlumberger.**
18    Q. Sub-C, is that C as in Charles?
19    **A. Subsea, like a sub and the sea, underneath the**
20 **sea.**
21    Q. But it's a C, like a C for Charles?
22    **A. No, not a C.**
23    Q. Not a C?
24    **A. S-u-b-s-e-a, which is a segment of**
25 **Schlumberger.**

10

1  Q. S-u-b?
2  A. S-e-a. That's where I started.
3  Q. And what is your date of birth, sir?
4  A. March 23rd, 1986.
5  Q. And are you a French citizen?
6  A. I have the dual citizenship, the German and the
7  French one.
8  Q. So let me ask you this: Your first job out of
9  school was for Subsea, the subsidiary of Schlumberger?
10 A. If we consider jobs also with internship, it
11 was actually my fourth employer because I already had
12 three previous internships, paid internships, and
13 Schlumberger was then my fourth employer, yeah.
14 Q. And has Schlumberger been your only employer
15 since you apprenticed for Subsea?
16 A. Yes.
17 Q. And let me ask you this: Were any of the
18 studies that you had in France -- did any of them deal
19 with the Americans with Disabilities Act, an American
20 law?
21 A. We had as a class one of the previous North
22 America Schlumberger personnel managers, who gave us,
23 you know, a few lectures on international HR management,
24 and specifically about that topic, I had a training when
25 I arrived in the US last year with our compliance team,

11

1  who trains, you know, HR professionals who come from
2  abroad to make sure that we are knowledgeable on
3  US-specific laws.
4  Q. Well, thank you for that. I'm going to come
5  back to the training you got in the United States last
6  year in a moment, but in terms of what you just
7  described, in your actual schooling, was that lecture by
8  Schlumberger people in connection with your schooling --
9  A. Yes.
10 Q. -- or your internship?
11 A. In connection with the school, not the -- It
12 was a previous employer.
13 Q. Let me just ask this: Is there a law in France
14 that is substantially similar to the Americans with
15 Disabilities Act?
16 A. Yes. And I would go a step further to say it's
17 even -- it's more complex than the one we have in France
18 when it comes to our disability law.
19 Q. Would you describe the French law as stronger
20 protections for people with disabilities than the
21 Americans with Disabilities Act?
22 A. It's a different approach. I wouldn't say
23 stronger because that's a personal opinion. I don't
24 think I'm here to give my personal opinion, but we work
25 with strong quotas with direct implication on the

12

1  employer's taxes at the end of the year if those, let's
2  say, minimum requirements are not met.
3  Q. When you used the word "complex" to describe
4  the French version of the laws protecting people with
5  disabilities, what did you mean by that?
6  A. Complex in the sense of it, I guess, involves
7  more administrative procedures and, let's say, more
8  technical understanding of the law.
9  Q. Now let's go back to what you described a
10 moment ago, the training you got last year. First of
11 all, I'm assuming that was in 2013?
12 A. Yes.
13 Q. And where did that take place?
14 A. In Houston in the headquarters of Schlumberger.
15 Q. And when during the year did this happen?
16 A. So I arrived in April the 15th, and two weeks
17 later, I obtained that training.
18 Q. And who organized the training?
19 A. Our compliance manager for North America was
20 part of the people organizing the training.
21 Q. And what's that person's name?
22 A. Judy Lawton.
23 Q. And --
24 A. And I had on another occasion a separate
25 training again with Leigh Nichols, who is our compliance

13

1  specialist.
2  Q. And as I understood it, you thought that took
3  place in April of last year?
4  A. Between April and May. I don't recall the
5  exact date because I was in a transition, so --
6  Q. A transition from what to what?
7  A. Transitioning to, you know, coming from London
8  to the US. And if I may add as well, in Schlumberger,
9  every HR professional has to go through a six-step
10 training program called Keystone, and that program
11 entails online modules, and most of the online modules
12 are actually dealing with US-specific topics.
13 Q. In terms of the training that you got there,
14 was that your first detailed training on the United
15 States approach to workers with disabilities?
16 A. No. I have, I'd say, a common and my personal
17 knowledge on this prior to that.
18 Q. Then let's talk about the training that you got
19 before April of 2013 on the American approach to workers
20 with disabilities.
21 A. To tell you what?
22 Q. Describe them. You said that was not your
23 first training on workers with disabilities. What I'd
24 like you to do is share with us what training you got
25 before you went to Houston in April 2013.

14

1    A. As I say, I mean, the company has us complete
2  what we call online modules on top of, let's say,
3  classes, and most of the online modules deal with
4  US-specific HR topics.
5    Q. And when you say an online module, is this an
6  official Schlumberger training module?
7    A. It's official Schlumberger training, yes.
8    Q. And when did you take your first online module
9  training on workers with disabilities?
10    A. I cannot recall exactly when I took that module
11  because we have a very large amount of modules to
12  complete, but I started in that Keystone training in
13  July 2010.
14    Q. July 2010. And how many of those -- Well, let
15  me ask you, what was it called, the training?
16    A. We had trainings -- I mean, you want the
17  training about -- specifically about the Americans with
18  Disability?
19    Q. Yes. And workers with disabilities.
20    A. I would not recall the name of that training
21  because, I mean, as I said, numerous trainings we do,
22  and we -- I cannot recall the names.
23    Q. You said "numerous." Can you recall any of the
24  names?
25    A. I can recall the topics, for instance, unions,

15

1  you know, how to work with unions, union, so that would
2  be one of them.
3    Q. No problem. Thank you for that, but what I'd
4  like you to do for the time being is let's focus our
5  attention just on the Americans with Disabilities Act
6  and workers with disabilities. I know there's a lot
7  more to HR, but my questions right now are just focusing
8  on your training that Schlumberger gave you in terms of
9  dealing with workers with disabilities. Is that okay
10  with you?
11    A. Yeah. I mean, you asked me specifically about
12  those online modules. I cannot give you the title of
13  any of those modules because I don't remember them.
14  However, I can very well remember the training with the
15  compliance team in US I received when I arrived in the
16  US, which dealt specifically with the ADA -- I mean --
17  the ADA, right. So --
18    Q. That's the one that was in person in Houston?
19    A. Yes.
20    Q. Right. But the way we got started on this line
21  of questioning, I asked you if that was your first
22  training by Schlumberger on the ADA and people with
23  disabilities. You said, No, I got other ones.
24      I'm trying to get you, as best you can, to
25  describe any other training you got on the ADA, other

16

1  than what you got in Houston.
2    A. By the best of my abilities, I won't be able to
3  recall that.
4    Q. No problem. And let me ask you this: From
5  your memory of the Houston event, were you given written
6  materials for that training?
7    A. I believe so, yes. Not only on ADA, but also
8  on the FMLA topic, so --
9    Q. And tell us as best you can what you can
10  remember about the training insofar as the obligations
11  an employer has to a worker who has a disability when
12  the worker is in need of an accommodation to allow the
13  worker to perform their job.
14    A. Sure. So to summarize it to the best of my
15  ability, as an employer, we do look at every request for
16  accommodation on a case-to-case basis, and we engage
17  with the employee in what we call an interactive process
18  where we have specific templates to be sent out where we
19  request, for instance, the clarification-of-the-
20  accommodation form, which has to be filled out by the
21  physician who specifically deals with, you know, the
22  reason for that accommodation, and it's being reviewed
23  then not only by the local HR, but hand in hand with our
24  compliance team, and we also look on a case-to-case
25  basis to which extent, due to, you know, our business,

17

1  let's say, framework, we can accommodate that.
2    Q. Let me ask you this: In terms of -- And
3  you're speaking from your memory of this training,
4  right?
5    A. Yeah.
6    Q. In terms of the decisions though, what training
7  did they give you on whether or not to grant an
8  accommodation or to deny it? What guidance were you
9  taught about how Schlumberger decides whether to honor a
10  request for accommodation or not?
11    A. The decision to honor or deny is not taken at
12  my level, so it's taken, as I say, in conjunction with
13  our compliance team, who has an overview of all North
14  America Land activities.
15    Q. There are going to be times during the
16  deposition where I make objection and perhaps Mr. Davis
17  does, and I'm going to object to that answer as not
18  being responsive. I'm not fussing at you. Sometimes I
19  have to do that.
20      But my question was about, what were you
21  trained on how, the methodology by which, Schlumberger
22  makes a decision whether to honor an accommodation
23  requested by a worker with a disability or not?
24    A. As I said, we were not trained to make the
25  decision. We're trained to facilitate the process of

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

---

**18**

1  obtaining the rightful documentation, reviewing them in
2  conjunction with our compliance team, and it's, again, a
3  decision which is taken jointly with different parts of
4  the organization, so HR, the local HR, as I stand here,
5  is not the one taking that decision.
6          MR. GRIFFIN:  Let me object as
7  nonresponsive.
8      Q.  If I'm hearing you right, during the training,
9  no one ever explained how Schlumberger makes a decision
10 of whether or not to honor a worker who has a
11 disability -- Let me rephrase that question.
12         Nowhere in your training did they explain
13 how Schlumberger makes a decision either to honor or not
14 honor a worker's request for accommodation when that
15 worker has a disability?
16         MR. DAVIS:  Objection.  Form.
17     Q.  Am I right in saying that?
18     A.  No.  Again, as I said, it's a case-to-case
19 approach, so it will be too easy to say there's a
20 black-and-white approach and guidelines to say this is a
21 yes, this is a no.
22     Q.  No.  We agree it's a case by case.  You've told
23 me that at least twice.  What I'm trying to do is, what
24 do they tell you about how they make the decision
25 whether to honor or not honor a worker's request for an

---

**19**

1  accommodation?
2      A.  I think I already responded to that.
3      Q.  Well, I need you to confirm that you were not
4  taught that at the training.  No one ever explained to
5  you how Schlumberger makes decisions on whether to grant
6  or not grant a worker with a disability's request for an
7  accommodation?
8          MR. DAVIS:  Objection.  Form.
9      Q.  Am I right in saying that?
10     A.  No, you're not.
11     Q.  Tell us in your own words for the benefit of
12 the court and the jury how Schlumberger -- how they
13 taught you they made decisions on whether to honor or
14 not honor a worker's request for an accommodation?
15     A.  As I said, we are taught to handle the process
16 of handling, you know, the accommodation process, which
17 is, again, an interactive process between the employee
18 making the requirement and us trying to facilitate the
19 request.
20         MR. GRIFFIN:  And let me object as
21 nonresponsive.
22     Q.  Do you know today -- Forget about what you
23 were taught.  Do you know today how Schlumberger makes
24 decisions of whether to honor or not honor a worker's
25 request for an accommodation when that worker has a

---

**20**

1  disability?
2          MR. DAVIS:  Asked and answered.
3          You can tell him again.
4          MR. GRIFFIN:  No, no, no, no.  Let me
5  object to the side-bar.
6      Q.  You understand my question now is not about
7  what you were trained in Houston, right?  We've covered
8  that, have we not?
9      A.  Yes.
10     Q.  Good.  Now I'm turning to a different subject,
11 what you know today.  Forget about what you knew in
12 Houston.  Do you know today, are you able to tell us,
13 how Schlumberger makes decisions on whether or not to
14 honor or not honor a worker's request for an
15 accommodation?
16     A.  And my response will be the same.  We're not
17 dealing here with typical --  When I say "typical
18 cases," every case is different and specific, and as
19 every case is specific and different, we need to, you
20 know, look at it on a case-by-case approach, so asking
21 me if we have a magic recipe to say yes or no would be
22 not the truth.
23     Q.  How do you decide?  How does Schlumberger
24 decide whether to honor or dishonor the request?
25     A.  We need, of course, medical evidence to

---

**21**

1  substantiate the request, not only to substantiate, but
2  also for us to understand why an accommodation is
3  needed.
4          We also look at the accommodation request
5  in terms of the feasibility to our business, especially
6  since we deal here with an oil-and-gas company where
7  some of our employees work on locations with heavy
8  equipment.  Every case needs to be dealt with, again, on
9  a case-by-case approach.
10     Q.  Let me ask you this:  Have you given me your
11 best answer of how Schlumberger -- the methodology by
12 which Schlumberger decides how --  Excuse me.  Let me
13 rephrase.
14         Have you given me your best answer to the
15 question of how Schlumberger decides whether or not to
16 honor a request for an accommodation when it comes from
17 a worker with a disability?
18         MR. DAVIS:  Objection.  Form.
19     Q.  You both talked at exactly the same time.  I
20 think you said yes, but I need you to say it for the
21 court reporter?  You did say yes, right?
22     A.  M-hm.
23     Q.  Okay.  Thank you.
24         COURT REPORTER:  I still didn't get an
25 answer.

---

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

22

1          MR. DAVID:  You need to say yes or no.
2          COURT REPORTER:  I'm sorry.
3          MR. DAVID:  She can't take down a nod of
4  the head.
5          THE WITNESS:  Okay.  Yes.
6      Q.  And there will be times when Schlumberger's
7  lawyer makes an objection, like he just did, and you are
8  answering at exactly the same time.  If you hear him
9  start talking, I will not insist you talk over him, so
10  if you hear him start to talk, go ahead and let him
11  finish what he's going to say.  Then you can answer, if
12  that's okay with you.
13      A.  M-hm.
14      Q.  Super.  Let me show you what's been marked as
15  Exhibit 1 and ask first of all whether you've ever seen
16  that before.
17      A.  Yes.
18      Q.  And let me just ask you this:  Have you ever
19  given a deposition before?
20      A.  No.  It's my first time.
21      Q.  Great.  Then there's a couple of things that
22  will help us to proceed.  One is, as the court reporter
23  has indicated, there will be times when you're tempted
24  to shake your head or nod your head, which is not a bad
25  way of communicating, but since she's writing down what

23

1  we're saying, it will be necessary for you to answer all
2  the questions with a verbal answer, if that's okay with
3  you.
4      A.  I agree.
5      Q.  Second, and sometimes it is challenging, and I
6  understand that, but when I'm asking a question, you
7  will sometimes know the rest of my question before I'm
8  finished and be tempted to answer before I'm finished,
9  and so I'll ask you to endeavor not to start answering
10  my question until I'm all the way finished, and on the
11  other hand, even though I may know what you're going to
12  say, I will try to let you finish your answer before I
13  begin my next question, if that's okay with you.
14      A.  That perfectly fine.
15      Q.  And last of all, there may be times, either
16  because of a language barrier or maybe because I even
17  ask a convoluted question, that you don't understand
18  what I'm asking, so I'll count on you to tell me at any
19  time during the day that you feel like we're not
20  communicating or that I'm asking a question that you're
21  not understanding, and that's okay with you?
22      A.  That's okay.
23      Q.  Great.  Let me ask you first, what has
24  Schlumberger done to prepare you to address the topics
25  that are listed in Exhibit No. 1?

24

1      A.  Can you be more specific?
2      Q.  Well, it's not a very specific question.  It's
3  a very broad question.  What did Schlumberger do to
4  prepare you to offer testimony on the topics that are
5  listed in Exhibit No. 1?
6      A.  I met with Bill yesterday.
7      Q.  Other than talking to Schlumberger's lawyer,
8  did the company make any effort to prepare you to give
9  testimony on the topics?
10      A.  No.
11      Q.  Let me ask you this:  What has Schlumberger
12  done, to your knowledge, to prepare you to fully,
13  completely and unevasively answer the questions
14  pertaining to the topics on Exhibit 1?
15          MR. DAVIS:  Objection.  Form.
16          THE WITNESS:  I'm still unclear what
17  happens when an objection is made.
18      Q.  Oh, you can still answer.
19          MR. DAVIS:  You can still answer, yeah.  If
20  I don't think you should answer, I will tell you.  If I
21  say, "Objection.  Form," if you understand the question,
22  you can still answer.
23      Q.  Sure.  It's like I make objections.  He makes
24  objections.  Unless he tells you, "Don't answer," we
25  just keep proceeding.

25

1      A.  Okay.
2      Q.  So my question that he objected to, and
3  certainly he can have a running objection on this
4  question that I'd asked, was, what has Schlumberger done
5  to prepare you to fully, completely and unevasively
6  answer the questions pertaining to the topics on Exhibit
7  1?
8          MR. DAVIS:  Objection.  Form.
9          THE WITNESS:  I went through extensive
10  training with, again, the program I told you about,
11  Keystone.  On top of that, we receive training on
12  various, different topics, such as how to communicate,
13  how to handle employees' queries, specific roundtables,
14  also how to handle communication when it comes to media,
15  et cetera, so that's, I think, training in general how
16  to communicate, which will help me to explain you the
17  company's intention.
18          MR. GRIFFIN:  Let me object as
19  nonresponsive.
20      Q.  I'm talking about -- Well, let me ask you
21  first, when did you first review the topics on Exhibit
22  1?
23      A.  I would say we started -- Exhibit No. 1.
24      Q.  In other words, when you look at the topics, I
25  mean -- Why don't take a look at them and first tell

26

1 the court, if you don't mind, when you first received a
2 copy of Exhibit 1.
3     **A. I receive a copy of it -- I mean of this**
4 **document -- yesterday. However, in most of the topics**
5 **listed, I was involved since, I think, end of April till**
6 **now in ongoing communication between our compliance team**
7 **and lawyers.**
8     Q. When did you first see these topics that are
9 listed?
10     **A. Some of them, I've seen them before because**
11 **I've dealt with them before. Some of them, I've**
12 **recently discovered them.**
13     Q. Let me ask you this: What have you done to
14 prepare to answer questions on the topics?
15     **A. I engage with my predecessor on the job. She**
16 **was the previous HR representative for Von Ormy, and**
17 **she's been on the job since the Von Ormy location**
18 **started, opened, and I liaise with -- So we're**
19 **referring here to Elizabeth Telford.**
20     Q. And did this all happen yesterday?
21     **A. No. It has been prior to that.**
22     Q. Right. But I'm talking about these topics that
23 are listed here. You only saw these topics for the
24 first time yesterday?
25         MR. DAVIS: Objection. Form.

27

1     Q. Right?
2         MR. DAVIS: Objection. Form.
3     Q. Did I misunderstand you? You only saw this
4 deposition notice with these topics yesterday?
5     **A. Yes.**
6     Q. That was the first time you ever saw them?
7         MR. DAVIS: Objection. Form.
8     Q. Right? These 30 items here.
9     **A. M-hm.**
10     Q. My question is, tell us, after you reviewed
11 these 30 topics, what did Schlumberger and you do to
12 prepare you to answer questions about these topics?
13     **A. Since in most of the topics, I was involved in**
14 **different processes in regards to, for instance, Juan's**
15 **accommodation, et cetera, I reviewed the files I had on**
16 **file, previous e-mails. Any documents relating to that**
17 **case was reviewed by myself.**
18         MR. GRIFFIN: Let me object as
19 nonresponsive.
20     Q. I'm talking about after you --
21     **A. This was done after I've seen them.**
22     Q. When yesterday did you see them first?
23     **A. In the morning.**
24     Q. And how did you first get a copy of the topics?
25     **A. How?**

28

1     Q. Yes.
2     **A. They were handed over to me.**
3     Q. By whom?
4     **A. By a Schlumberger lawyer. We're represented**
5 **here by Bill.**
6     Q. So yesterday morning in your meeting with him,
7 he handed you the list of the topics?
8     **A. Yes.**
9     Q. I don't want to know anything he told you or
10 what you told him, but I want you to tell the court what
11 you did after reviewing the topics to prepare yourself
12 to answer questions about Schlumberger's position on
13 these topics.
14     **A. I read, reviewed all documents we have on file**
15 **for those topics. I had various phone calls with people**
16 **who could provide me with further information or confirm**
17 **certain points.**
18     Q. Who did you talk with to confirm information or
19 to get information that will allow you to answer
20 questions on the topics?
21     **A. I spoke with Elizabeth Telford. As I said, I**
22 **arrived in my position as HR representative for San**
23 **Antonio in 2014 in April, and prior to that, my**
24 **colleague was in charge of that location, so I inherited**
25 **basically this part of this case, and a reason for me**

29

1 **getting in touch with her was to clarify certain points**
2 **to be able to answer to your questions to the best of my**
3 **knowledge.**
4     Q. Great. Well, take a look at the topics, and
5 I'm going to circle any of them that you talked to
6 Elizabeth about, which topics that you talked to her
7 about.
8         MR. DAVIS: Excuse me. Did you say you
9 arrived in 2014?
10         THE WITNESS: '13.
11         MR. DAVIS: '13. You can go ahead.
12         THE WITNESS: Number two. Three. Four.
13 Five. Six. Seven and eight.
14     Q. And that's all?
15     **A. The topics were not addressed as they are here,**
16 **but basically what we discussed will help me to answer**
17 **the topics I just listed.**
18     Q. One through eight?
19     **A. Yes.**
20     Q. Great.
21     **A. Mainly, yeah.**
22     Q. Beg your pardon?
23     **A. I said, "Mainly, yeah."**
24     Q. Are there any other topics that you visited
25 with Elizabeth Telford about, other than one through

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

30

1  eight?
2      **A. No.**
3      Q. And tell us any other folks that you visited
4  with after you got the list of the topics to prepare
5  yourself to answer questions about them.
6      **A. Can you repeat?**
7      Q. Sure. Who else did you talk to, beside
8  Elizabeth Telford?
9      **A. I spoke with Bradley Brown, and that's mainly**
10  **in regards to number five and number six.**
11      Q. And did you talk to anyone else about the
12  topics?
13      **A. I spoke with Maria Reyes and as well --**
14      Q. Maria Reyes?
15      **A. Yes. As well in regards to number five and**
16  **number six.**
17      Q. And any other folks that you spoke with
18  yesterday after getting a copy of the topics?
19      **A. No.**
20      Q. Did Schlumberger provide you any documents to
21  review to prepare you for answering questions about
22  these topics?
23      **A. I'm not sure if I understand your question.**
24      Q. Right. Someone, I assume, asked you to testify
25  as Schlumberger's representative in this deposition?

31

1      **A. M-hm.**
2      Q. And who was that?
3      **A. Our compliance manager, our legal team.**
4      Q. Who is?
5      **A. Judy Lawton. And the legal team.**
6      Q. And when Judy -- How did Judy communicate that
7  to you?
8      **A. I mean, I wasn't called like by Judy about**
9  **that, but by Lynn Ross, who is our paralegal specialist.**
10  **I don't recall her exact job title, but she involved me**
11  **in the preparation of that case with our SLB lawyer.**
12      Q. And my question then is, did they provide you
13  any documents for you to review to prepare you?
14      **A. Yes.**
15      Q. And tell us, describe the documents that you
16  were given to review to prepare yourself to testify here
17  today.
18      **A. Can I ask to have those documents? Because I**
19  **don't recall the exact name of those documents, but**
20  **basically those were responses on, I think, questions**
21  **pointed out from your side in regards to this case, so**
22  **various different -- I don't remember the exact name of**
23  **the documents.**
24      Q. And were they sent to you electronically or --
25      **A. Electronically, yes.**

32

1      Q. And I'm assuming you still have those
2  somewhere?
3      **A. Yes.**
4      Q. Saved?
5      **A. Yes.**
6      Q. The documents that were given to you to prepare
7  yourself?
8      **A. Yes.**
9      Q. But you don't have those today?
10      **A. I was asked to come with empty hands, so --**
11      Q. But you still have somewhere stored --
12      **A. I have them on my computer, sir, yeah.**
13      Q. Perfect. And you're willing to keep those
14  secure?
15      **A. Yes.**
16      Q. Perfect. Thank you, thank you. Do you
17  understand that today you will be giving Schlumberger's
18  position on the topics that are listed in Exhibit 1?
19      **A. Yes, I understand.**
20      Q. Speaking for the company?
21      **A. Yes, I understand.**
22      Q. Let me show you what's been marked as Exhibit 2
23  and ask if you can tell us what that is.
24      **A. It's a letter from the EEOC.**
25      Q. In your training in Houston --  And I hope

33

1  I'm --  Is it Ballenger?
2      **A. Ballenger.**
3      Q. Bellanger. Thank you. What were you taught as
4  to the role of the EEOC in the United States?
5      **A. The EEOC is basically an independent, if I may**
6  **say, tool which enables employees to seek advice and**
7  **support if they believe they've been discriminated by**
8  **the employer in any way or form, and that includes**
9  **racial discrimination up to discrimination because of a**
10  **certain disability.**
11      Q. And that's what you were taught in Houston?
12      **A. That's my common knowledge on the EEOC.**
13      Q. Let me just ask you this: Does Schlumberger
14  respect the EEOC?
15          MR. DAVIS: Objection. Form.
16          THE WITNESS: We fully comply with the
17  EEOC.
18          MR. GRIFFIN: Let me object to the
19  responsiveness.
20      Q. I'm not arguing whether they did or didn't.
21  I'm just asking you, as an organization, does
22  Schlumberger respect the EEOC?
23          MR. DAVIS: Objection. Form.
24          THE WITNESS: We do respect and comply with
25  EEOC.

---

**34**

1 Q. And since you've been at Schlumberger, is this
2 the first cause determination that you've ever seen that
3 the EEOC has issued regarding workplace discrimination
4 by Schlumberger?
5 **A. Can you repeat the question again --**
6 Q. Sure.
7 **A. -- or rephrase it?**
8 Q. Well, let me just ask -- I will rephrase it.
9 What do you understand Exhibit 2 to be?
10 **A. It's a response from the EEOC in regards to, I**
11 **guess, the request from Juan Alonzo-Miranda to look at**
12 **how his request for reasonable accommodation was**
13 **assessed and addressed by Schlumberger.**
14 Q. What is the significance of a determination by
15 the EEOC at Schlumberger?
16      MR. DAVIS: Objection. Form.
17      THE WITNESS: Again, with objection, form,
18 can --
19      MR. DAVIS: You can answer if you
20 understand the question.
21      THE WITNESS: Okay.
22      We do comply with what they ask us to do.
23      MR. GRIFFIN: Object to the responsiveness.
24 Q. My question is not asking what they did. I'm
25 asking, what significance, if any, does a cause

**35**

1 determination have with Schlumberger?
2      MR. DAVIS: Objection. Form.
3      THE WITNESS: I'm sorry. I don't
4 understand the question.
5 Q. Do you understand that the EEOC has made a
6 cause determination that Schlumberger has violated
7 Juan's rights in failing to grant him an accommodation
8 for his disability; do you understand that's what this
9 document says?
10      MR. DAVIS: Objection. Form.
11 Q. Or not?
12 **A. No. Because I did not have the time to read it**
13 **fully, so -- And I object to the fact that we did not**
14 **comply with trying to accommodate Juan Alonzo's request.**
15 Q. Is today the first day you have actually read
16 the EEOC's determination?
17 **A. This is the first time I read this document,**
18 **yes.**
19 Q. Who at Schlumberger has actually read and
20 reviewed this cause determination dated November the
21 2nd, 2012?
22 **A. As far as I know, I've read various**
23 **communications between Schlumberger and the EEOC, and**
24 **from what I understand is that we engaged with Juan**
25 **Alonzo-Miranda in trying to obtain further medical**

**36**

1 **evidence to justify the request for reasonable**
2 **accommodation, and to that date, I have, to the best of**
3 **my knowledge, seen zero evidence which was given by the**
4 **proper physician who was in charge of Mr. Miranda's**
5 **PTSD. So what I've seen is that in May 2012, my**
6 **colleague Elizabeth Telford was informed through our HSE**
7 **Department of a request for reasonable accommodation.**
8      **As you would all agree, this is not the**
9 **obvious request because it's not something we can see**
10 **straight ahead that this accommodation is required, so**
11 **as per our Schlumberger policy, we engaged in an**
12 **interactive process in trying to obtain further**
13 **documentation through his psychiatrist or physician to**
14 **sign off on the clarification form for reasonable**
15 **accommodation.**
16      **And to this date, we never receive -- we**
17 **did receive one which was signed -- signed and completed**
18 **by the family doctor, if I might say, and most of the**
19 **questions were answered with not applicable, and we had**
20 **in that form no clear evidence, medically speaking, on**
21 **why we should proceed with an accommodation.**
22      **Therefore, we asked for a further review**
23 **with Juan Alonzo-Miranda, and to my knowledge, not only**
24 **was Elizabeth Telford engaged in that process, but also**
25 **people in Houston, being Gaynor Richardson, but also our**

**37**

1 **legal team, who wanted to explain to Juan that we are**
2 **not denying his request; we are just requiring him to**
3 **provide us with the rightful documents and clear medical**
4 **evidence.**
5      **And as I reviewed yesterday the**
6 **documentation which -- given in this case, I also**
7 **realized that the main psychiatrist following Juan**
8 **Miranda's PTSD in May did not sign off on those papers,**
9 **and his notes, or her notes, clearly said that there was**
10 **no evidence that this would support his condition, and**
11 **she also, or he also, added that it would be maybe a**
12 **liability for the dog to be within a Schlumberger**
13 **facility where we have heavy equipment.**
14      **Later on, we've also seen in the, you know,**
15 **documents you provided us that he changed his**
16 **psychiatrist in June, and I believe that new**
17 **psychiatrist did not mention anything about this request**
18 **for accommodation until in November where he or she made**
19 **it very clear that she doesn't believe that there is any**
20 **medical or science evidence or research being done that**
21 **this request accommodation would help Juan Alonzo's, you**
22 **know -- will help him to complete his tasks or do his**
23 **job in a better way, so as far as I know, there is no**
24 **clear evidence of a medical background for us to say**
25 **that, yes, this accommodation was needed.**

38

1    **However, in November, we did decide to**
2    **accommodate and to accept his request for accommodation**
3    **under specific conditions to ensure not only our**
4    **employees' safety, but also Juan Alonzo's dog, being**
5    **Goldie, yeah.**
6        MR. GRIFFIN: Let me object as
7    nonresponsive.
8        Q. Do you remember what the last question was?
9        **A. I do.**
10       Q. What was the last question?
11       **A. You asked me if I -- Your question was also**
12   **pretty long, so could you repeat your question?**
13       Q. No. I think the question was who at -- You
14   said you did not review the determination until today.
15   I asked -- The question was, who at Schlumberger
16   reviewed the determination?
17       MR. DAVIS: You mean Exhibit 2?
18       MR. GRIFFIN: Yes, Exhibit 2.
19       THE WITNESS: It was sent to Leigh Nichols,
20   who is with our HR compliance team.
21       Q. What was done, if anything, by Schlumberger
22   when it received this determination by the EEOC that
23   Schlumberger had in fact violated the Americans with
24   Disabilities Act by not granting Juan's request for
25   accommodation?

39

1        MR. DAVIS: Objection. Form, and that's
2    also outside the scope of the topics listed in the
3    deposition notice, Exhibit 1.
4        THE WITNESS: No.
5        Q. What do you mean, "No"?
6        **A. I cannot tell you who and whether action was**
7    **taken on this document. Again, from my knowledge and**
8    **what I've seen so far, we did engage in various**
9    **communication not only with the EEOC, also with Juan**
10   **Alonzo in regards to his request for his accommodation.**
11       MR. GRIFFIN: Let me object to the
12   nonresponsive portion of the answer.
13       Q. Have you seen any other cause determinations
14   issued against Schlumberger, besides Exhibit 2?
15       **A. No. This is the first time.**
16       Q. Has anyone at Schlumberger ever told you up to
17   today whether or not the EEOC's statements in the cause
18   determination are correct or incorrect?
19       MR. DAVIS: Objection. Outside the scope
20   of the topic list.
21       THE WITNESS: I don't understand the
22   question.
23       Q. Sure. Has anybody said at Schlumberger said
24   that they disagreed with anything in that cause finding?
25       **A. No.**

40

1        Q. Let me show you Deposition Exhibit 3 and ask if
2    you have ever seen that before.
3        **A. So your question about that document was?**
4        Q. When did you first see it?
5        **A. Now.**
6        Q. Well, take a look at it, and I'm going to ask
7    you a couple questions about it.
8        **A. Can I ask for a quick break?**
9        Q. Well, as soon as we get through with this
10   question about this document, we can certainly take a
11   break.
12       **A. Okay.**
13       MR. DAVIS: Just for the record, that's a
14   letter addressed to me, not Schlumberger.
15       Q. Let me just ask you about the third paragraph
16   in the letter. Do you see the statement made "The EEOC,
17   however, did find that your client refused to provide
18   Mr. Alonzo-Miranda a reasonable accommodation that he
19   requested"; do you see that sentence?
20       **A. I see it. But I don't agree with it.**
21       Q. No problem. But the next sentence, "The record
22   shows [that] to this date, your client did not and has
23   not identified any other effective, alternate
24   accommodation for Mr. Alonzo-Miranda in response to his
25   accommodation request," I want you to tell us whether

41

1    Schlumberger agrees with that or disagrees with that.
2        MR. DAVIS: Objection. Outside the scope
3    of the topic list.
4        THE WITNESS: Yeah. I mean, first of
5    all --
6        MR. DAVIS: You don't need to answer that.
7        That is outside the scope of the topic
8    list, and you're asking him about a letter that is
9    addressed to me that he's never seen before.
10       Q. Yes. I just need you to state whether or not
11   you agree or disagree that Schlumberger, by January the
12   18th, 2013, had not as of that date identified any other
13   effective alternate accommodations for Mr.
14   Alonzo-Miranda in response to his request.
15       **A. I disagree.**
16       Q. What other do you know about? What other
17   effective alternate accommodations did Schlumberger make
18   to Juan in response to his request to access his service
19   dog while at work? What other suggestions did
20   Schlumberger make as effective alternate accommodations?
21       MR. DAVIS: Objection. Form.
22       THE WITNESS: Can I take a break now?
23       Q. No. You have to answer first. Then we take a
24   break.
25       **A. Okay. I know that we sent Juan Alonzo a**

JEAN-REMY BELLANGER - VOLUME 1 - August 21, 2014

---

42

1  letter, which I think was sent by Elizabeth Telford, in
2  November 2012 informing Juan Alonzo that indeed we will
3  allow Juan Alonzo to have Goldie under certain
4  conditions at his workplace.
5       Q.  Slow down.  We know about Goldie.  What I'm
6  asking you about are other effective accommodations,
7  besides Goldie, okay?  You understand what I'm asking
8  you?
9       A.  No.
10      Q.  We know -- Excuse me.  We know he asked
11 Schlumberger to allow him to access Goldie the service
12 dog while at work, right?
13      A.  Yes.
14      Q.  The EEOC found that to be a reasonable
15 accommodation, right?
16          MR. DAVIS:  Objection.  Form.
17          THE WITNESS:  No.
18      Q.  Well, that's exactly what Exhibit 2 says, isn't
19 it?
20          MR. DAVIS:  Objection.  Outside the --
21      Q.  I'm not asking you whether you agree with it or
22 not.  I'm asking, that's what the determination says?
23          MR. DAVIS:  Objection.  Outside the scope
24 of the topic list, and the document speaks for itself.
25      Q.  If you disagree that's what the EEOC says in

---

43

1  the determination, I want you to tell me that.
2       A.  Based on the knowledge of the whole process in
3  which we engaged with Juan Alonzo-Miranda, based on the
4  medical documentation I could see, I completely disagree
5  with that statement, as I believe we did engage in the
6  best of our abilities to try to accommodate Juan
7  Alonzo's request.
8       Q.  And what I'm trying to get you to say before we
9  take a break is what other accommodations did you guys
10 suggest to Juan, besides Goldie.  What other
11 accommodations did you suggest or offer to him, other
12 than Goldie, as an accommodation?
13      A.  Based on Juan Alonzo's request, there are no
14 other accommodation requests, other than having his
15 service dog with him at work, which I'm aware of.
16      Q.  So finishing this up then, what the letter says
17 is true, that Schlumberger did not suggest any other
18 effective alternate accommodations for him, besides
19 allowing Goldie at one point, right?
20      A.  No, that's not true.
21      Q.  What other accommodations did Schlumberger
22 suggest to him, other than the dog?
23      A.  We did accommodate his schedule to have him
24 work only on days.  Most -- Not most, but every other
25 employee in his position, being a maintenance

---

44

1  technician, whether it's a trainee or not, has to work
2  on a shift which is a day shift followed by a night
3  shift, and Juan Alonzo was then, you know, as a result
4  of our efforts to accommodate his request, exceptionally
5  being put on day shift only.
6          MR. DAVIS:  He's answered --
7          MR. GRIFFIN:  Let's --
8          MR. DAVID:  -- the question.  He's answered
9  your question --
10         MR. GRIFFIN:  Since we --
11         MR. DAVID:  -- and he wants to take a
12 break.
13         MR. GRIFFIN:  Since you've answered that
14 question, and I thank you for that, let's take about a
15 five-, ten-minute break.
16         THE WITNESS:  Appreciate it.  Thank you.
17         (Recess.)
18      Q.  Where we left off, I'll ask you to look at the
19 topic list, if you don't mind, for a moment, and I will
20 ask you to look at topic number four and let me know
21 when you're there.
22      A.  I'm there.
23      Q.  Tell the jury of any suggested accommodations
24 offered by Schlumberger to Juan.
25      A.  So Schlumberger in November 2012 sent out a

---

45

1  letter informing Juan Alonzo that he would be allowed to
2  bring his service dog within a specific area and to have
3  the dog being kept within a kettle (sic).
4          Further to that, his work shift was
5  accommodated as well because people in his position,
6  employed in his position, work days on and then, after
7  three days off, go back to night shift, so we decided to
8  keep him only on day shift.
9       Q.  When were those two accommodations suggested,
10 Goldie and the day-shift issue?
11      A.  So --
12      Q.  I'm talking about the dates.
13      A.  Oh.  It was before my time in San Antonio, so I
14 know the letter about Goldie was sent in November 2012,
15 and I believe it is within the documents you will have.
16      Q.  And what about the day-shift issue?  When did
17 that happen?
18      A.  I don't know when the decision was made for
19 that, but I know that he was accommodated.
20      Q.  But what rule was abrogated with respect to the
21 day shift?  I mean, what rule was being changed to do
22 that?
23      A.  A rule?
24      Q.  Yeah.  I mean, what was Schlumberger doing to
25 accommodate?  What policy were they changing?  What rule

---

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

---

46

1 were they modifying?  What were they doing differently
2 in allowing him to be on day shift?
3          MR. DAVIS:  Objection.  Form.
4     Q.  You understand my question?
5     **A.  I understand.  But there's no rule.  We have**
6 **everybody on a similar work schedule, and as an**
7 **employer, we have to be consistent with all employees**
8 **within the same position, so we made an exemption for**
9 **Juan to be working on days only within that position.**
10    Q.  But allowing a person to work on day shift
11 doesn't violate any rule at Schlumberger, does it?
12    **A.  Again, we don't have work schedule rules.**
13    Q.  Let me ask you this then:  What is your
14 definition of what an accommodation is?
15    **A.  As it was stated, an accommodation is we look**
16 **at, let's say, how the people in the same position are**
17 **doing their job, whether it's in regards to the tools**
18 **they use, whether it's in regards to the environment**
19 **they are in, and we try, to the best abilities of what**
20 **is feasible to the business, to accommodate the request**
21 **whenever it is, you know, in our mind, justified.**
22          MR. GRIFFIN:  Let me object to
23 nonresponsive.
24    Q.  What is your definition of accommodation; what
25 does the word mean?

---

47

1     **A.  The word means to derogate from a certain**
2 **practice or rule or policy which applies to similar**
3 **people in a certain job, since we're talking about jobs,**
4 **and to change it in a way it helps the employee to be**
5 **able to do his job in a better way.**
6     Q.  No problem.  So in this particular case, you
7 mentioned the day, the working days, and the dog,
8 correct?
9     **A.  M-hm.**
10    Q.  What rule or practice was -- is in place at
11 Schlumberger about dogs at Schlumberger's workplaces?
12    **A.  Schlumberger doesn't normally allow employees**
13 **to have their dogs on their workplace, and for that,**
14 **there's a simple reason:  We work in work environments**
15 **which might pose a threat not only to the animal itself,**
16 **but also to the employees involved in that work**
17 **environment.**
18    Q.  Is that written down anywhere?
19    **A.  Sorry?**
20    Q.  Is that written down, or is that something
21 you're just saying to us?
22    **A.  I'm explaining you the business, so I'm not**
23 **stating here any policy.**
24    Q.  Right.  But when you defined accommodation for
25 me, you said it was a derogation of a rule or practice

---

48

1 at Schlumberger, and I'm asking you, is there -- Let's
2 say you have an employee that doesn't have a disability
3 that wants to bring his dog to work.  Is there a written
4 rule or policy Schlumberger says that people can't bring
5 their dog to work?
6     **A.  To my knowledge, our US employee handbook does**
7 **not mention anything about dogs, but again, here I might**
8 **be wrong because it's a really, you know, detailed**
9 **description of our practices, so here again, you know,**
10 **I'm telling you that to the best of my knowledge, no, we**
11 **have nothing in regards to dogs.**
12    Q.  Now, what about memos, directives of any kind
13 that say that workers should not be able to bring their
14 dogs to work?
15    **A.  No.**
16    Q.  Is there a -- Well, if a worker brings a dog
17 to work, is that violating any policy or doing anything
18 wrong vis-a-vis Schlumberger?
19    **A.  Yes.  To a certain extent, because we have very**
20 **strict HSE, health, safety and environment, rules which**
21 **apply to every employee, depending on the work**
22 **environment he works in, and these HSE rules would apply**
23 **to human beings, but would also apply to animals, but**
24 **the thing is, you know, we need to look first at how we**
25 **apply HSE rules and make sure that our employees work in**

---

49

1 **a safe environment before we can look into a request to**
2 **bring a dog in.**
3     Q.  But let's say they don't request.  Now, what
4 I'm asking is not where somebody asks or requests, where
5 a worker brings a dog to work and either stakes the dog,
6 puts him in a kennel, whatever, says, "I want my dog at
7 work with me."  This person doesn't have a disability,
8 just wants to bring their dog to work because nobody
9 will take care of the dog.
10    **A.  Yeah.**
11    Q.  Does that violate a rule or not?
12    **A.  It would definitely violate our insurance rules**
13 **because the dog would not be insured by our company**
14 **insurance, right?  I mean, it's the same thing as**
15 **bringing within a maintenance yard where you have heavy**
16 **equipment -- you cannot bring your own children.  The**
17 **same applies, due to safety reasons, to dogs.**
18    Q.  So if I'm hearing you right, it would be
19 against the rule for a worker to bring a dog to work?
20    **A.  It would be against HSE policies.**
21    Q.  Does the policy say that, or is that something
22 you are --
23    **A.  It's an interpretation.**
24    Q.  Great.  Now, what is your geographic area where
25 you're in charge of HR?

---

50

1   **A. So I'm in charge of all of south Texas, which**
2   **includes San Antonio, Von Ormy, Alice, Corpus Christi,**
3   **Alice again -- sorry -- Laredo, Pleasanton, Iowa Colony,**
4   **and I might have forgotten a few, but yeah.**
5   Q. Laredo is in yours?
6   **A. Laredo is in mine, yeah.**
7   Q. And tell the jury as best you can, who is
8   Fiido, a dog named Fiido?
9   **A. I have no knowledge of Fiido.**
10  Q. You don't?
11  **A. No.**
12  Q. Never seen Fiido in Laredo?
13  **A. No.**
14  Q. Have you been to Laredo?
15  **A. Yes.**
16  Q. You've been to the yard?
17  **A. I've been to the yard, yeah.**
18  Q. Let me show you Exhibit No. 4 and ask if
19  you'd --
20        MR. DAVIS: Hang on. Let me see that.
21  Q. -- tell us what that is.
22  **A. It's a print-screen of a Facebook page.**
23  Q. Are you aware of whether or not the
24  Schlumberger location in Laredo actually has a dog on
25  premises as the location's mascot?

51

1         MR. DAVIS: Objection. Outside the scope
2   of the corporate rep notice.
3         THE WITNESS: (Shook his head from side to
4   side).
5   Q. You shook your head. Are you or are you not
6   aware that --
7   **A. I'm not aware of any dog being a mascot of the**
8   **Laredo district.**
9   Q. And let me just show you Exhibit No. 5 and ask
10  if you can identify the blue uniforms in the photographs
11  as being Schlumberger uniforms.
12        MR. DAVIS: Hang on. Let me see that.
13        THE WITNESS: Can you reiterate the
14  question?
15  Q. Sure. Can you identify the uniforms as being
16  Schlumberger uniforms on the exhibit?
17  **A. Yeah. Those are Schlumberger uniforms.**
18  Q. And this is within your responsibility in HR,
19  Laredo, is it not?
20  **A. It is indeed.**
21  Q. And if we look through the equipment in the
22  pictures, we can see that there's Schlumberger
23  equipment, can we not?
24  **A. I cannot tell you if it's Schlumberger**
25  **equipment. Some of the equipment is being run by**

52

1   **third-party-providers and still have the Schlumberger**
2   **logo on it, so I cannot tell you whether it's -- that**
3   **would be owned by Schlumberger.**
4   Q. Do you recognize any of the scenes in the
5   photographs from your visits to Laredo?
6   **A. I recognize the shop.**
7   Q. And let me just ask you, can you explain to the
8   jury in any way how it could be that the Laredo
9   Schlumberger location would have a pet dog running loose
10  around the premises while denying for several months
11  Juan Alonzo-Miranda's request to have a service dog to
12  help him manage PTSD at work?
13        MR. DAVIS: Objection. Form and outside
14  the scope of the corporate rep notice.
15        THE WITNESS: Can you reiterate the
16  question?
17  Q. Sure. Can you explain to the ladies and
18  gentlemen of the jury how it is or how it could be that
19  the Schlumberger location in Laredo has a dog as a pet
20  mascot running around while at the same time denying an
21  Iraq war veteran's request to have a service dog at the
22  San Antonio location?
23        MR. DAVIS: Objection. Form and outside
24  the scope of the deposition notice.
25        THE WITNESS: So as I said, I'm not aware

53

1   of Laredo having a dog as the mascot or representing the
2   Laredo yard. What I can say, however, with -- in
3   regards to Juan Alonzo's request for accommodation in
4   bringing his dog to work is that it was never denied,
5   and throughout and since we were made aware of this
6   request, we fully engaged in an interactive process in
7   trying to understand the medical evidence behind his
8   request for accommodation.
9         MR. GRIFFIN: Let me object to the
10  nonresponsive portion of the answer.
11  Q. My question is, is there any explanation that
12  you have, and if you don't, it's okay, but is there any
13  explanation for how it could be that for several months,
14  Mr. Alonzo was not allowed to have his service dog at
15  the San Antonio location to accommodate a disability
16  when the Laredo Schlumberger location had a pet dog at
17  the premises running around loose?
18        MR. DAVIS: Objection. Form and outside
19  the scope of the corporate rep notice.
20        THE WITNESS: It's interesting you said to
21  accommodate and help his disability because as I said,
22  again, we tried to the best of our ability to understand
23  how a dog would help him to address or support his
24  well-being in regards to his disability, and since
25  that -- since the time we've engaged in that process, we

JEAN-REMY BELLANGER - VOLUME 1 - August 21, 2014

---

**54**

1  have, again, zero evidence that his service dog at work
2  would help him in any form, so again, zero evidence.
3  　　　　MR. GRIFFIN: Let me object to responsive.
4  　Q. Do you remember what the question was?
5  　**A. Yes.**
6  　Q. What was the question?
7  　**A. You have long questions, sir, so --**
8  　Q. Do you remember it or not?
9  　**A. I do remember.**
10 　Q. Well, then --
11 　**A. But I --**
12 　Q. Tell us as best you can what you remember the
13 question to be.
14 　**A. You asked me if you think it's normal for us**
15 **not to accept his request for accommodation while we**
16 **have a dog in Laredo running loose, and I wanted to**
17 **specifically focus on, one, the first part of your**
18 **question.**
19 　Q. That was not my question. My question is,
20 there any explanation that you have for the jury why a
21 dog would be permitted as a pet at --
22 　**A. That was not your question.**
23 　Q. Well, let's not --
24 　**A. Your question was longer than that, sir, so if**
25 **you want to --**

---

**55**

1  　Q. See, we can't get into an argument over what my
2  question was. All I can do is --
3  　**A. I don't, but --**
4  　Q. But now you're --
5  　**A. -- you obviously want that.**
6  　Q. Now you're interrupting, okay? We've got to
7  let each other talk and let each other finish, so I'm
8  going to try this question.
9  　　　Do you have any explanation of how it could
10 be at Schlumberger that they would allow a pet dog
11 running around the Laredo location while at the same
12 time denying a service dog for several months during the
13 year 2012? If you --
14 　　　　MR. DAVIS: Objection.
15 　Q. If you have an explanation for how that dog is
16 allowed and this one is not, I want you to tell the
17 jury.
18 　**A. Your question --**
19 　　　　MR. DAVID: Hang on.
20 　　　　THE WITNESS: -- has two parts.
21 　　　　MR. DAVIS: Hang on, hang on.
22 　　　　Objection. Form and outside the scope of
23 the corporate rep notice.
24 　Q. You just blurted out there were two questions,
25 so --

---

**56**

1  　**A. No. You got two parts in your question, so**
2  **first part is I'm not aware of that dog being on our**
3  **premises. Second --**
4  　Q. But if he is, is that right or wrong?
5  　　　　MR. DAVIS: Objection. Form.
6  　　　　THE WITNESS: If you let me finish
7  responding to your question, right? The second part is
8  we never denied Juan Alonzo's request for an
9  accommodation.
10 　Q. Do you agree with me that between the period of
11 May 2012 and November 2012, you would not allow him to
12 use his service dog at the Schlumberger location in San
13 Antonio, Texas? Does Schlumberger deny that?
14 　**A. Again, we did not deny. We wanted to review**
15 **further medical evidence to help us understand how a**
16 **service dog at a workplace such as a maintenance yard**
17 **would be of any benefit for Juan Alonzo's --**
18 　Q. What benefit is the dog in Laredo --
19 　**A. -- condition.**
20 　Q. -- to anybody?
21 　　　　MR. DAVIS: Objection. Form.
22 　　　　THE WITNESS: Sorry?
23 　Q. What benefit of the dog in Laredo is it to
24 anybody?
25 　**A. I --**

---

**57**

1  　　　　MR. DAVIS: Objection. Form, and it's
2  outside the scope of the corporate rep notice. He's
3  already said he doesn't have any knowledge of the dog
4  being in Laredo --
5  　　　　MR. GRIFFIN: Object to --
6  　　　　MR. DAVID: -- so he can't answer that
7  question.
8  　　　　MR. GRIFFIN: Object to the form.
9  　Q. Is it against any rules at Schlumberger for the
10 Laredo Schlumberger location to have a pet dog running
11 around its location?
12 　**A. Again, these are pictures. I cannot confirm**
13 **nor validate whether we have a pet dog at the Laredo**
14 **yard, as I'm not aware of that.**
15 　Q. When you determine -- You will make calls this
16 afternoon?
17 　**A. That's for sure.**
18 　Q. And when you find out that they've got Fiido
19 out there and that he's on Facebook and that he runs
20 around the location, what are you going to do?
21 　　　　MR. DAVIS: Objection. Form.
22 　　　　You don't need to answer that. Don't
23 answer that.
24 　　　　MR. GRIFFIN: Certify that question,
25 please.

---

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

58

1    Q. Is it against the rules or not for the Laredo
2  location to have a pet dog on the premises?
3           MR. DAVIS: Objection. Form and outside
4  the scope of the corporate rep notice.
5           THE WITNESS: As I said, I'm not aware of
6  any dog.
7    Q. I know you're not, but would it be against the
8  rules for them to have that dog or not?
9    **A. Again, you're mentioning a specific situation,**
10 **so every specific situation is being dealt on a**
11 **case-to-case approach, as in Juan Alonzo's case.**
12   Q. So can you tell the judge whether or not it's
13 against Schlumberger's rules for the Schlumberger people
14 of Laredo to have a pet dog running around their
15 premises?
16          MR. DAVIS: Objection. Form and outside
17 the scope of the corporate rep notice.
18          THE WITNESS: I will reiterate my response
19 that I'm not aware of any dog in Laredo, and I can't
20 give you, you know, hypothetic --
21   How do you put that?
22   Q. Why can't you? You're supposed to know the
23 rules, aren't you?
24          MR. DAVIS: Objection. Form. You --
25   Q. Aren't you supposed to know the rules?

59

1           MR. DAVIS: Objection. Form. You're just
2  arguing with him.
3    Q. Aren't you supposed -- as the HR person,
4  supposed to know the rules, the workplace rules, for
5  Schlumberger?
6    **A. I'm very well familiar with the workplace rules**
7  **for Schlumberger, and I cannot tell you what we would do**
8  **in a specific case which I'm not aware of.**
9    Q. Why can't you tell me that?
10          MR. DAVIS: Objection. Form.
11          THE WITNESS: Because every case is being
12 reviewed not by one decisionmaker, but by various
13 stakeholders in the company, which involves, of course,
14 myself, the local HR representative, but as well our
15 compliance and legal team, so if I would give you an
16 answer right now, that would not be, you know, an honest
17 answer because I cannot tell you what would be the
18 outcome as of now.
19   Q. Who would decide?
20   **A. As for any accommodation request --**
21   Q. No, no, no. Slow down. We're not
22 communicating.
23          MR. DAVIS: Let him answer.
24   Q. No. I can tell we're not communicating, and --
25          MR. DAVIS: Well, you're interrupting him.

60

1    Q. -- we're short of time.
2        So we're not talking about the
3  accommodation for Juan. We're talking about the dog in
4  Laredo, okay?
5    **A. M-hm.**
6    Q. The question is about the rules that apply to
7  that. I'm trying to figure out for you to tell the
8  judge and the jury what process people were supposed to
9  go through at Schlumberger to have a dog in Laredo
10 that's their pet dog, their mascot. What should they
11 have done to get permission to have that dog there?
12          MR. DAVIS: Objection. Form and outside
13 the scope of the corporate rep notice.
14          THE WITNESS: Sir, I'm not aware of any dog
15 in Laredo, so as of now, I would have to make an
16 investigation to look into that case. I --
17          MR. GRIFFIN: Let me object to the
18 nonresponsive portion of the answer.
19   Q. But in any event, that's what you're going to
20 do, is investigate the situation with the dog in Laredo?
21   **A. That's a company decision.**
22   Q. But that's HR, right?
23   **A. HR works hand in hand with different**
24 **stakeholders in the company, being the compliance and**
25 **legal team as well.**

61

1    Q. Now, tell us, at Schlumberger, where did the
2  buck stop when it comes to Schlumberger's refusal to
3  allow --
4    **A. I didn't get that expression, where the buck**
5  **stops.**
6    Q. We're going to have to not interrupt.
7    **A. You're interrupting me very often, so once in a**
8  **while, I interrupt you because you use an expression**
9  **which I'm not familiar with.**
10   Q. But in the future, let me finish the question,
11 and then say you don't understand it; is that okay
12 with --
13   **A. Okay. Can we work on a principle of**
14 **reciprocity --**
15   Q. But you're --
16   **A. -- where what you ask me applies to yourself as**
17 **well?**
18   Q. See, you're doing it again. Now, are we
19 agreeable or not that when you don't understand
20 something I'll ask you, you'll let me finish the
21 question before you tell me you're not understanding; is
22 that okay with you?
23   **A. I agree if you'll also let me finish my**
24 **answers, right.**
25   Q. Absolutely. Now, who makes the final decision

62

1 at Schlumberger when a worker with a disability needs an
2 accommodation in the workplace?
3     A. So the process starts with our local HR rep,
4 who engages in an interactive process to inform first
5 the employee of the documentation we need in order to
6 review his request. This is being done in written as
7 well, and once we obtain the required documentation, the
8 documentation is not only reviewed by the local HR, but
9 by HR in our headquarters as well as with the compliance
10 team and the legal team.
11     MR. GRIFFIN: Let me object to the
12 responsiveness.
13     Q. Do you remember what my last question was?
14     A. You asked me who are the people involved in --
15     Q. No.
16     A. -- the process.
17     Q. Thank you for telling me that. No, that was
18 not my question. My question was, who makes the final
19 decision of whether or not an accommodation sought by a
20 worker with a disability is granted or not?
21     A. We don't have one person in the company who
22 makes a decision on those kind of requests. Those
23 requests are being reviewed and agreed up in joint --
24 Let's say, well, it's a compromise or a joint agreement.
25     Q. So there's no final decisionmaker?

63

1     A. It needs to be between the different parties
2 involved.
3     Q. Who has what -- How does that work? Who gets
4 to decide? Who are the people? Who are the officers?
5 How does it work?
6     A. As I said, local HR is the main person involved
7 with interacting with the employee and ensuring that we
8 engage properly in the interactive process. Once we
9 have the documentation, the case is reviewed by our
10 compliance team, and once they have reviewed that, and
11 our legal team, we can then sit down together and look
12 at the request in regards to also our business
13 accommodation needs.
14     Q. But who decides whether it's to be granted or
15 not granted?
16     A. Within a company like Schlumberger, we do not
17 take decisions at a level which is a local level. We do
18 it in agreement with, let's say, other people involved,
19 and I already mentioned them to you before.
20     MR. GRIFFIN: Let me object as
21 nonresponsive.
22     Q. Is this process by which Schlumberger decides
23 when to grant or not grant a worker's request for
24 accommodation documented anywhere where the jury could
25 actually read how you decide whether to grant or not

64

1 grant an accommodation?
2     A. We don't have a written process for the
3 decision-making process of accommodations. It's, again,
4 a joint effort by different stakeholders to review and
5 approve together a decision.
6     MR. GRIFFIN: Let's have this marked. Is
7 it 6, Judy; is that where we are?
8     COURT REPORTER: Yes.
9     MR. GRIFFIN: There we go, and we can also
10 mark 7 as well.
11     (Exhibits 6 and 7 marked.)
12     Q. Let me show you what's marked as Exhibit No. 6
13 and ask you first whether you've seen that before.
14     A. Yes.
15     Q. When did you first see that?
16     A. I've seen it yesterday.
17     Q. Can you see from Exhibit No. 6 that in May of
18 2012, that Juan requested accommodation of his service
19 dog?
20     A. What I see is that Juan did not inform directly
21 HR or his direct management line, but he mentioned or
22 informed a team of our health, safety, environment
23 department of his condition and request to -- for an
24 accommodation.
25     MR. GRIFFIN: Let me object as

65

1 nonresponsive.
2     Q. Tell me whether you -- Schlumberger takes the
3 position that Juan did not or did request an
4 accommodation to bring his service dog to work in May
5 2012.
6     A. He did inform through our health, safety,
7 environment team his desire, need, request, for a job
8 accommodation, but it did not go directly to HR or his
9 manager at that time.
10     Q. And who is the letter written by?
11     A. So the HSE team obviously forwarded that
12 request to our HR rep, Elizabeth Telford, who took
13 initiative to initiate direct communication with Juan on
14 May 8th, 2012.
15     MR. GRIFFIN: Let me object to
16 responsiveness.
17     Q. My question was, who signed the letter?
18     A. The letter was signed by Elizabeth Telford, our
19 HR representative at that time.
20     Q. What does she tell Juan that he needs to do?
21     A. She explains him that we have been made aware
22 through the HSE team of his request for a job
23 accommodation in order to perform the essential
24 functions of his job, and my colleague explains him the
25 documents we require in order to review his request,

66

1 **which is a medical release form to be signed and the**
2 **clarification accommodation form to be filled out and**
3 **signed by the person treating his condition.**
4 Q. Anything else that Ms. Telford demanded from or
5 asked of Juan?
6 **A. That's all I can see in that letter.**
7 Q. I'm going to ask if Exhibit No. 7, you can
8 confirm Juan's authorization for the physicians to
9 deliver information to Schlumberger regarding his
10 accommodation request.
11      MR. DAVIS: Objection. Form.
12      MR. ALONZO-MIRANDA: Can I see that?
13      MR. GRIFFIN: See what? This? Sure.
14      MR. ALONZO-MIRANDA: Thank you.
15 Q. Your answer was?
16 **A. I forgot the question.**
17 Q. The question was, can you see that that's
18 what -- that Juan had signed an authorization for
19 physicians to discuss his case with Schlumberger?
20      MR. DAVIS: Objection. Form.
21 Q. You nodded your head, but we need you to say
22 yes.
23 **A. I see that that's a request being made by Juan**
24 **Alonzo to his doctor to have his medical -- to have some**
25 **medical information being shared with his employer.**

67

1 Q. With his who?
2 **A. Employer.**
3 Q. That's Schlumberger, right?
4 **A. At that time, yes.**
5 Q. And it says there that it authorizes Juan's --
6 authorized Juan's providers to discuss his situation
7 with any "physician of my employer's choosing." The
8 employer there being referred to is Schlumberger, right?
9 **A. Yes.**
10 Q. Did Schlumberger ever, in the entire period
11 between May of 2012 and November of 2012 -- ever seek
12 out any guidance from any physician regarding PTSD or
13 Juan's request for an accommodation at work?
14 **A. I'm not aware of any request at that time.**
15 Q. Was there any rule against HR at Schlumberger
16 seeking out expertise about PTSD or service dogs?
17 **A. No. We don't have any rule specifically about**
18 **PTSD or service dogs.**
19 Q. Does Schlumberger have any explanation why it
20 didn't seek out its own expertise or advice about PTSD
21 when Juan asked that the service dog be allowed to come
22 to work with him on or about May the 8th, 2012?
23      MR. DAVIS: Objection. Form and also calls
24 for invading the attorney-client privilege.
25      THE WITNESS: So our process in every type

68

1 of accommodation request is to reach out to the employee
2 and have him or her provide us with medical
3 documentation or evidence to support his request or her
4 request.
5      MR. GRIFFIN: Let me object to
6 responsiveness.
7      Would you mind reading that last question
8 back?
9      (Record read.)
10      THE WITNESS: I stick to the previous
11 answer I gave.
12 Q. But we agree Schlumberger did not seek out any
13 help of its own in trying to reach an agreement with
14 respect to Juan on his request for an accommodation
15 regarding the service dog that he made on or about May
16 the 8th, 2012, right?
17      MR. DAVIS: Objection. Form and calls for
18 an invasion of the attorney-client privilege.
19      THE WITNESS: As per our process, and we
20 are very consistent in regards to every type of request
21 we receive, the documentation is provided by the
22 employee to help us to make the assessment.
23 Q. But you can see that's not true in Exhibit 7
24 because the Schlumberger form refers to "a physician of
25 my employer's choosing," okay? Do you see where it

69

1 talks about Schlumberger's -- a physician of
2 Schlumberger's choosing on the second paragraph of the
3 authorization that was given for Juan to sign?
4      Second paragraph, second line talks about
5 "a physician of my employer's choosing." You've told me
6 that Schlumberger did not choose or hire anyone to give
7 Schlumberger any advice or information about PTSD or
8 Juan, correct?
9      MR. DAVIS: Objection. Form.
10 Q. Am I right in saying that?
11      MR. DAVIS: Objection. Form and calls for
12 invasion of the attorney-client privilege.
13      THE WITNESS: Can you repeat again your
14 question?
15 Q. Sure. We know, don't we, that Schlumberger did
16 not hire a physician or anyone else to give it any
17 advice about PTSD or Juan's situation, right?
18      MR. DAVIS: Objection. Form and asks to
19 invade the attorney-client privilege.
20 Q. You've nodded your head, but we need you to say
21 yes.
22 **A. I'm not aware of Schlumberger reaching out to**
23 **any expert on that matter to have a separate opinion.**
24 Q. Well, why -- If Schlumberger can choose a
25 physician to help it, why did it not do so here with

70

1  Juan?
2      **A.  What I believe here, when we say an employer's**
3  **choosing, might also refer to a physician or any medical**
4  **provider who might be approved by the Schlumberger**
5  **benefits coverage, but that's my interpretation right**
6  **now.**
7      Q.  So I know that's your interpretation of the
8  letter, but my question is, if Schlumberger can hire a
9  physician of its choice to assist it during the
10  accommodation process, why wasn't that done here for
11  Juan?
12      **A.  I was not involved in that process at the time**
13  **in 2012, so I cannot give you any information in why we**
14  **did not do that.**
15      Q.  Right.  But speaking for Schlumberger, I'm
16  asking you to give Schlumberger's position on it, not
17  yours, J.R., but the company's position on why it didn't
18  hire any physicians to assist it in addressing this
19  request for an accommodation for PTSD.
20      **A.  Still, as a company representative, I do not**
21  **know the exact circumstances of the reason why we did**
22  **not reach out for a specialist at that time to get -- to**
23  **make out the company's opinions on that.**
24      Q.  Are you aware, J.R., that the company has hired
25  a doctor to give information on PTSD after it got sued

71

1  in this case?
2      **A.  I'm not aware of that either.**
3      Q.  No one has told you that Schlumberger has hired
4  a doctor to give expert testimony in this lawsuit; you
5  didn't know that?
6      **A.  No.**
7          **May I quickly go to the toilet?**
8          MR. GRIFFIN:  Certainly.  We can take a
9  five-minute break, yep, yep, yep.
10      (Recess.)
11  Q.  Now, let's start with --
12      **A.  Hold on just a second.  Sorry.**
13          **Okay.**
14  Q.  Let's start with topic one, if we might.
15      **A.  Okay.**
16  Q.  And let me just ask you this:  Does
17  Schlumberger believe that Juan Alonzo was not capable of
18  performing the essential functions of his job?
19      **A.  No.**
20  Q.  When did Schlumberger first become aware that
21  Juan is a person who has post-traumatic stress disorder?
22      **A.  I believe Schlumberger became aware when we**
23  **started to engage in that interactive process for a job**
24  **accommodation.  In my personal case, taking over all HR**
25  **for south Texas, I did not -- I've not been aware of**

72

1  **Juan's PTSD until after his termination.**
2          MR. GRIFFIN:  Let me object as
3  nonresponsive.
4      Q.  I'm not asking when you became aware of
5  anything.  I'm asking when Schlumberger first became
6  aware that Juan had PTSD.
7          MR. DAVIS:  Objection.  Form.
8      Q.  Speaking for the company.
9      **A.  I would say it was in 2012.  Now, when exactly**
10  **it was disclosed, that's something I don't know.**
11      Q.  Before May 8th, 2012, or did they learn it for
12  the first -- Schlumberger take the position it learned
13  it for the first time on May the 8th, 2012?
14          MR. DAVIS:  Objection.  Form.
15          THE WITNESS:  I don't know, sir.
16      Q.  And you've not found that out from anyone else
17  at Schlumberger, when it first learned that plaintiff
18  had PTSD?
19      **A.  It was, I believe, in H one half year of 2012.**
20  **Exactly when, I will not be able to tell you.**
21      Q.  And tell us how you were trained as to what the
22  word "interactive" means.
23      **A.  Interactive means we first ensure that the**
24  **employee is aware of the requirements, and now it's time**
25  **to proceed with a review based on facts, and we make**

73

1  **sure that we give him the documents he needs to bring us**
2  **back, communicate as well to do follow-ups with the**
3  **employee as of the status of his request.**
4      Q.  Anything else that you were taught about what
5  interactive means?
6      **A.  Interactive means engaging different persons to**
7  **look at the process or to assess a certain situation.**
8      Q.  What does Schlumberger see as its
9  responsibilities in the interactive process to help
10  identify accommodations to allow workers with
11  disabilities to successfully work?
12      **A.  Can you repeat that again --**
13      Q.  Sure.
14      **A.  -- and make it shorter?**
15      Q.  Yes.  What does Schlumberger see as its
16  responsibilities in the accommodation process, the
17  interactive process to identify accommodations that will
18  allow a worker with a disability to successfully perform
19  the essential functions of the job?
20          MR. DAVIS:  Objection.  Form.
21          THE WITNESS:  Do you mind reiterating the
22  question again, sir?
23      Q.  She can read it back, no problem.
24      (Record read.)
25          THE WITNESS:  So Schlumberger first of all

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

74

1  gives, I think, every employee a job opportunity if the
2  person shows the right abilities, capabilities to do his
3  job. So once the company becomes aware of any need for
4  an accommodation, we try to the best of our abilities,
5  after business constraints which come with it, to look
6  at the accommodation request and inform the employee of
7  its feasibility and also of the process he needs to
8  engage with the company to obtain an outcome.
9          (Exhibit 8 marked.)
10     Q.  Is that your best answer to how Schlumberger
11  sees its responsibilities to a worker with a disability
12  who has sought an accommodation that would allow
13  successful performance of the essential functions?
14          MR. DAVIS:  Objection.  Form.
15     Q.  Is that your best answer to that question?
16          MR. DAVIS:  Objection.  Form.
17          THE WITNESS:  I would just add that we do
18  whatever is in our hands, and if it's justified --
19  That's very important.  If it's justified and we have
20  clear evidence of the benefit it will bring to the
21  employer -- to the employee in regards to his job
22  performance or the quality of his job, we'll do whatever
23  it takes to address and look at the request.
24          MR. GRIFFIN:  Let me object to
25  nonresponsive.

75

1     Q.  So in this particular case, would I be right in
2  saying that Schlumberger's role in the accommodation
3  process between May and November of 2012 was asking
4  things from Juan, asking him to bring Schlumberger
5  documents; is that true or not true?
6     **A.  During that time period, we were communicating,**
7  **liaising with Juan Alonzo in order to obtain further**
8  **information and medical evidence to make a decision on**
9  **his request.**
10     Q.  And who made those decisions?
11     **A.  We addressed that, I believe, before, and it's**
12  **a joint process between different stakeholders in the**
13  **company.**
14     Q.  Who are --  Name them, every last one of them,
15  every last one of them that participated in the decision
16  making from May 2012 all the way to November 2012.  Who
17  made the decisions?
18     **A.  Do you want the roles or the actual names?**
19     Q.  The names.
20     **A.  So Elizabeth Telford, Richard -- Gaynor**
21  **Richardson, David Dunn, Leigh Nichols, Judy Lawton.**
22          **Thinking of other people who I don't recall**
23  **their names, under the operations manager, which at that**
24  **time was a different one.**
25     Q.  Who is the highest-ranking person of the ones

76

1  that you just listed who were involved in the decision
2  making between May of 2012 and November of 2012 with
3  Schlumberger?
4     **A.  The two highest person I just listed would be**
5  **Gaynor Richardson and Judy Lawton, and both act and**
6  **interact with each other as direct peers.**
7     Q.  What is Gaynor --  Is it Gaynor, did you say?
8     **A.  Yeah.**
9     Q.  What is her title?
10     **A.  The Production Group HR Manager for North**
11  **America Land.**
12     Q.  And Judy Lawton, what is her title?
13     **A.  She is the HR Compliance Manager for North**
14  **America Land.**
15     Q.  Are they officers in the company?
16     **A.  Sorry?**
17     Q.  Are they officers?
18     **A.  What do you understand with officers?**
19          MR. DAVIS:  Objection.  Form.
20     Q.  Well, do they have executive management
21  authority?
22     **A.  Yeah.**
23          MR. DAVIS:  Objection.  Form.
24     Q.  Let me ask you this:  Is Exhibit 8 a document
25  that Juan gave to Schlumberger at Schlumberger's

77

1  request?
2     **A.  Yes.**
3     Q.  And what date did Schlumberger receive that
4  document from Juan?
5     **A.  If I'm not mistaken, that should be in June**
6  **2012, and it was signed by a family doctor, and from**
7  **what I --**
8     Q.  Does it say "family doctor," or are you just
9  saying that?
10     **A.  It doesn't say it.  But --**
11     Q.  What does it say?
12     **A.  -- based on the research, it says "Internal**
13  **Medicine," "Dr. Barbara Roach."**
14     Q.  Do you understand in the United States that
15  internal medicine physicians are different than family
16  physicians?
17     **A.  I let it up to your interpretation.**
18     Q.  No.  But I need your interpretation.  That's
19  why I'm asking you.
20     **A.  So when I look at this form, I see that most of**
21  **the questions have been answered by not applicable or**
22  **very -- or just one word, and this document or these**
23  **answers do not give us any explanation of how he**
24  **would -- this accommodation would benefit Juan Alonzo or**
25  **any clear medical evidence that it's required.**

78

1           MR. GRIFFIN: Let me object to
2    nonresponsive.
3           Q.  You remember what my question was?
4           **A.  You can repeat the question if you want.**
5           MR. GRIFFIN: If you don't mind, let him
6    know what the question was.
7           (Record read.)
8           Q.  Yeah.  What is your understanding is the
9    difference between family physicians and internal
10   medicine physicians?
11          **A.  I don't have the answer.**
12          Q.  Let me ask you this:  If there's not, it's
13   okay, but is there a reason why you are not answering my
14   questions directly when I'm asking you about the
15   exhibits?
16          MR. DAVIS: Objection.  Form.
17          You don't need to answer that.
18          THE WITNESS: Okay.
19          MR. DAVID: That's just argumentative.
20          THE WITNESS: I won't answer.
21          Q.  You will not answer?
22          **A.  Yeah.**
23          Q.  Who in the United States can prescribe
24   medicine?
25          **A.  I won't answer to this either.**

79

1           MR. DAVIS: Objection.  Form.
2           Q.  Excuse me?  You won't answer that either?
3           **A.  No.**
4           Q.  You don't --
5           MR. DAVIS: If you know the answer, it's --
6           THE WITNESS: No.
7           Q.  Are you refusing or not refusing?  Because you
8    said you were.
9           MR. DAVIS: Don't refuse.  Just tell him if
10   you know what the law is on who can prescribe medicine
11   or not.
12          MR. GRIFFIN: Object to the side-bar.
13          Counsel, I'm going to ask you not to --
14          MR. DAVIS: I'm telling him not --
15          MR. GRIFFIN: Let me finish.
16          MR. DAVID: -- don't refuse to answer.
17          MR. GRIFFIN: Don't interrupt, please.  I
18   promise I'll let you make your speech when you want to,
19   but my understanding of the rules, you're not supposed
20   to be coaching him and making speaking statements.  He
21   has refused to answer that question, and you have then
22   interrupted the deposition and asked him -- given him
23   instruction.  I don't think you should give him
24   instruction while I'm asking him questions.  I'm going
25   to proceed again.

80

1           Q.  Are you aware, sir, that in the United States,
2    that -- which health care providers can prescribe
3    medicine?
4           MR. DAVIS: Objection.  Form, outside the
5    scope of the deposition notice.
6           THE WITNESS: I would say that physicians,
7    doctors in regard to medicine, are entitled to prescribe
8    drugs or --
9           Q.  What about psychologists?
10          **A.  That's out of my scope of knowledge.**
11          Q.  Therapists, counselors?
12          **A.  (The witness shook his head from side to side.)**
13          Q.  Don't know?
14          **A.  I don't know.**
15          Q.  But what you did get on -- what Schlumberger
16   did get in May of 2012 was a document from Dr. Roach
17   describing that Juan in fact has PTSD; is that correct?
18          **A.  Yes.**
19          Q.  And going down the -- And this is something
20   that Schlumberger received in May, right?
21          **A.  Yes.  End of May.**
22          Q.  And Schlumberger refused at that time to allow
23   him to bring the dog to work, correct?
24          **A.  We asked for further --**
25          Q.  Yes.

81

1           **A.  -- documentation because this did not provide
2    us with clear medical evidence to justify his
3    accommodation request.**
4           Q.  Right.  But while you were waiting for this,
5    you would not let him bring the dog while all this
6    information was being gathered, correct?  Schlumberger
7    refused to allow him to have access to the service dog
8    while all this was taking place, right?
9           MR. DAVIS: Objection.  Form.
10          THE WITNESS: We never denied his request.
11   We were asking for further medical evidence because this
12   document at no point provides explanation to why a dog
13   will be required.
14          MR. GRIFFIN: Object to nonresponsive.
15          Q.  My question was, while you're doing this, was
16   Juan -- Just tell me.  If he was allowed to bring the
17   dog between May and November 2012, I want you to tell me
18   that.  It's my understanding Schlumberger refused to
19   allow him the dog until November 2012; is that true or
20   not?
21          MR. DAVIS: Objection.  Form.
22          THE WITNESS: His request at that time was
23   not properly reviewed because documents were missing, so
24   unless we would have had documents to help us to make a
25   proper assessment, this decision was still on hold.

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

82

1    Q. But while it's on hold, the dog can't come,
2  right?
3    **A. It's under review.**
4    Q. While its under review, the dog can't come,
5  right?
6    **A. Because it has not been -- properly been**
7  **assessed yet.**
8    Q. Right. And until it's properly assessed,
9  Schlumberger doesn't allow the dog, right?
10    **A. Because it's still under review.**
11    Q. But they won't allow the dog during that time,
12  right?
13    **A. Documentation were missing to help us to**
14  **understand why the dog was providing any medical**
15  **benefits to our employee.**
16    Q. I just need you to tell me that Schlumberger
17  would not allow the dog on the premises until November
18  2012.
19        MR. DAVIS: We'll stipulate.
20    Q. Is that true?
21        MR. DAVIS: We stipulate to that.
22        MR. GRIFFIN: Thank you. God bless you.
23    Q. Going through the form, if I'm reading the
24  form, the answer to question number one, the diagnosis
25  is PTSD, right?

83

1    **A. I confirm.**
2    Q. The question two, "Is the employee taking
3  [medicine]?"  And the answer he says is "yes," "see note
4  attached," right?
5    **A. Yes.**
6    Q. And three asks about side effects, and if so,
7  list them, and the physician says no, correct?
8    **A. Yes.**
9    Q. The next one says: Does the employee use any
10  other mitigating measures to assist his functioning?  If
11  so, describe.
12        And here the doctor wrote not applicable,
13  right?
14    **A. Yes.**
15    Q. The next one asks about the medical condition,
16  and he's answered a, b and c on the form, has he not?
17    **A. I have difficulties to read the doctor's**
18  **handwriting, if you can read it on my behalf.**
19    Q. Well, as I'm reading b, you tell me if you
20  agree that he says the duration of this is lifetime.
21    **A. I agree, yeah.**
22    Q. And c says what's the basis for the
23  information. He says psychological exam or perhaps
24  psychiatric exam, p-s-y-c-h.  You see that?
25    **A. I see that, but I see the rest as "end."**

84

1    Q. Then the next question is, "Does the...medical
2  condition preclude travel to and from work?"  And the
3  doctor says no, does he not?
4    **A. Yes.**
5    Q. The next question, number seven, "Does the
6  employee's medical condition preclude him...from being
7  at work?  If so, how long is this restriction expected
8  to last and what is the medical reason?"  The physician,
9  Dr. Roach, answers "No as long as he has" his -- I think
10  the words --
11    **A. "Companion animal."**
12    Q. "Companion animal."  Thank you.  And then they
13  ask: Does his condition preclude assignments of any of
14  the tasks on the job description?
15        And the doctor says, "Not that I know" of,
16  right?
17    **A. Yes.**
18    Q. Then the next question is:  Does the employee
19  need additional leave?
20        And the doctor says no, right?
21    **A. Yes.**
22    Q. The next question is whether the condition
23  affects his ability to safely perform some activities,
24  correct?
25    **A. Yes.**

85

1    Q. And the doctor says no, his condition doesn't
2  affect his ability to do those things, right?
3    **A. Yes.**
4    Q. And then 11 and 12 are answered "N/A," right?
5    **A. Nonapplicable, I assume.**
6    Q. And then he answers number 13 by saying "NA,"
7  "This is a psychiatric issue not medical," right?
8    **A. Which is pretty interesting because it's not a**
9  **psychiatric signing off on this, but yes, I confirm.**
10    Q. Does Schlumberger think that internal medicine
11  physicians cannot treat and diagnose mental illness?
12    **A. No. We don't believe that.**
13    Q. Does Schlumberger think it's inappropriate in
14  any way for an internal medicine physician to be
15  treating and diagnosing mental illness for patients?
16        MR. DAVIS: Objection. Form, outside the
17  scope of the notice.
18        THE WITNESS: We believe this clarification
19  form for accommodation should be signed and completed by
20  the physician being the most knowledgeable in regards to
21  our employee's condition, being here the PTSD, and
22  obviously there was in parallel to that a dedicated
23  psychiatrist taking care of Juan Alonzo, but obviously
24  that psychiatrist did not sign on this paper.
25        MR. GRIFFIN: Objection. Nonresponsive.

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

86

1    Q. Let me ask you this: Either you agree or
2 disagree or don't know whether internal medicine
3 physicians are trained and able to treat and diagnose
4 PTSD?
5    A. I don't know.
6    Q. Do you know whether anybody at Schlumberger
7 knows that?
8        MR. DAVIS: Objection. Form and outside
9 the scope of the notice.
10       THE WITNESS: I won't answer that.
11   Q. Well, you shook your head, but you do have to
12 answer that.
13       MR. DAVIS: You can answer whether you
14 know.
15       THE WITNESS: I don't know.
16   Q. You don't know whether anybody at Schlumberger
17 knows whether or not an internal medicine physician can
18 diagnose and treat PTSD?
19   A. Is that the same question as before?
20   Q. Yes.
21   A. Okay.
22   Q. I'm trying to ask it in the same way to make
23 sure we're staying on the same page.
24   A. We're still on the same page. I don't have any
25 knowledge of anyone who could make that call.

87

1    Q. Is there anything written down at Schlumberger
2 that says which doctors' notes are good enough to grant
3 an employee's request for accommodations and which are
4 not?
5    A. I'm not aware of any documentation of that
6 kind.
7    Q. In number 14, the physician is asked about if
8 the employee is likely to experience incapacitation and
9 that sort of thing, and the physician, if I'm reading
10 this right, says, "if PTSD flares, this could cause
11 emotional distress"?
12   A. I confirm.
13   Q. And we agree that Schlumberger was aware that
14 Mr. Alonzo-Miranda in fact had flashbacks and panic
15 attacks before Schlumberger allowed the service dog on
16 to the premises?
17       MR. DAVIS: Objection. Form.
18   Q. Isn't that true?
19   A. I'm not aware of any incidents of that kind.
20   Q. So Schlumberger is not aware of any panic
21 attacks or symptoms of PTSD that Juan had while at work
22 as a Schlumberger employee?
23   A. Can you be more precise with the dates?
24   Q. No. I'm asking you whether Schlumberger is
25 aware that he had any, not when, but whether he did.

88

1 Either Schlumberger is aware or not aware that he had
2 panic attacks or flashbacks while at work for
3 Schlumberger as a result of his PTSD. I'm just asking
4 you as a representative of Schlumberger, is it aware or
5 not aware that he had those attacks --
6        MR. DAVIS: Objection. Outside the
7 scope --
8    Q. -- before Goldie was permitted to enter the
9 premises in November 2012?
10       MR. DAVIS: Objection. Outside the scope
11 of the corporate representative topics.
12       THE WITNESS: I don't have the knowledge of
13 any documents stating any flashbacks or -- What was it
14 again?
15   Q. Panic attacks, symptom --
16   A. Panic attacks, exactly. No.
17   Q. -- symptoms of PTSD.
18   A. No. I didn't read any of that.
19   Q. Did Schlumberger reach out to any of Juan's
20 providers with respect to his PTSD during the
21 accommodation process?
22   A. I'm not aware of any communication effort on
23 our side to reach out to his --
24   Q. And do you know --
25   A. -- physicians.

89

1    Q. -- why Schlumberger, if it wanted to learn more
2 about PTSD and Juan's condition -- why it didn't reach
3 out to any of his physicians or caretakers to learn more
4 about PTSD and service animals?
5    A. The people involved in the process do not have
6 the medical background to be able to assess the
7 rightfulness of the doctors' basically assessment. What
8 we wanted was medical evidence to help us make a fair
9 judgment on that request.
10       MR. GRIFFIN: Let me object to
11 nonresponsive.
12   Q. Is there any reason, any rule at Schlumberger
13 that says that Schlumberger can't gather information
14 from caretakers in order to learn more about a condition
15 that requires a reasonable accommodation?
16   A. I'm not aware of any rule which doesn't allow
17 us to reach out to a physician unless we do not have
18 clear authorization from the employee himself for us to
19 do so.
20   Q. Is that written down anywhere?
21   A. That what?
22   Q. What you just said.
23   A. The last part or the first part?
24   Q. Anything in your answer. That Schlumberger
25 does not -- will not or does not reach out on its own to

JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014

90

1  gather information about conditions for which workers
2  with disabilities need accommodations.
3      **A. It's being included in the HIPAA act, so we as**
4  **an employer cannot obtain more information than needed**
5  **from a physician.**
6      Q. But that's not true here because you had a
7  release from Mr. Alonzo-Miranda, right?
8      **A. M-hm.**
9      Q. But despite the authorization that Mr.
10  Alonzo-Miranda gave to Schlumberger, it never reached
11  out and obtained any information from any of Mr.
12  Alonzo-Miranda's providers?
13      **A. Not that I'm aware of.**
14      Q. What meetings took place among Schlumberger
15  people about Dr. Roach's letter?
16      **A. I don't know about any specific meetings, but I**
17  **know that as per e-mail exchanges between our**
18  **headquarters and compliance team and the local HR, that**
19  **this documentation was shared to the main stake -- or**
20  **decision makers for those type of requests, and all**
21  **agreed that it did not provide us with clear medical**
22  **evidence.**
23      MR. GRIFFIN: Let me object as
24  nonresponsive.
25      Q. Who decided that Dr. Roach's letter about the

91

1  dog was not enough?
2      **A. As I said, there's no single person in the**
3  **company who takes that decision.  It's based on a review**
4  **jointly with different parties from the company.**
5      Q. Does Schlumberger contend that Dr. Roach was
6  not a treating physician for Juan Alonzo-Miranda?
7      **A. Can you repeat again, sir?**
8      Q. Does Schlumberger take the position that Dr.
9  Roach was not a treating physician for Juan?
10      **A. No.  We only wanted further medical evidence**
11  **and explanation.**
12      Q. And I'll show you Exhibit 9.
13          (Exhibit 9 marked.)
14      Q. And ask if you can identify that as a second
15  document submitted by Juan in connection with his
16  request that he be allowed access to his service dog
17  while at work.
18      **A. What is your question again?**
19      Q. Is this the second documentation that Juan gave
20  to Schlumberger to support his request for an
21  accommodation of access to his service dog while at
22  work?
23      **A. It looks like it.  And I'd like just to add**
24  **that the person signing on that document is not a**
25  **physician, and I believe that's the reason why it did**

92

1  **not serve as further medical evidence for us to be**
2  **taking into account.**
3      MR. GRIFFIN: Let me object to the
4  nonresponsive portion of the answer.
5      Q. But what I hear you saying is that this didn't
6  satisfy Schlumberger either, did it?
7      **A. What I'm saying is that this does not serve as**
8  **medical evidence, and it has not been signed by a**
9  **physician.**
10      Q. Right.  And so this is the second document that
11  he submitted.  Neither one of them were satisfactory to
12  Schlumberger to grant the accommodation?
13      **A. None of the --**
14      Q. Am I right in saying that or not?
15      **A. None of the documents provide sufficient**
16  **medical evidence and explanation for us to properly**
17  **assess his request for accommodation.**
18      Q. Now, were there any other forms that were
19  filled out by Juan's providers that were supplied to
20  Schlumberger?
21      I mean, Mr. Yates and Dr. Roach are the
22  only two, aren't they?
23      **A. Based on what was provided from Juan during**
24  **that time period, I'm only aware of that clarifying**
25  **accommodation form signed by Dr. Roach.**

93

1      Q. And Mr. Yates?
2      **A. Yes.**
3      Q. Well, when it comes to the dog itself, why
4  didn't Schlumberger just allow him to bring the dog to
5  work during the months from May to November while
6  Schlumberger is deciding whether or not to grant the
7  accommodation; why didn't Schlumberger just let him
8  bring the dog while this was under consideration?
9      **A. It's a matter of following proper procedures**
10  **and process which are in place in a company to request**
11  **an accommodation and wait till an assessment has been**
12  **made and a decision taken.  As you can imagine, when you**
13  **run a large company, if for any accommodation request we**
14  **would just first go ahead and say yes and then later on**
15  **refuse, that would be frustrating for all parties.**
16      Q. How long did it take for Schlumberger to tell
17  Juan that it was dissatisfied with Dr. Roach's
18  documentation?
19      **A. I've seen documentation of communications sent**
20  **to Juan to explain him that we need further information**
21  **or medical evidence to substantiate his request.**
22      MR. GRIFFIN: Let me object as
23  nonresponsive.
24      Q. My question was, when did that happen?
25      **A. I cannot give you any specific dates.**

94

1    Q.  Isn't it true that it was more than a month
2  after Dr. Roach submitted his report to Schlumberger
3  that Schlumberger finally told Juan that it was not
4  sufficient for Schlumberger?
5          MR. DAVIS:  Objection.  Form.
6          THE WITNESS:  I'm not aware of the dates.
7          (Exhibit 10 marked.)
8    Q.  Does Exhibit No. 10 tell you that it wasn't
9  until July 23rd or 24th, 2012 that Elizabeth informs
10  Juan that it's not happy or it's dissatisfied with Dr.
11  Roach's report?
12          MR. DAVIS:  Objection.  Form.
13          THE WITNESS:  I disagree.  As the e-mail
14  clearly states on that June 22nd, Elizabeth Telford did
15  inform Juan Alonzo via our Microsoft Office Communicator
16  that the form provided was not fully completed.
17    Q.  What date?  What I'm trying for the jury and
18  the judge to understand is, when did Schlumberger first
19  tell Juan it was dissatisfied with Dr. Roach's report?
20    A.  Do you mind repeating the question?
21    Q.  Sure.  When did Schlumberger first tell Juan
22  that it was dissatisfied with Dr. Roach's report and
23  would require further documentation from him?
24    A.  Based on an understanding of the document you
25  gave me, it's the first time on June 22nd and the second

95

1  time in this e-mail on July 24th.
2    Q.  Where it says in the second paragraph, J.R.,
3  Ms. Telford says on behalf of Schlumberger, that the
4  accommodations form from Dr. Roach "was not completed by
5  the physician treating you for your condition," do you
6  see that?
7    A.  Yes.
8    Q.  Where did she get any -- Where did she get the
9  idea that Dr. Roach was not treating Juan for PTSD?
10    A.  I cannot provide you with an -- I mean, with an
11  answer for that.
12    Q.  Does Schlumberger know whether it's true, what
13  Ms. Telford says in her letter, that Dr. Roach was not
14  treating Juan for PTSD?
15    A.  Again, I do not know.
16    Q.  And let me ask you this:  Did Schlumberger ever
17  reconsider its position with respect to those two forms
18  in terms of their, Schlumberger's, satisfaction with
19  them?
20    A.  Till today, we still have no clear medical
21  evidence on why this accommodation request should be
22  implemented.  However, in a joint effort to help our
23  employees to perform to the best of our abilities -- of
24  their abilities, we did approve this accommodation in
25  November 2012, the same year.

96

1    Q.  My question is why -- what --  Well, let me ask
2  you this:  What had changed from the time that Mr. Yates
3  had written his report that Schlumberger felt was not
4  satisfactory and November 2012 when Schlumberger finally
5  said it was okay for Juan to have access to the service
6  dog; what had changed between the two reports that
7  Schlumberger thought were unsatisfactory and
8  Schlumberger's decision in November to allow the dog on
9  the premises; what had changed?
10    A.  Since I was not involved in the decision-taking
11  process and the assessment as well of that decision, I
12  cannot give you any information on what has changed in
13  the meantime.
14    Q.  Well, but I'm asking you, as the deponent under
15  the topics, this question:  What had changed to cause
16  Schlumberger to change its mind about the accommodation
17  from the time that Mr. Yates submitted his documentation
18  with respect to the service dog and November 2012 when
19  Schlumberger finally allowed the dog on the premises;
20  what changed?
21          MR. DAVIS:  Objection.  Outside the scope
22  of the corporate rep topic.
23          THE WITNESS:  It was before my time, and I
24  was not involved in those meetings to make this
25  assessment, and I'm sure they must have a valid reason

97

1  to approve it in November.
2          MR. GRIFFIN:  Let me object to
3  responsiveness.
4    Q.  You understand I'm not asking you about your
5  personal knowledge?  I'm asking you about Schlumberger's
6  knowledge about the accommodation and what had changed
7  from the time that Mr. Yates had submitted his
8  documentation and November when Schlumberger finally
9  agreed to allow the dog to be on the premises.
10          MR. DAVIS:  Objection.  Form and outside
11  the scope of the topics.
12          THE WITNESS:  Based on my knowledge, I
13  cannot provide you with any satisfactory response to
14  that question.
15    Q.  You understand that topic number 15 is
16  Schlumberger's evaluation of the request for
17  accommodations and responses to the request for
18  accommodations, and you're unable to tell us as the
19  Schlumberger representative why it agreed to have the
20  dog in November and what had changed when Mr. Yates's
21  report and when Schlumberger finally agreed to let the
22  dog?
23          MR. DAVIS:  Objection.  Form.
24    Q.  You don't -- you don't have an answer for --
25    A.  No.

98

1    Q. -- Schlumberger?  Okay.  As a representative of
2  Schlumberger, can you tell us whether or not the EEOC's
3  cause determination, Exhibit 2, had anything to do with
4  the decision making in November 2012 that Schlumberger
5  made to finally allow the service dog on to the
6  premises?
7    **A. Based on my knowledge, I cannot answer that**
8  **question.**
9    Q. But you understand I'm not asking your personal
10  knowledge; I'm asking about Schlumberger's knowledge?
11    **A. I'm replying as a corporate representative, and**
12  **as a -- based on the knowledge as a corporate**
13  **representative, I cannot provide you with satisfactory**
14  **information on this one.**
15        (Exhibit 11 marked.)
16    Q. And is Exhibit 11 the letter informing Juan
17  that Schlumberger was not satisfied with Mr. Yates's
18  documentation?
19        MR. DAVID:  Objection.  Form.
20        THE WITNESS:  Can you repeat the question,
21  sir?
22    Q. Sure.  Is that the documentation of
23  Schlumberger's informing Juan that it was not satisfied
24  with Mr. Yates's documentation either?
25        MR. DAVIS:  Objection.

99

1        THE WITNESS:  Yes, it is.
2    Q. Let me ask you this:  Who is Mr. Paal
3  Kibsgaard?
4    **A. That's our current CEO.**
5    Q. Of the entire Schlumberger?
6    **A. Yes.**
7    Q. That's the big company?  I mean the parent
8  corporation.
9    **A. Yes.**
10    Q. As a representative of Schlumberger, can you
11  tell us whether or not Juan's communications with Mr.
12  Kibsgaard had anything to do with Schlumberger's
13  allowing the service dog access to Schlumberger's
14  premises as an accommodation for Juan?
15    **A. No, I don't think so.**
16    Q. And you're speaking as a representative of
17  Schlumberger?
18    **A. Yes.**
19    Q. Tell us about the decision making that -- for
20  Schlumberger of why it agreed in November 2012 to allow
21  the dog on the premises?
22    **A. I reiterate the same response as before, which**
23  **is that to my knowledge, I have no information on how**
24  **the decision was taken, by whom and what made it change**
25  **the outcome to approve it.**

100

1    Q. Have you asked that question of anyone at
2  Schlumberger?
3    **A. (Indicating)?**
4    Q. About the decision making to finally allow the
5  service dog on the premises in November 2012?
6    **A. What I know is that it was taken by HR, let's**
7  **say, VPs or officers to allow it, and again, I'm not**
8  **familiar with the decision-taking process which took**
9  **place in Houston.**
10    Q. We're going to have to go down to the
11  courthouse here in just a second, but I want to ask
12  first --
13        (Exhibit 12 marked.)
14    Q. -- what is Exhibit No. 12?
15    **A. That's a clarifying accommodation form**
16  **completed and signed by Rochelle E. Dennis, which is --**
17  **who is a psychiatrist.**
18    Q. What role did that play, if any, in
19  Schlumberger's decision making vis-a-vis the service dog
20  for Juan's PTSD?
21    **A. I don't know.  As I did not read this document**
22  **before.**
23    Q. It's the first time you've seen it?
24    **A. Yes.**
25    Q. And finally, before we depart at least to go

101

1  downtown, does Schlumberger take the position that its
2  decision in November 2012 to allow the service dog on to
3  the premises was the correct decision under
4  Schlumberger's policies?
5    **A. Can you --**
6        MR. DAVIS:  Objection.  Form.
7        THE WITNESS:  -- reiterate the question?
8    Q. Sure.  Schlumberger in November of 2012 finally
9  did agree that the dog -- that a service dog would have
10  access to the premises, right?
11    **A. Yes.**
12    Q. Was that the right decision under
13  Schlumberger's own policies?
14    **A. I believe, yeah.**
15    Q. Was there ever a determination made that
16  Schlumberger had made a mistake or should not have
17  granted the request for accommodation in November 2012?
18    **A. No.**
19    Q. And in terms of the --
20        Well, tell you what:  It is quarter after
21  one, and we probably should break because we've got to
22  get all the way downtown, so why don't we --
23        We can go off the record here.
24        (Recess.)
25        (Exhibit 13 marked.)

102

1          FURTHER EXAMINATION
2  Questions by Mr. Griffin:
3      Q.  Does Schlumberger agree that post-traumatic
4  stress disorder is a disability?
5          MR. DAVIS:  Objection.  Form and outside
6  the scope of the notice.
7          THE WITNESS:  Yes.  PTSD is a disability.
8      Q.  And turning to the decision in November 2012 to
9  grant the reasonable accommodation, I'll ask you if
10  Exhibit No. 13 is the letter granting the accommodation
11  of allowing the service dog on to Schlumberger's
12  premises.
13      **A.  I confirm.**
14      Q.  Excuse me?
15      **A.  This letter is a response to Juan**
16  **Alonzo-Miranda stating that his request for**
17  **accommodation to bring his service dog, Goldie, to work**
18  **has been granted.**
19      Q.  Right.  What I'm saying is, Exhibit 13 is the
20  letter that grants the accommodation?
21      **A.  I do confirm.**
22      Q.  And when we broke for our intermission, you had
23  confirmed as the company representative that that
24  decision was the correct one, right?
25      **A.  Yes.**

103

1          MR. DAVIS:  Objection.  Form.
2      Q.  And to your knowledge, has anyone at
3  Schlumberger contended that the decision to grant that
4  reasonable accommodation was incorrect?
5          MR. DAVIS:  Objection.  Form, outside the
6  scope.
7          THE WITNESS:  I'm not aware of anyone
8  stating that.
9      Q.  And was there any claim by Schlumberger in the
10  months that came after November 30th, 2012 that the
11  accommodation of bringing Goldie, bringing the service
12  dog, that is, to Schlumberger's premises was not a
13  reasonable accommodation?
14          THE WITNESS:  Can you read the -- just the
15  beginning of the question?
16      Q.  Yes.  Thank you for that, and I'm going to
17  rephrase that to try to make it a little shorter.
18          Did anybody at Schlumberger claim that the
19  accommodation granted on November 30th was unreasonable
20  in the months that -- in the months after November 30th?
21      **A.  No.**
22      Q.  In other words, once Goldie was allowed on to
23  the premises as a service animal for Juan, nobody at
24  Schlumberger claimed that that was unreasonable?
25          MR. DAVIS:  Objection.

104

1      Q.  Right?
2      **A.  As long as the conditions stated in this letter**
3  **would be respected, yes, nobody would consider this as**
4  **unreasonable.**
5      Q.  So what's described on Exhibit 13 is the
6  reasonable accommodation that Schlumberger agreed to?
7      **A.  Yes.**
8      Q.  And that's their position today?
9      **A.  The request --**
10          MR. DAVIS:  Objection.  Form.
11          THE WITNESS:  -- for -- I mean our
12  decision to -- for the working hours of Juan during
13  daytime -- I mean on days -- does not show up on this
14  one, but I believe we should add to this on top of our
15  accommodation for his schedule.
16          MR. GRIFFIN:  Let me object as
17  nonresponsive.
18      Q.  I'm just trying to make sure that the
19  accommodation of allowing the service dog on to the
20  premises was a reasonable accommodation and that no one
21  has complained about that since it was granted.
22          MR. DAVIS:  Objection.  Form.
23      Q.  From Schlumberger's perspective.
24          MR. DAVIS:  Objection.  Form.
25          THE WITNESS:  Schlumberger as a company,

105

1  no.  Nobody has any objections to make, but I've heard
2  about employees who have had questions about our
3  decision.
4      Q.  But not management?
5      **A.  Not management.**
6      Q.  To your knowledge or to the company's
7  knowledge, did Goldie present any problems to anyone
8  while Goldie was acting as the service dog while Juan
9  was at work?
10      **A.  I'm aware of only one situation where Goldie**
11  **was a bit aggressive with one employee that was reported**
12  **to HR.  An employee said he almost got snapped by the**
13  **dog or bitten, but that's basically all I have on that.**
14      Q.  Was that written down anywhere or recorded in
15  some way?
16      **A.  I believe, yes.  I've seen it documented and**
17  **sent to HR by e-mail.**
18      Q.  And what was the outcome of that?
19      **A.  The outcome was that we basically -- in the**
20  **e-mail, it was stated that -- I believe Juan also stated**
21  **that the employee might have acted a bit aggressive as**
22  **well, you know, so it wasn't something for us where we**
23  **would see any concerns.**
24      Q.  No problem.  Was there any issue of -- Was
25  Goldie ever injured or threatened in any way while the

106

1  dog was serving as a service animal at Schlumberger?
2        MR. DAVIS: Objection. Form.
3        THE WITNESS: Due to the fact that Juan
4  respected our conditions for the accommodation, I
5  believe that the dog was in no way threatened while
6  being on our facility. That's the reason why we wanted
7  those conditions to be respected.
8        MR. GRIFFIN: Let me object to
9  responsiveness.
10      Q. I'm just trying to getting you to confirm, if
11  you would, that Goldie was never injured while working
12  as a service dog at Schlumberger.
13      **A. Not to my knowledge.**
14      Q. And Goldie injured no one else while Goldie was
15  serving as a service dog?
16      **A. Not to my knowledge.**
17      Q. Have any other -- To your knowledge, at --
18  Not to your knowledge. Excuse me. Let me rephrase.
19      Has Schlumberger ever -- at any of its
20  facilities ever authorized a service dog for any person
21  with a disability?
22      **A. To my knowledge, it's the first case I'm aware**
23  **of.**
24      Q. In other words, there are no people who have
25  vision impairments who use a service dog as workers?

107

1      **A. To my knowledge, in south Texas, no.**
2      Q. But what about companywide?
3      **A. I --**
4        MR. DAVIS: Objection. Outside the scope.
5        THE WITNESS: That's outside of my scope of
6  work.
7      Q. Right. But Schlumberger has not prepared you
8  to answer that question?
9      **A. That's correct.**
10      Q. No problem. Let me ask this: Why was the
11  decision on November the 30th, 2012 to grant the
12  reasonable accommodation of the service dog granted, but
13  not in October? In other words, why was it granted on
14  November 30th, but not allowed in October of the same
15  year?
16      **A. I don't have information on that.**
17      Q. Do you have -- Does the company have any
18  knowledge on why it took more than six months for
19  Schlumberger to agree that the accommodation was
20  reasonable?
21        MR. DAVIS: Objection. Form.
22        THE WITNESS: Throughout that whole period,
23  we were engaged in an interactive process, trying to
24  understand and to obtain further medical evidence to
25  assess his request.

108

1      Q. But what did they receive that caused the
2  company to finally agree that the service dog was a
3  reasonable accommodation?
4        MR. DAVIS: Objection. Form.
5        THE WITNESS: Again, I have no information
6  on the exact circumstances of the decision-taking
7  process that --
8      Q. On the November 30th --
9      **A. Exactly.**
10      Q. -- agreement to grant the --
11      **A. Yeah.**
12      Q. -- reasonable accommodation? Okay.
13      Do you know, does the -- Who at the
14  company made the decision that Goldie had to be inside
15  her kennel except when Juan went to her?
16      **A. Who made that decision?**
17      Q. Yes.
18      **A. Again, that's the conditions which were given**
19  **in order to accommodate the request were -- resulted in,**
20  **I guess, the reviews and meetings between local -- HR**
21  **local management and HQ and HQ compliance.**
22      Q. But do you know who at Schlumberger came up
23  with the idea that the dog would have to be in the
24  kennel?
25      **A. No, I don't know.**

109

1      Q. And let me ask you this: Does Schlumberger
2  recognize that service dogs who are assisting workers
3  with PTSD have the ability to observe the patient?
4        MR. DAVIS: Objection. Form, outside the
5  scope.
6        THE WITNESS: What do you mean? Observe?
7  Serve or observe?
8      Q. O-b-s-e-r-v-e, observe, that the dogs --
9      **A. Okay.**
10      Q. -- are trained to observe the patient.
11      **A. As a company, we have, I guess, no particular,**
12  **let's say, policy or statement to make on service dogs.**
13      Q. Well, I'm not really asking you about policies.
14  I'm just saying, is the company aware that service dogs
15  for patients who have PTSD -- that the dogs are trained
16  to observe the patient, to keep an eye on them?
17      **A. Obviously --**
18        MR. DAVIS: Objection. Form, outside the
19  scope of the notice.
20        THE WITNESS: Obviously, yes. Because the
21  request was granted.
22      Q. And does the company understand that the dogs
23  are trained to be able, when they observe a patient
24  having a flashback or a panic attack -- is to intervene
25  with the patient to prevent the patient from suffering a

110

1 PTSD flashback or panic attack?
2        MR. DAVIS: Objection. Form, outside the
3 scope of the notice.
4        THE WITNESS: Since the letter was
5 approved, I believe that those points were taken into
6 account to push us to grant it.
7        Q. Can you see, J.R., that if the dog is in the
8 kennel and the patient is going into a panic attack or a
9 flashback, that it will be more difficult for the dog to
10 get the patient's attention if the dog is in a kennel as
11 opposed to being on a leash?
12        MR. DAVIS: Objection. Form, outside the
13 scope of the notice.
14        THE WITNESS: The reason why Goldie has to
15 remain in the kennel is mainly due to the work
16 environment in which Juan Alonzo was working as a
17 maintenance technician. Heavy equipment, chemicals such
18 as acids can be found on those facilities, and it's not
19 only in the interest of protecting Goldie, but also
20 protecting other employees when we move heavy equipment,
21 to make sure that everybody is safe.
22        Having a dog who walks in between your feet
23 or is not under control -- that might also be a
24 possibility -- can harm the dog, but also the employee
25 themselves.

111

1        MR. GRIFFIN: Let me object as
2 nonresponsive.
3        Q. My question, does the company understand that
4 if the dog is in the kennel and the dog observes the
5 patient going into a panic attack or a flashback, that
6 it will be more difficult for the dog to intervene with
7 the patient if the dog is in a kennel?
8        MR. DAVIS: Objection. Form, outside the
9 scope of the notice.
10        THE WITNESS: I cannot answer to that.
11        Q. And that's because the company has not shared
12 that with you?
13        A. That's because, I guess, the company is not
14 specialized in, you know, service dogs.
15        Q. Does the company have any physicians of its own
16 to consult with when a worker with a disability is in
17 need of an accommodation?
18        (Exhibit 14 marked.)
19        THE WITNESS: I'm not aware of a dedicated
20 person, but we have a dedicated service, such as
21 Psy-Com, which is available to every employee, as we do
22 not discriminate or differentiate between employees with
23 PTSD or other types of conditions, and they can reach
24 out for counseling or any type of issues they have,
25 which range from depression up to financial issues, et

112

1 cetera.
2        MR. GRIFFIN: Let me object as
3 nonresponsive.
4        Q. I don't think we were communicating --
5        A. (Indicating).
6        Q. Beg pardon?
7        A. May I just reply to --  This has nothing to do
8 with this, but I was supposed to have a meeting at four.
9 Just to let them know that I have to postpone it.
10        Q. You want to send a text or something to let
11 them know?
12        A. Yes.
13        Q. You're certainly free to do that.
14 We can go off the record while he responds
15 to that text.
16        (Discussion off the record.)
17        Q. Tell us, if you would, about the company's
18 response to any complaints that Juan made to
19 Schlumberger about harassment against him in 2013.
20        A. I met on several occasions, at least two which
21 I can remember, with Juan Alonzo and at that time the HR
22 manager for south Texas, Ruchira Corey, to discuss the
23 harassment complaint which Juan Alonzo brought to our
24 attention.
25        Q. Tell us about the complaint and what

113

1 Schlumberger did in response to it.
2        A. As far as I can remember, Juan Alonzo described
3 a situation where he was being harassed by other
4 employees working at the shop. It involved putting
5 grease on his chair or on his tools for work. This is,
6 let's say, the main incident I can recall; also comments
7 of other employees making comments to Juan about being,
8 slash (sic), the crazy guy.
9        So once that was brought to our attention,
10 of course, it's something which we cannot observe
11 through a camera because we don't film or record our own
12 employees, and looking at Juan Alonzo's pictures, which
13 portray and depicted the grease on his chair, we decided
14 to do an investigation, but of course, it's hard for us
15 to observe it, as it already took place.
16        So we decided to avoid targeting specific
17 individuals, to avoid any form of retaliation for Juan
18 Alonzo-Miranda in this case, and spoke with the
19 maintenance manager for San Antonio, who was at that
20 time Bradley Brown, and it was decided that he would
21 have a meeting, which is called an SOIM meeting, which
22 takes place during shift change, and would address that
23 with everybody, those type of behaviors, without
24 targeting any specific people because we wanted also to
25 ensure that Juan Alonzo would not be targeted in any way

**JEAN-REMY BELLANGER - VOLUME 1   -   August 21, 2014**

114

1  or form.
2         Anyway, the message which was given by the
3  maintenance manager was to remind them of what we expect
4  them to do, and if any further incidents will -- would
5  take place, we would definitely apply the corresponding
6  disciplinary action if needed.
7         So we did also follow up with Bradley
8  Brown, and he that those incidents did not occur anymore
9  after that meeting.
10     Q.  I would like you to explain, if you would, as
11  best you can what Schlumberger did to determine who, for
12  example, turned the service dog's kennel upside down.
13  In other words, what effort did Schlumberger make to
14  find out who turned the dog's kennel upside down?
15     A.  We did look into it, but we had no evidence to
16  identify the individual who might have done it.
17     Q.  Right.  I know that, but what efforts were
18  made to find --
19     A.  As I said, we did discuss it with the manager,
20  who himself could not -- did not know anything further.
21     Q.  Was anybody else talked to, besides the
22  manager?
23     A.  We did speak to a few employees.  But again,
24  the idea was not to have Juan Alonzo being targeted in
25  any way or form because what we wanted to have is have

115

1  things return to normal and ensure that this does not
2  occur anymore.
3     Q.  Well, let me ask you this:  Do we agree it
4  would be important for Schlumberger to find out who at
5  Schlumberger was calling Juan the crazy guy?  Would that
6  be important, to know who's doing that?
7         MR. DAVIS:  Objection.  Form.
8         THE WITNESS:  I mean, we did discuss that
9  with Juan at that time, and to my knowledge, we did not
10  receive any specific names of the person involved in
11  that.
12         MR. GRIFFIN:  Let me object to the
13  responsiveness.
14     Q.  My question was about, do we agree that it
15  would be important for Schlumberger to find out who at
16  Schlumberger is calling Juan the crazy guy?
17         MR. DAVIS:  Objection.  Form.
18     Q.  Either it's important to know who's doing that
19  or not.
20     A.  Yes, it's important.
21     Q.  And have you described as best you can all the
22  effort -- No.  Excuse me.  Let me ask this question:
23         What efforts were made, if any, by
24  Schlumberger to determine the identity of people who
25  were making jokes about Juan, calling him the crazy guy?

116

1         MR. DAVIS:  Objection.  Form.
2         THE WITNESS:  We did an internal
3  investigation, and we did not have clear witnesses to
4  confirm those statements.
5     Q.  And is that investigation in writing?
6     A.  I did not do that investigation myself, so I
7  cannot tell you whether this investigation has been
8  documented and written or not.
9     Q.  But the company hasn't shared with you in
10  preparation for this deposition whether or not there's a
11  copy of any investigation of which Schlumberger people
12  called Juan the crazy guy?
13     A.  No.
14     Q.  Now, let me ask you this:  Do you know of any
15  efforts by Schlumberger to determine the identity of the
16  persons or people at Schlumberger who called Juan the
17  crazy guy?
18         MR. DAVIS:  Objection.  Form.
19         THE WITNESS:  Again --
20     Q.  Don't know?
21     A.  No.  Because you just asked the same question
22  again, so I'm just -- Maybe I --
23     Q.  But let's stay with me.  There's two or three
24  different things we've talked about: the grease issue,
25  the turning-the-kennel-upside-down issue and the

117

1  calling-him-the-crazy-guy issue.  I'm asking just about
2  the crazy-guy issue right -- the crazy-guy comments now.
3         What efforts were made, if any, from the
4  company's perspective to find out who was doing that?
5     A.  We had two meetings with Juan to address it,
6  and I was present myself when we discussed those topics,
7  and based on what I can recall, no specific names were
8  given to us during those meetings.
9     Q.  But that's meetings with Juan?
10     A.  Yes.
11     Q.  But I'm talking about the people who were
12  actually doing the talking about him and calling him
13  crazy.  Who did Schlumberger go to and investigate to
14  determine the identity of the people who were calling
15  him that crazy guy behind his back?
16         MR. DAVIS:  Objection.  Form.
17         THE WITNESS:  We spoke with the maintenance
18  manager, with the --
19     Q.  And who's that?
20     A.  Bradley Brown.
21     Q.  Anybody else?
22     A.  I believe Juan's supervisor at that time, but I
23  don't remember his name.
24     Q.  Same question with respect to the incident with
25  regard to the grease.

**JEAN-REMY BELLANGER - VOLUME 1   -   August 21, 2014**

---

118

1        And before I do that, did Juan actually
2  supply to Schlumberger photographs of the kennel turned
3  upside down and photographs of the grease?
4        **A. Yes.**
5        Q. Great. And what, if anything, did Schlumberger
6  do to investigate the perpetrator of the grease conduct
7  out there?
8        **A. We carried out an investigation, spoke with the**
9  **department manager, who is Bradley Brown, and due to the**
10 **lack of evidence, we could not identify the person**
11 **involved for those two events.**
12       Q. And as I understand it, what you did after all
13 this was to have a remedial plan: The HR team would set
14 up a training on respect and professionalism that will
15 be mandatory for all the maintenance crews; is that
16 right?
17       **A. That's something we do very often, but I don't**
18 **recall this training specifically.**
19       Q. Did Schlumberger actually require the
20 maintenance crews to attend a training on respect and
21 professionalism as a result of Juan's reporting to you
22 of the grease incident, the crazy -- being called the
23 crazy guy and having the service dog's kennel turned
24 upside down?
25       **A. That's definitely one of the remedial actions**

---

119

1  **which was suggested. I do not know whether it was**
2  **implemented or not yet.**
3        Q. And the company has not shared with you whether
4  they actually followed through and set up a training on
5  respect and professionalism, mandatory for all the
6  maintenance crews?
7        **A. I do not know.**
8        Q. In other words, the company hasn't told you
9  that?
10       **A. No.**
11       Q. And I'll ask you if Exhibit No. 14 contains
12 documentation of the information that Juan provided to
13 Schlumberger about the harassment he was receiving as a
14 result of his --
15       **A. Can you repeat it?**
16       Q. -- his disability. Is the Exhibit No. 14 the
17 documentation of the harassment that we've been talking
18 about in the previous questions?
19       MR. DAVIS: Objection. Form.
20       Q. And either it is or it isn't. I'm just trying
21 to get you to identify the document.
22       MR. DAVIS: Well, it's a bunch of
23 documents, but let him go through and tell you what each
24 one is.
25       Q. Are you ready to answer that question?

---

120

1        **A. If you don't mind again just --**
2        Q. No problem. Is Exhibit 14 the documentation
3  about the issues that we've been discussing about
4  harassment that Juan reported to Schlumberger?
5        **A. Yes.**
6        Q. And does it actually contain on the second page
7  your letter as the -- Is it HR Manager; am I saying
8  that right, your title, J.R.?
9        **A. Representative.**
10       Q. HR Representative. In other words, the second
11 page of the exhibit is your letter?
12       **A. Yes.**
13       Q. And so this you have personal knowledge of?
14       **A. Yes.**
15       Q. And as I see on the bottom paragraph, you
16 write, "As a remedial plan, the HR team will set up a
17 training provided a third party on 'Respect and
18 Professionalism' which will be mandatory to attend for
19 the maintenance crews"; do you see that?
20       **A. Yes.**
21       Q. I think what you've shared with us is that you
22 don't know and the company hasn't informed you whether
23 or not the company followed through and actually set up
24 that training?
25       **A. Yes.**

---

121

1        Q. I'm right in saying that?
2        **A. Yes.**
3        Q. No problem. And to your knowledge, J.R., did
4  Schlumberger ever give any training to Juan's coworkers
5  on the importance of the service dog and the role of
6  the service dog at the Schlumberger premises in San Antonio?
7        **A. No.**
8        Q. Do you know why not?
9        **A. I know that we don't want to put more focus**
10 **than needed on somebody's accommodation. That can be**
11 **interpreted in different ways.**
12       Q. Right. But if people see a dog inside the
13 premises and want to know "What's that dog doing here?"
14 how would they know that the dog is there for a good
15 reason, in other words, as a reasonable accommodation?
16       **A. Okay. I see. So no -- In regards to the**
17 **training, no training was given, but yes, local**
18 **management has informed them that it's due to his --**
19 **it's a service dog; it's not just a pet dog.**
20       Q. How was that communicated to the coworkers?
21       **A. I believe through their direct managers.**
22       Q. But I mean, was it by a meeting? Was it by
23 e-mail? Was it by sensitivity training?
24       **A. I can -- I don't have information on that.**
25       Q. In your letter, the second, what you call the

---

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

---

122

1 alternative to the training, mandatory training, for the
2 maintenance crews on respect and professionalism -- you
3 had an alternative solution such as transferring to a
4 new location or different crew or department with
5 Schlumberger.
6          Do you know whether or not any of that was
7 accomplished by Schlumberger?
8     **A. Yes. Ruchira and myself, we did explore within**
9 **our south Texas division whether we have any openings in**
10 **different departments in San Antonio, but also outside**
11 **San Antonio, so we reach out directly to what we believe**
12 **will be the best fit for Juan at the HSE department.  At**
13 **that time, there was no need or no approval for an**
14 **additional head count on day assigned.**
15     Q. There was no approval for him to go to a
16 different place, you mean?
17     **A. Yes.  Because that's a business need first, and**
18 **his profile was submitted by the -- to the HSE manager,**
19 **who did not grant his transfer to the HSE department.**
20     Q. As a representative of Schlumberger today, can
21 you confirm that because -- Juan had a PTSD episode at
22 work in mid-October and missed about six weeks of work
23 because of that panic attack suffered at work?
24          MR. DAVIS: Objection. Form.
25          THE WITNESS: Can you be more precise about

---

123

1 what time frame you're referring to?
2     Q. October.
3     **A. Yes.  Which year?**
4     Q. 2012.
5     **A. 2012?  I'm not aware of any incident in that**
6 **period.**
7     Q. And the company has not briefed you on any of
8 that?
9     **A. No.**
10     Q. And I think you may have answered this
11 indirectly, but I want to make sure we understand.  I'm
12 asking you now about your personal role in this, not
13 speaking as the company, but as just an ordinary
14 witness.
15          Did you have any role in Schlumberger's
16 decision on November the 30th, 2012 to agree to the
17 reasonable accommodation of the service dog being
18 allowed access to the premises?
19          MR. DAVIS: Objection. Form.
20     Q. You had no role in that?
21     **A. No.  I was in London at that time.**
22     Q. Right.  You were not one of the decisionmakers?
23     **A. No.**
24     Q. In other words, you weren't in the decision
25 making either for the six months while the dog wasn't

---

124

1 allowed nor a decisionmaker on November 30th when the
2 dog was allowed?
3     **A. I do confirm.**
4     Q. But once you became involved as an HR
5 representative over this Schlumberger premises, you did
6 not disagree that the service dog was a reasonable
7 accommodation for his PTSD?
8          MR. DAVIS: Objection. Form.
9          THE WITNESS: As a matter of fact, I got
10 informed about Juan's PTSD only in May 2014, this year,
11 so that was not something which was brought to my
12 attention before.  Again, I knew about the
13 accommodation, and that's something which was addressed
14 during our hand-over, that Juan was approved to have his
15 service dog come to work within those given conditions,
16 but the PTSD was not mentioned.
17          I think I'm here to handle employees, their
18 performance, their progression, training, and it's on a
19 need-to-know basis that I believe PTSD information
20 should be handled.
21     Q. But certainly, when you got there, you did not
22 take the position that allowing the service dog was an
23 undue hardship on Schlumberger?
24     **A. I never heard that Schlumberger would say that**
25 **it's an undue hardship.**

---

125

1     Q. And at no point have you heard Schlumberger say
2 that having -- allowing the dog access was not a
3 reasonable accommodation for him?
4     **A. We never said it's an undue hardship.  We never**
5 **said it's -- What you said again?**
6     Q. Not reasonable.
7     **A. Not reasonable, yeah.**
8     Q. And ultimately it was approved?
9     **A. Yes.  That is what I understand.**
10     Q. And as I understand it, Schlumberger agrees
11 that Juan in fact has PTSD, right?
12     **A. Yes.**
13     Q. And Schlumberger agrees that Juan was qualified
14 to perform the essential functions of his mechanic's
15 job?
16     **A. Yes.**
17     Q. J.R., have we already discussed everything that
18 Schlumberger knows about what Schlumberger did to
19 investigate Juan's report that he was being targeted,
20 because of his disability, on the job with harassment?
21          MR. DAVIS: Objection. Form.
22          THE WITNESS: I don't believe the
23 harassment was due to his disability.
24     Q. What do you think calling a person a crazy
25 person -- Are you suggesting that calling a person with

---

126

1  PTSD a crazy person is not related to their mental
2  condition?
3      A. Again, I don't think that PTSD has anything to
4  do with some of the employees', let's say, behavior
5  towards Juan. We have in our -- the maintenance
6  department many veterans or retired military people, so
7  I think they would be the first one to support Juan
8  because of his PTSD, but when you want to understand
9  maybe these type of behaviors, and I'm not saying
10 understanding in a way of supporting them and saying
11 that they are okay, but just to understand why they came
12 up, you need to understand the bigger picture, which is
13 also looking at facts prior to these events.
14     I was -- I read a few of the documentation
15 my colleague wrote in 2012 about colleagues of Juan who
16 heard him say that he was going through some hard times
17 and thinking about, you know, suicide at one point, if
18 I'm correct, with his colleagues, that they called an
19 ambulance because they were worried for his life.
20     On a different occasion, beginning, I
21 think, 2013, Juan -- we were going through some head
22 transactions, and Juan was worried about his job and
23 mentioned to another colleague that "If I lose my job, I
24 will shoot up this place." I'm quoting here, and this
25 kind of comments made different people -- might lead his

127

1  coworkers to be cautious when it comes to Juan
2  Alonzo-Miranda and maybe develop those type of
3  behaviors.
4      MR. GRIFFIN: Let me object as
5  nonresponsive.
6      Q. We were talking about the comment "crazy
7  person," and I thought you told the ladies and gentlemen
8  of the jury that you thought calling a person with PTSD
9  a crazy person had nothing to do with their disability,
10 and I was trying to get you to elaborate on what you
11 mean by saying that it's not related to their disability
12 when a coworker calls him a crazy person.
13     A. Because first, I don't think that everybody
14 within his coworkers was aware of his PTSD. That's not
15 something we as a company advertise.
16     Q. Well, what were they told about --
17     MR. DAVIS: Let him finish.
18     Q. -- why the dog was there?
19     MR. DAVID: Let him finish.
20     THE WITNESS: Sorry?
21     Q. What were they told about why the dog was
22 there?
23     A. We already covered that in a prior question.
24     Q. I thought you said that they told everybody
25 that he had the dog as a service animal for

128

1  accommodation.
2      A. Yes. But that doesn't mean we will disclose
3  whether or not he has PTSD.
4      Q. Well, did you leave it --
5      A. You can have a service dog and you --
6      Q. For what?
7      A. I don't think it's our employer's right to
8  disclose the medical condition of one of our employees
9  to other coworkers.
10     Q. Well, did you leave it to the imagination of
11 coworkers to just imagine why this gentleman needed a
12 service dog?
13     A. No, we didn't leave it to people's imagination.
14 We explained, as much as we are entitled to explain it,
15 why Juan needed a dog.
16     Q. Why -- Everybody knew Juan wasn't blind,
17 right?
18     A. Obviously.
19     Q. Well, what other conditions do service dogs
20 assist people, other than blindness, mental illness and
21 perhaps diabetes?
22     MR. DAVIS: Objection. Form.
23     THE WITNESS: I'm not a service dog expert,
24 so I cannot respond to that.
25     Q. Well, let me just ask, do you stick with your

129

1  position that calling a person a crazy person who has a
2  service dog is something unrelated to their disability?
3  If you do, it's okay. I just want to know if you're
4  sticking with that.
5      A. I'm saying it's not necessarily related to his
6  PTSD that someone can call another coworker a crazy guy.
7      Q. Okay.
8      A. Unless you can prove me that there's a direct
9  link.
10     Q. No. I think that the jury will -- can do that
11 better than you and I can, no problem.
12     And does Schlumberger agree that once it
13 had agreed that the dog was a reasonable accommodation,
14 that in fact, Juan suffered no more PTSD flashbacks or
15 panic attacks after the accommodation was granted?
16     MR. DAVIS: Objection. Form.
17     THE WITNESS: This is not something the
18 company is aware of.
19     Can I respond to that, elaborate further
20 what I --
21     Q. Yes. I might have to object if it's not
22 responsive, but yes, go ahead.
23     A. Once the dog came and was approved November
24 2012 --
25     Right?

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

---

130

1  Q. November 30th, yes.
2  **A. Yes.**
3  **-- I cannot say anything about any**
4  **flashbacks whatsoever.  However, after I came into that**
5  **role towards the end of the year and more specifically**
6  **till -- from Jan. to April, the service dog obviously**
7  **did not, you know, address work performance issues we**
8  **had with Juan, such as coming late, which was reported**
9  **and confirmed from -- especially from February to March,**
10 **or incidents such as sleeping on the job while, you**
11 **know, scheduled to work.**
12         MR. GRIFFIN:  Let me object as
13 nonresponsive.
14 Q. We're going to talk about that issue once we
15 get some more records from Schlumberger, but what I'm
16 talking about, just to make sure that you've said
17 everything you want to say about the relationship or the
18 appropriateness of a coworker calling Juan a crazy
19 person.
20 **A. As a human resource representative, I totally**
21 **condemn such comments, which I think are not appropriate**
22 **at all, and if we could have identified the person, we**
23 **would have dealt with the corresponding disciplinary**
24 **action.**
25 Q. Who is Nate Benavides?

---

131

1  **A. I'm sorry, sir.  You'll have to refresh my**
2  **mind.**
3  Q. That's okay.  If you don't --
4  **A. I look after 2,000 people, so I do not know**
5  **them all by heart.**
6  Q. You've never heard that name before?
7  **A. Nick, you said?**
8  Q. Nate.
9  **A. Nate?**
10 Q. Natividad "Nate" Benavides.
11 **A. I heard his name, and I believe he works for**
12 **the maintenance shop, but more precisely, I can't recall**
13 **anything.**
14 Q. And Daniel Bernal or maybe pronounced Bernal?
15 **A. No.**
16 Q. And Bradford Nez, N-e-z?
17 **A. No.**
18 Q. And you mentioned earlier in your testimony
19 that Schlumberger -- and if I paraphrase this wrong, you
20 tell me, but they weren't going to try to target the
21 people involved in this conduct toward Juan, but rather
22 address it as a group; you remember that?
23 **A. Yes.**
24 Q. And why was there a reluctance to try to target
25 the three people alleged to have committed these acts

---

132

1  against Juan?
2        MR. DAVIS:  Objection.  Form.
3  Q. What was the reluctance to target people who
4  were suspects for that sort of wrongful conduct toward
5  him?
6        MR. DAVIS:  Objection.  Form.
7        THE WITNESS:  I'm not aware of any
8  reluctance.  It's more lack of evidence.
9  Q. But if there are suspicions of those three, why
10 were they not targeted at least for interviews to tell
11 the truth about what they had done to Juan?
12        MR. DAVIS:  Objection.  Form.
13        THE WITNESS:  So your question implies that
14 when you interview an employee, he will tell -- he will
15 admit those type of allegations?
16 Q. Well, don't you expect your employees to be
17 honest when they're interviewed?
18 **A. Yes.  But --**
19 Q. So why were they not interviewed once they were
20 suspects for this sort of conduct?
21 **A. I was not given specific names.**
22 Q. You're saying that the name of Natividad
23 Hernandez was never brought to your attention as one of
24 the suspects for this sort of conduct against Juan?
25 **A. At least not during our conversations.**

---

133

1  Q. Was Enrico Ugoletti interviewed about his
2  conduct toward Juan?
3  **A. No.**
4  Q. Was Natividad Hernandez interviewed about his
5  conduct toward Juan?
6  **A. To my knowledge, not with myself.**
7  Q. And that same answer for Daniel Bernal and
8  Bradford Nez?
9  **A. Yes.**
10 Q. And does Schlumberger admit that Juan himself
11 shared with his coworkers at his shift, during meetings,
12 that Goldie was in fact his service dog for his PTSD?
13 **A. Sorry?**
14 Q. In other words, is Schlumberger aware that Juan
15 himself disclosed to his coworkers that Goldie was his
16 service dog for PTSD?
17        MR. DAVIS:  Objection.  Form.
18        THE WITNESS:  I'm not aware of that.
19 Q. Are there any rules or procedures in writing at
20 Schlumberger that help HR people to decide whether or
21 not, on a case-by-case basis, a request for
22 accommodation will be granted or denied?
23 **A. Not to my knowledge.  It's a case-by-case**
24 **approach.**
25 Q. Right.  But in each case, somebody has to

---

134

1  decide whether it will be granted or not, right?
2      **A. M-hm.**
3      Q. And the parameters for how that decision is
4  made in each case, as I understand it, is not documented
5  anywhere at Schlumberger?
6      **A. Not that I'm aware of.**
7      Q. So the group, whoever the group is, that makes
8  decisions about whether accommodations will be granted
9  by Schlumberger or not granted by Schlumberger, how --
10      Well, let me put it this way:  At some
11  point during the process, Schlumberger contended that
12  the two letters from the doctor and the therapist were
13  not sufficient, right?
14      **A. (The witness nodded his head up and down.)**
15      Q. But ultimately the company came to grant the
16  reasonable accommodation in November, right?
17      MR. DAVIS:  Objection.  Form.
18      THE WITNESS:  You're talking about the two
19  clarification forms.
20      Q. Yes.  The ones -- I think one of them is Dr.
21  Roach, and the other one was Mr. Yates.
22      **A. The latest one.**
23      Q. Was Mr. Yates?
24      **A. Okay.**
25      Q. Yes.

135

1      **A. And that was a psychiatrist, right?**
2      Q. I think he was a therapist.
3      Right, Juan?
4      MR. ALONZO-MIRANDA:  Who?
5      MR. GRIFFIN:  Mr. Yates.
6      MR. ALONZO-MIRANDA:  He's a licensed
7  clinical social worker.
8      Q. Yeah.  LCS -- Yeah.  Think therapist.
9      **A. There's two different letters, right?  And one**
10  **was a soc- -- I mean a clarification form, and another**
11  **one was a slightly different document.**
12      Q. Right.  But the ones we talked about were Dr.
13  Roach's -- He's the MD, internal medicine physician,
14  and the other one --
15      MR. ALONZO-MIRANDA:  "She."
16      MR. GRIFFIN:  "She."  Pardon me.  Thank
17  you.
18      Q. Dr. Barbara Roach.  And the second one was the
19  one from Mr. Yates, right?
20      **A. M-hm.**
21      Q. My question is, with that documentation, the
22  reasonable accommodation was approved on November the
23  30th, with no additional medical information provided,
24  right?
25      **A. I do not know whether additional documentation**

136

1  was provided or not.
2      Q. But as the company representative, the only two
3  that you have seen --
4      **A. The only two which I have seen are those, yes.**
5      Q. And is there any guidance?  For example, if
6  this came up today and a veteran has PTSD and requests a
7  service dog and presents medical documentation, and
8  let's say there are three letters, one from an MD, one
9  from a social-worker therapist and one from a
10  psychologist, and two of them say the service dog should
11  be allowed because it helps the patient, but the
12  psychologist says, "I'm not sure that would be a good
13  idea, and the dog might get hurt on the workspace," "in
14  the workspace," what guidance do Schlumberger's
15  decisionmakers have on whether or not they're going to
16  grant the request for the accommodation or to say, "No.
17  You can't have the dog because one of the psychologists
18  says it's not a good idea"?  What tools are available to
19  Schlumberger management people to decide whether or not
20  to honor a worker with a disability's request for
21  accommodation in that circumstance?
22      MR. DAVIS:  Objection.  Form.
23      THE WITNESS:  So what maybe you missed to
24  mention in your question is also that we not only take
25  into consideration the medical evidence, but also the

137

1  current position, current work environment and the
2  feasibility of the accommodation from a business point
3  of view.  All those factors are being taken into account
4  to assess a situation.
5      Q. Right.  I understand taken into account, but
6  once you have all of the factors and taken it into
7  account, what guidance is there to say, "Yes.  Granted,"
8  or "No.  Denied"?
9      MR. DAVIS:  Objection.  Form.
10      Q. How is that decision made?
11      **A. Again, it's a case-by-case approach.**
12      Q. But how does the team have any guidance on
13  which way they'll go in each case?
14      MR. DAVIS:  Objection.  Form.
15      THE WITNESS:  It's a case-by-case approach.
16      Q. Well, I know.  But if it's a case-by-case
17  approach, the results can be all over the map.  I'm
18  asking you to explain for the judge and jury, what
19  resources did the decisionmakers have to guide them in
20  these case-by-case decisions on each individual worker
21  who requests a reasonable accommodation for a
22  disability?
23      **A. The people involved in that decision-taking**
24  **process are mostly people who have very strong knowledge**
25  **and experience with the company, but also with those**

138

1  **type of requests, and those are the people who,**
2  **basically based on their experience, would be the best**
3  **to assess whether also to take into consideration the**
4  **business environment, if it's a feasible decision or**
5  **not.**
6      MR. GRIFFIN:  Let me object as
7  nonresponsive.
8      Q.  What I'm getting at is I hear you saying it's
9  good to have people who have done this before and
10  participate.  I get that.  But as I understand it
11  though, Schlumberger has no guidance for those folks who
12  are making those decisions on how they're supposed to
13  decide once they've gathered all the information and
14  once they are required to make a decision to, yes, honor
15  the worker's request for the reasonable accommodation
16  or -- or excuse me -- honor the worker's request for an
17  accommodation, or no, to deny it; there's no guidance
18  for them in any given case --
19     **A.  I don't agree with it.  We seek external**
20  **guidance from technical people whenever we believe it is**
21  **required to help us to assess a case, such as legal**
22  **guidance, et cetera.**
23     Q.  Well, but I'm not talking about law.  I'm
24  talking about accommodations for a worker with a
25  disability, and if you're disagreeing, I want you to

139

1  tell me why, but you've mentioned you can get external
2  guidance.  I get that, but the -- in this particular
3  case with Juan, Schlumberger did not reach out and get
4  any external guidance from experts in PTSD or service
5  dogs during this entire process, right?
6      MR. DAVIS:  Objection.  Form.
7      THE WITNESS:  I cannot confirm or deny this
8  because, as I said, I was not involved in the
9  decision-taking process, but it's very likely they
10  reached out to external parties to obtain technical
11  guidance.
12     Q.  Well, and I appreciate you giving me your
13  opinion about that, but I need to know whether, as the
14  company representative, as being --
15     **A.  As a company representative, I -- Sorry I --**
16  **Because I know what you're getting at, but I cannot -- I**
17  **don't have information, I don't have the knowledge as of**
18  **today to provide you with a yes or no answer.**
19     Q.  But you as an individual HR person would have
20  expected them to do that?
21     MR. DAVIS:  Objection.  Form.
22     THE WITNESS:  It's not about me.  It's
23  about the company, and yes, whenever we deem necessary,
24  we do request external guidance.
25     MR. GRIFFIN:  I can't read that.

140

1      MR. ALONZO-MIRANDA:  SLB, Schlumberger.
2      Q.  Well, does anyone at Schlumberger at all have
3  any expertise or experience with post-traumatic stress
4  disorder?
5      MR. DAVIS:  Objection.  Form, outside the
6  scope of the topic.
7      THE WITNESS:  Not to my knowledge.  I don't
8  know whether we have those people or not.
9      Q.  And getting back to the scenario, today, if a
10  worker comes in and Schlumberger tells them, "Bring in
11  medical information about your request," and they give
12  three different statements, one from an MD medical
13  doctor, one from a psychologist and one from a
14  therapist, where the three of them -- or two of them say
15  that the reasonable accommodation is a good one, the
16  dog, and the third one says it's not such a good idea
17  because the dog could get hurt and there are better ways
18  of doing this, how would Schlumberger -- what
19  methodology would Schlumberger use to decide whether or
20  not to accept the worker's request for an accommodation
21  or to deny it --
22     MR. DAVIS:  Objection.  Form.
23     Q.  -- under those circumstances?
24     MR. DAVIS:  Objection.  Form and outside
25  the scope of the topics.

141

1      THE WITNESS:  Under those circumstances, we
2  look for clear medical evidence.  And again, referring
3  to our current case, what I've seen so far did not show
4  me any clear medical evidence so far.
5      Q.  Well, I'm going to talk to you about that in a
6  moment, but regardless of your opinion about that,
7  Schlumberger itself determined that the accommodation
8  was reasonable and granted it on November the 30th,
9  before you arrived?
10     **A.  Yes.**
11     Q.  And maybe it's a --  Not --  "Cultural" is not
12  the right word, but maybe we see this from different
13  perspectives, you being a Frenchman and I an American,
14  but I need you to tell me as best you can what you mean
15  by "medical."
16     **A.  Medical?**
17     Q.  Yes.  When you said --  You've used the term
18  several times today --  Granted you were not involved in
19  this, but you have said, "I don't see medical evidence."
20     **A.  Okay.  For me, what I understand under medical**
21  **evidence is explaining how that accommodation could**
22  **address a certain pathology and improve or have any**
23  **positive impact on an employee's work performance or**
24  **environment or just well-being.  That's what I**
25  **understand.  Medical evidence is also explanation of how**

142

1  **it can address the condition.**
2      Q. But do you understand that -- And if you
3  don't, it's okay, but psychologists cannot give medical
4  advice, right?
5          MR. DAVIS: Objection. Form.
6          THE WITNESS: Sorry?
7      Q. Psychologists cannot give medical advice
8  because they're not physicians; do you understand that?
9  **A. Yes.**
10     Q. Likewise, therapists, even though they're good,
11  even though they help people, they can't give medical
12  advice either, can they?
13  **A. M-hm.**
14     Q. And these two categories of people,
15  psychologists and therapists, they cannot prescribe
16  medicine for patients, can they?
17         MR. DAVIS: Objection. Form.
18         THE WITNESS: I'm not referring to medical
19  as per se medicine, drugs. I'm referring as evidence to
20  explain a certain condition, whether it's a physical,
21  psychological, and to help us understand how one of
22  these two can be addressed through a certain
23  accommodation. That's what I understand under medical
24  evidence or, if you prefer, psychological evidence.
25     Q. If you had been making the decisions or had a

143

1  vote in November about whether the accommodation was
2  reasonable or not, is your thought that if you had been
3  involved in that decision making, you would have
4  disagreed with Schlumberger's decision to determine that
5  the service dog was a reasonable accommodation?
6          MR. DAVIS: Objection. Form and outside
7  the scope.
8          THE WITNESS: If I would have been there
9  during that time, my personal opinion on this is that
10  basically, yes, as long as it helps Juan to do his job
11  and that the dog is kept within a safety area and
12  doesn't, you know, present any safety concerns for other
13  coemployers -- employees, I would have granted that
14  request.
15     Q. No problem. And does Schlumberger contend that
16  any medical providers ever took the position that the
17  dog would not help Juan while at work?
18  **A. During that process, no. We did not have**
19  **documentation from Juan stating that.**
20     Q. Are you aware of anybody that takes the
21  position today that the service dog is not helpful to
22  Juan?
23         MR. DAVIS: Objection. Calls for
24  attorney-client privilege and work product.
25     Q. I'm not talking about lawyers. I'm talking

144

1  about medical people.
2      **A. Based on what I've seen yesterday on the notes**
3  **from the two psychiatrists following Juan in 2012, I**
4  **do -- have seen comments being made about the -- let's**
5  **say, the lack of evidence for a service dog to address**
6  **Juan's PTSD condition.**
7      Q. But in your view, that doesn't change your view
8  that the accommodation was a reasonable one?
9          MR. DAVIS: Objection. Form.
10     Q. Am I right in saying that, J.R.?
11  **A. Once the company makes a decision, I do, you**
12  **know, make sure we follow that decision.**
13     Q. In other words, despite what you saw about
14  doctors having different opinions, you still agree that
15  it was a reasonable accommodation for the dog to have
16  access to the premises, right?
17         MR. DAVIS: Objection. Form.
18         THE WITNESS: It's hard for me to respond
19  to your question because I wasn't involved, and maybe I
20  did not have access to all the facts at that time, but
21  again, a decision's been made by the company, and I make
22  sure we do respect our engagement.
23     Q. Right. But as the company representative,
24  Schlumberger is not saying today that the accommodation
25  of the dog was not reasonable?

145

1          MR. DAVIS: Objection. Form, calls for
2  attorney --
3      Q. Is it?
4          MR. DAVID: -- client privilege and work
5  product.
6          THE WITNESS: We do not consider it as not
7  reasonable.
8      Q. And I think I asked you this, but I'm going to
9  apologize and make sure I have this. At no time was
10  Goldie or Juan in danger or harm's way because
11  Schlumberger granted the reasonable accommodation in
12  November 2012?
13  **A. That's something I cannot assess.**
14     Q. But the company has not briefed you on any time
15  that they were in any --
16  **A. We did not have -- Besides the one complaint**
17  **by a coworker, I have no incidents on file.**
18     Q. And you're aware that therapists, psychologists
19  and doctors can have different opinions about the best
20  measures to help the patient?
21  **A. They're all human beings, yes.**
22     Q. Sure. And from your perspective as an HR
23  person at Schlumberger, Schlumberger is going to approve
24  the accommodation if there is a good-faith basis to
25  believe that the accommodation will allow the worker to

146

1  be successful?
2  **A. Sure.**
3      MR. DAVIS: Objection. Form.
4  Q. Was -- I may have asked you this, and if I
5  did, I apologize. Was having Goldie at the Schlumberger
6  location a hardship in any way for Schlumberger, having
7  the dog there?
8  **A. No.**
9  Q. And when Juan says that Goldie did help him to
10 be a successful worker, free of panic attacks on the
11 job, Schlumberger has no reason to disagree with that,
12 right?
13     MR. DAVIS: Objection. Form.
14     THE WITNESS: We have no reason to
15 disagree.
16 Q. Now, Schlumberger is aware that Juan actually
17 worked at the Laredo facility for some time?
18 **A. I wasn't aware of that.**
19 Q. Let me ask you a few questions about your
20 relationship with Juan, if that's okay. When did you
21 first get introduced to Juan?
22 **A. It was in 2013. I would say first time I had**
23 **the chance to meet Juan was because of his military**
24 **orders and payroll issues he encountered, and I believe**
25 **we liaised on these type of topics at the beginning.**

147

1      **Later on, we had the meetings with -- in**
2  **regards to his complaints about his work environment,**
3  **and yes, I mean, I was also required to attend**
4  **another -- a coaching session between him and Thomas**
5  **Skierka, the division maintenance manager, end of last**
6  **year. Those are basically the few times we were in**
7  **touch together.**
8  Q. What was your impression of Juan?
9  **A. Juan is a very polite employee, very courteous.**
10 Q. Courteous?
11 **A. Courteous, yes. And when he has a topic on his**
12 **mind, he will talk with a lot of details about it, and**
13 **yes, that's basically what I can recall of my personal**
14 **impression of Juan.**
15     (Exhibit 15 marked.)
16 Q. No problem. He was straightforward and honest
17 with you in his dealings?
18     MR. DAVIS: Objection. Form.
19     THE WITNESS: So far, yes.
20 Q. And you said he was courteous?
21 **A. He was courteous, yes.**
22 Q. Approximately how many times did you have
23 face-to-face meetings with Juan?
24 **A. I would say around five. Four of them were**
25 **very formal. Others were just running into each other**

148

1  **and just checking if everything was okay.**
2  Q. And am I right that for all of Juan's
3  evaluations at work, that he met or exceeded
4  expectations?
5      MR. DAVIS: Objection. Form.
6      THE WITNESS: In regards to his performance
7  appraisals, which I had a look at, yes. He showed the
8  ability to be able to perform his duties.
9  Q. And so all of his evaluations showed that he
10 met or exceeded expectations?
11 **A. Yes. He met. He didn't exceed them.**
12 **That's -- I didn't see an exceed expectations, but**
13 **maybe --**
14 Q. No problem. Well, I should say met or
15 exceeded, at least met.
16 **A. Yes. He definitely showed the ability to**
17 **perform his job.**
18 Q. And as I understand it, he was evaluated three
19 days before he was fired; is that right?
20 **A. I do not know when he was evaluated by his**
21 **direct manager.**
22 Q. And you mentioned your first visit with Juan
23 was when he was discussing with you going on leave for
24 military duty?
25 **A. Yeah. He went on various military duties or**

149

1  orders, and he every now and then, I guess, had his
2  orders being changed at the last time, which would then
3  result in having to update payroll accordingly, and as
4  our payroll runs on a biweekly basis, once payroll has
5  certain information, we need to wait for the next pay
6  cycle to change or update it accordingly, so these were
7  the main type of issues he encountered.
8      (Exhibit 17 marked.)
9  Q. Is Exhibit 17 documentation of Juan's
10 submitting to Schlumberger information about times when
11 he was requesting to be off from work, documenting that?
12 **A. I've not seen all of them, but they look**
13 **correct to me.**
14 Q. I'm going to show you Exhibit No. 15, and when
15 we visit next time, we may talk more about that and
16 further, but can you at least identify that as the
17 official Schlumberger policy as it relates to incidents
18 or reports of harassment of another worker?
19 **A. Yes.**
20 Q. And that is supposed to be followed by
21 Schlumberger?
22 **A. It's not supposed. It is followed by**
23 **Schlumberger.**
24 Q. And is there anything that's been changed in
25 that policy since you've come on board in Texas?

150

1    A. We had a new rollout of what we call the
2 blueprint, which does entail a new orientation, not
3 necessarily on the harassment policy, but in regards to
4 the company policy and the attitude of what we expect
5 from employees, but more -- This is kind of -- Yeah.
6 I mean, it's -- it's still, I would believe, up to date.
7    Q. J.R., when you became aware of the reports of
8 the harassment of Juan in the fall of 2012, who else in
9 management had any role in investigating the report and
10 what was to be done about it?
11    A. I'm not aware of the harassment case in 2012.
12    Q. The three incidents with the grease, the
13 crazy-people comments and the turning the kennel upside
14 down. I had the wrong year. Thank you.
15    A. Okay, okay.
16    Q. Yeah. Thank you. Excuse me. 2013. Bless
17 you. Because the service dog only was approved on
18 November 30th --
19    A. Exactly.
20    Q. -- '12, but in '13 when you got -- You came on
21 board in April of '13?
22    A. Yes.
23    Q. But when you got on board is when Juan reported
24 to you this harassment. Who else was involved in the
25 investigation of that report, other than you?

151

1    A. My manager at the time, Ruchira Corey.
2 Compliance team was closely following our investigation.
3    Q. And who is the compliance team?
4    A. Judy Lawton and her specialist, Leigh Nichols.
5    Q. Leigh Nichols?
6    A. Yeah.
7    Q. Anyone else?
8    A. I believe David Dunn was following that closely
9 as well.
10    Q. And what's his job title?
11    A. His job title at the time was PPS HR Manager,
12 North America Land.
13    Q. Have you review -- Well, you were on board on
14 April the 23rd, 2014, right?
15    A. On April twenty --
16    Q. Yes. This past April, yes. It is my
17 understanding that Schlumberger fired Juan on April the
18 25th, 2014, and what I'm asking you is, have you
19 reviewed Juan's evaluation dated April the 23rd, 2014?
20    A. No. The performance reviews and the evaluation
21 does not go through with HR.
22    Q. No problem. At Schlumberger, when people are
23 evaluated, are they evaluated over the course of their
24 entire career in their evaluations, or are they only
25 evaluated for the period of time being evaluated?

152

1    A. They're only evaluated for every -- I mean,
2 the evaluation always cover the calendar year, which
3 start from Jan. of a given year to the 31st of December,
4 so what you have here covers the full year of 2013.
5    Q. In other words, even though it's dated April
6 the 23rd, it does not cover any part of 2014?
7    A. I do confirm.
8       MR. GRIFFIN: It is five o'clock. Let's go
9 off the record here for a second.
10       (SIGNATURE NOT REQUESTED)

153

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2          SAN ANTONIO DIVISION
3 Juan Alonzo-Miranda,    *
        Plaintiff,   *
4                *
  VS.          *  CIVIL ACTION NO.:
5              *  5:13-CV-01057
               *
6 Schlumberger Technology   *
  Corporation,       *
7        Defendant.   *
8
9     REPORTER'S CERTIFICATION
      ORAL DEPOSITION OF
10      JEAN-REMY BELLANGER
        August 21, 2014
11        Volume 1
12    I, JUDY L. MOORE, a Certified Shorthand
13 Reporter in and for the State of Texas and Registered
14 Merit Reporter, do hereby certify to the following:
15    That the witness, JEAN-REMY BELLANGER, was
16 duly sworn by the officer and that the transcript of the
17 oral deposition is a true record of the testimony given
18 by the witness;
19    That the original deposition was delivered to
20 John W. Griffin;
21    That a copy of this certificate was served on
22 all parties and/or the witness shown herein on
23 _____;
24    That the amount of time used by each party at
25 the deposition is as follows:

**JEAN-REMY BELLANGER - VOLUME 1  -  August 21, 2014**

154

1      John W. Griffin - 3 hours, 48 minutes
2      I further certify that pursuant to FRCP
3  Rule 30(f)(1), the signature by the deponent:
4      _____ was requested by the deponent or a party
5  before the completion of the deposition and that the
6  signature is to be before any notary public and returned
7  within 30 days from date of receipt of the transcript.
8  If returned, the attached Changes and Signature Pages
9  contain any changes and reasons therefor.
10     XXXXX was not requested by the deponent or a
11  party before the completion of the deposition.
12     I further certify that I am neither counsel
13  for, related to, nor employed by any of the parties or
14  attorneys in the action in which this proceeding was
15  taken, and further that I am not financially or
16  otherwise interested in the outcome of the action.
17     Certified by me this the 25th day
18  of August, 2014.
19
20  _____
     JUDY L. MOORE, CSR 2236
21    Expiration Date: 12-31-14
     JULIE A. JORDAN & COMPANY
22    Firm Registration No. 280
     7800 North MoPac Expressway
23    Suite 120
     Austin, Texas  78759
24    (512) 451-8243
     (512) 451-7583 (Fax)
25    E-MAIL: info@jordanreporting.com

**A**

**A.D**
5:9
**abilities**
16:2, 43:6, 46:19
74:2, 74:4, 95:23
95:24
**ability**
16:15, 53:22
84:23, 85:2, 109:3
148:8, 148:16
**abitur**
7:1
**able**
16:2, 20:12, 29:2
47:5, 48:13, 72:20
86:3, 89:6, 109:23
148:8
**above-entitled**
5:3
**abroad**
11:2
**abrogated**
45:20
**Absolutely**
61:25
**accept**
38:2, 54:15
140:20
**access**
41:18, 42:11, 81:7
91:16, 91:21, 96:5
99:13, 101:10
123:18, 125:2
144:16, 144:20
**accommodate**
17:1, 35:14, 38:2
43:6, 43:23, 44:4
45:25, 46:20
53:15, 53:21
108:19
**accommodated**
45:5, 45:19
**accommodation**
16:12, 16:16
16:20, 16:22, 17:8
17:10, 17:22
18:14, 19:1, 19:7
19:14, 19:16

19:25, 20:15, 21:2
21:4, 21:16, 27:15
34:12, 35:7, 36:2
36:7, 36:10, 36:15
36:21, 37:18
37:21, 37:25, 38:2
38:25, 39:10
40:18, 40:24
40:25, 42:15
43:12, 43:14
46:14, 46:15
46:24, 47:24, 53:3
53:8, 54:15, 56:9
59:20, 60:3, 62:2
62:19, 63:13
63:24, 64:1, 64:18
64:24, 65:4, 65:8
65:23, 66:2, 66:10
67:13, 68:1, 68:14
70:10, 70:19
71:24, 73:16, 74:4
74:6, 74:12, 75:2
77:24, 81:3, 85:19
88:21, 89:15
91:21, 92:12
92:17, 92:25, 93:7
93:11, 93:13
95:21, 95:24
96:16, 97:6, 99:14
100:15, 101:17
102:9, 102:10
102:17, 102:20
103:4, 103:11
103:13, 103:19
104:6, 104:15
104:19, 104:20
106:4, 107:12
107:19, 108:3
108:12, 111:17
121:10, 121:15
123:17, 124:7
124:13, 125:3
128:1, 129:13
129:15, 133:22
134:16, 135:22
136:16, 136:21
137:2, 137:21
138:15, 138:17
140:15, 140:20
141:7, 141:21

142:23, 143:1
143:5, 144:8
144:15, 144:24
145:11, 145:24
145:25
**accommodations**
3:20, 3:22, 4:3
41:13, 41:17
41:20, 42:6, 43:9
43:11, 43:18
43:21, 44:23, 45:9
64:3, 73:10, 73:17
87:3, 90:2, 95:4
97:17, 97:18
134:8, 138:24
**accomplished**
122:7
**account**
92:2, 110:6, 137:3
137:5, 137:7
**acids**
110:18
**act**
10:19, 11:15
11:21, 15:5, 38:24
76:5, 90:3
**acted**
105:21
**acting**
105:8
**action**
1:4, 39:6, 114:6
130:24, 153:4
154:14, 154:16
**actions**
118:25
**activities**
17:14, 84:23
**acts**
131:25
**actual**
11:7, 75:18
**ADA**
15:16, 15:17
15:22, 15:25, 16:7
**add**
13:8, 74:17, 91:23
104:14
**added**
37:11

**additional**
84:19, 122:14
135:23, 135:25
**address**
23:24, 53:23
74:23, 113:22
117:5, 130:7
131:22, 141:22
142:1, 144:5
**addressed**
29:15, 34:13
40:14, 41:9, 75:11
124:13, 142:22
**addressing**
70:18
**administration**
7:8, 8:12
**administrative**
12:7
**admit**
132:15, 133:10
**advertise**
127:15
**advice**
33:6, 67:20, 69:7
69:17, 142:4
142:7, 142:12
**Affairs**
7:6
**affect**
85:2
**Africa**
6:19
**afternoon**
57:16
**age**
6:2
**aggressive**
105:11, 105:21
**ago**
12:10
**agree**
18:22, 23:4, 36:8
40:20, 41:11
42:21, 56:10
61:23, 68:12
83:20, 83:21, 86:1
87:13, 101:9
102:3, 107:19
108:2, 115:3

115:14, 123:16
129:12, 138:19
144:14
**agreeable**
61:19
**agreed**
62:23, 90:21, 97:9
97:19, 97:21
99:20, 104:6
129:13
**agreement**
62:24, 63:18
68:13, 108:10
**agrees**
41:1, 125:10
125:13
**ahead**
22:10, 29:11
36:10, 93:14
129:22
**Akard**
2:7
**Alice**
50:2, 50:3
**allegations**
132:15
**alleged**
131:25
**allow**
16:12, 28:19, 42:3
42:11, 47:12
55:10, 56:11, 61:3
73:10, 73:18
74:12, 80:22, 81:7
81:19, 82:9, 82:11
82:17, 89:16, 93:4
96:8, 97:9, 98:5
99:20, 100:4
100:7, 101:2
145:25
**allowed**
45:1, 53:14, 55:16
67:21, 81:16
87:15, 91:16
96:19, 103:22
107:14, 123:18
124:1, 124:2
136:11
**allowing**
43:19, 46:2, 46:10

99:13, 102:11
104:19, 124:22
125:2
**Alonzo**
39:10, 41:25, 42:2
42:3, 44:3, 45:1
53:14, 66:24
71:17, 75:7, 77:24
85:23, 94:15
110:16, 112:21
112:23, 113:2
113:25, 114:24
**Alonzo's**
35:14, 37:21, 38:4
43:7, 43:13, 53:3
56:8, 56:17, 58:11
113:12
**Alonzo-Miranda**
1:3, 2:10, 3:11
3:19, 3:24, 4:1, 4:6
5:3, 34:11, 35:25
36:23, 40:18
40:24, 41:14, 43:3
66:12, 66:14
87:14, 90:7, 90:10
91:6, 102:16
113:18, 127:2
135:4, 135:6
135:15, 140:1
153:3
**Alonzo-Miranda's**
52:11, 90:12
**alternate**
40:23, 41:13
41:17, 41:20
43:18
**alternative**
122:1, 122:3
**ambulance**
126:19
**America**
10:22, 12:19
17:14, 76:11
76:14, 151:12
**American**
10:19, 13:19
141:13
**Americans**
10:19, 11:14
11:21, 14:17, 15:5

38:23
**amount**
14:11, 153:24
**and/or**
153:22
**animal**
47:15, 84:11
84:12, 103:23
106:1, 127:25
**animals**
48:23, 89:4
**answer**
17:17, 21:11
21:14, 21:25
22:11, 23:1, 23:2
23:8, 23:12, 24:13
24:18, 24:19
24:20, 24:22
24:24, 25:6, 26:14
27:12, 28:12
28:19, 29:2, 29:16
30:5, 34:19, 39:12
41:6, 41:23, 53:10
57:6, 57:22, 57:23
59:16, 59:17
59:23, 60:18
66:15, 68:11
74:10, 74:15
78:11, 78:17
78:20, 78:21
78:25, 79:2, 79:5
79:16, 79:21
82:24, 83:3, 86:10
86:12, 86:13
89:24, 92:4, 95:11
97:24, 98:7, 107:8
111:10, 119:25
133:7, 139:18
**answered**
20:2, 36:19, 44:6
44:8, 44:13, 77:21
83:16, 85:4
123:10
**answering**
22:8, 23:9, 30:21
78:13
**answers**
61:24, 77:23, 84:9
85:6
**Antonio**

1:2, 5:6, 5:11
28:23, 45:13, 50:2
52:22, 53:15
56:13, 113:19
121:6, 122:10
122:11, 153:2
**anybody**
39:23, 56:20
56:24, 86:6, 86:16
103:18, 114:21
117:21, 143:20
**anymore**
114:8, 115:2
**Anyway**
114:2
**apologize**
145:9, 146:5
**APPEARANCES**
2:1
**Appearing**
2:5, 2:9
**applicable**
36:19, 77:21
83:12
**applies**
47:2, 49:17, 61:16
**apply**
48:21, 48:22
48:23, 48:25, 60:6
114:5
**appraisals**
148:7
**appreciate**
44:16, 139:12
**apprenticed**
10:15
**apprenticeship**
7:11, 9:2, 9:4, 9:7
9:9, 9:14
**approach**
11:22, 13:15
13:19, 18:19
18:20, 20:20, 21:9
58:11, 133:24
137:11, 137:15
137:17
**appropriate**
130:21
**appropriateness**
130:18

**approval**
122:13, 122:15
**approve**
64:5, 95:24, 97:1
99:25, 145:23
**approved**
70:4, 110:5
124:14, 125:8
129:23, 135:22
150:17
**Approximately**
147:22
**April**
12:16, 13:3, 13:4
13:19, 13:25, 26:5
28:23, 130:6
150:21, 151:14
151:15, 151:16
151:17, 151:19
152:5
**area**
45:2, 49:24
143:11
**arguing**
33:20, 59:2
**argument**
55:1
**argumentative**
78:19
**arrived**
10:25, 12:16
15:15, 28:22, 29:9
141:9
**asked**
15:11, 15:21, 20:2
25:4, 30:24, 32:10
36:22, 38:11
38:15, 42:10
54:14, 62:14, 66:5
67:21, 79:22
80:24, 87:7, 100:1
116:21, 145:8
146:4
**asking**
20:20, 23:6, 23:18
23:20, 33:21
34:24, 34:25, 41:8
42:6, 42:7, 42:21
42:22, 48:1, 49:4
70:16, 72:4, 72:5

75:3, 75:4, 77:19
78:14, 79:24
81:11, 87:24, 88:3
96:14, 97:4, 97:5
98:9, 98:10
109:13, 117:1
123:12, 137:18
151:18
**asks**
49:4, 69:18, 83:6
83:15
**assess**
73:7, 89:6, 92:17
107:25, 137:4
138:3, 138:21
145:13
**assessed**
34:13, 82:7, 82:8
**assessment**
68:22, 81:25, 89:7
93:11, 96:11
96:25
**assigned**
122:14
**assignments**
84:13
**assist**
70:9, 70:18, 83:10
128:20
**assisting**
109:2
**assume**
30:24, 85:5
**assuming**
12:11, 32:1
**attached**
83:4, 154:8
**attack**
109:24, 110:1
110:8, 111:5
122:23
**attacks**
87:15, 87:21, 88:2
88:5, 88:15, 88:16
129:15, 146:10
**attend**
118:20, 120:18
147:3
**attention**
15:5, 110:10

112:24, 113:9
124:12, 132:23
**attitude**
150:4
**attorney**
145:2
**attorney-client**
67:24, 68:18
69:12, 69:19
143:24
**attorneys**
154:14
**August**
1:15, 5:9, 153:10
154:18
**Austin**
154:23
**authority**
76:21
**authorization**
66:8, 66:18, 69:3
89:18, 90:9
**authorized**
67:6, 106:20
**authorizes**
67:5
**available**
111:21, 136:18
**avoid**
113:16, 113:17
**aware**
43:15, 50:23, 51:6
51:7, 52:25, 53:5
56:2, 57:14, 58:5
58:19, 59:8, 60:14
65:21, 67:14
69:22, 70:24, 71:2
71:20, 71:22
71:25, 72:4, 72:6
72:24, 74:3, 80:1
87:5, 87:13, 87:19
87:20, 87:25, 88:1
88:1, 88:4, 88:5
88:22, 89:16
90:13, 92:24, 94:6
103:7, 105:10
106:22, 109:14
111:19, 123:5
127:14, 129:18
132:7, 133:14

133:18, 134:6
143:20, 145:18
146:16, 146:18
150:7, 150:11

**B**

**baccalaureate**
7:1
**bachelor**
7:3, 7:4, 7:18
**back**
11:5, 12:9, 45:7
68:8, 73:2, 73:23
117:15, 140:9
**background**
6:16, 37:24, 89:6
**bad**
22:24
**Ballenger**
33:1, 33:2
**Barbara**
3:21, 77:13
135:18
**barrier**
23:16
**based**
43:2, 43:3, 43:13
72:25, 77:12, 91:3
92:23, 94:24
97:12, 98:7, 98:12
117:7, 138:2
144:2
**basically**
28:25, 29:16
31:20, 33:5, 89:7
105:13, 105:19
138:2, 143:10
147:6, 147:13
**basis**
16:16, 16:25
83:22, 124:19
133:21, 145:24
149:4
**Beg**
29:22, 112:6
**beginning**
103:15, 126:20
146:25
**behalf**

83:18, 95:3
**behavior**
126:4
**behaviors**
113:23, 126:9
127:3
**beings**
48:23, 145:21
**believe**
9:8, 16:7, 33:7
37:16, 37:19, 43:5
45:15, 70:2, 71:17
71:22, 72:19
75:11, 85:12
85:18, 91:25
101:14, 104:14
105:16, 105:20
106:5, 110:5
117:22, 121:21
122:11, 124:19
125:22, 131:11
138:20, 145:25
146:24, 150:6
151:8
**Bellanger**
1:14, 2:11, 5:2, 6:1
6:8, 33:3, 153:10
153:15
**Benavides**
130:25, 131:10
**benefit**
19:11, 56:17
56:18, 56:23
74:20, 77:24
**benefits**
70:5, 82:15
**Benin**
6:20
**Berlin**
7:6
**Bernal**
131:14, 131:14
133:7
**best**
15:24, 16:2, 16:9
16:14, 21:11
21:14, 29:2, 36:2
43:6, 46:19, 48:10
50:7, 53:22, 54:12
74:4, 74:10, 74:15

95:23, 114:11
115:21, 122:12
138:2, 141:14
145:19
**better**
37:23, 47:5
129:11, 140:17
**big**
99:7
**bigger**
126:12
**Bill**
24:6, 28:5
**birth**
10:3
**bit**
6:15, 105:11
105:21
**bitten**
105:13
**biweekly**
149:4
**black-and-white**
18:20
**bless**
82:22, 150:16
**blind**
128:16
**blindness**
128:20
**blue**
51:10
**blueprint**
150:2
**blurted**
55:24
**board**
149:25, 150:21
150:23, 151:13
**born**
6:16, 6:17
**bottom**
120:15
**Bradford**
131:16, 133:8
**Bradley**
30:9, 113:20
114:7, 117:20
118:9
**break**

40:8, 40:11, 41:22
41:24, 43:9, 44:12
44:15, 71:9
101:21
**briefed**
123:7, 145:14
**bring**
4:2, 45:2, 48:3
48:4, 48:13, 49:2
49:8, 49:16, 49:19
65:4, 73:1, 74:20
75:4, 80:23, 81:5
81:16, 93:4, 93:8
102:17, 140:10
**bringing**
49:15, 53:4
103:11, 103:11
**brings**
48:16, 49:5
**broad**
24:3
**broke**
102:22
**brought**
112:23, 113:9
124:11, 132:23
**Brown**
30:9, 113:20
114:8, 117:20
118:9
**buck**
61:2, 61:4
**bunch**
119:22
**business**
7:8, 7:24, 8:11
8:11, 16:25, 21:5
46:20, 47:22
63:12, 74:5
122:17, 137:2
138:4

**C**

**calendar**
152:2
**call**
6:12, 14:2, 16:17
86:25, 121:25
129:6, 150:1

**called**
6:9, 7:19, 13:10
14:15, 31:8
113:21, 116:12
116:16, 118:22
126:18
**calling**
115:5, 115:16
115:25, 117:12
117:14, 125:24
125:25, 127:8
129:1, 130:18
**calling-him-the-c...**
117:1
**calls**
28:15, 57:15
67:23, 68:17
69:11, 127:12
143:23, 145:1
**camera**
113:11
**capabilities**
74:2
**capable**
71:17
**care**
49:9, 80:2, 85:23
**career**
151:24
**caretakers**
89:3, 89:14
**carried**
118:8
**case**
18:22, 18:22
20:18, 20:19, 21:8
27:17, 28:25
31:11, 31:21, 37:6
47:6, 58:11, 59:8
59:11, 60:16, 63:9
66:19, 71:1, 71:24
75:1, 106:22
113:18, 133:25
134:4, 137:13
138:18, 138:21
139:3, 141:3
150:11
**case-by-case**
20:20, 21:9
133:21, 133:23

137:11, 137:15
137:16, 137:20
**case-to-case**
16:16, 16:24
18:18, 58:11
**cases**
20:18
**categories**
142:14
**cause**
5:3, 6:2, 34:2
34:25, 35:6, 35:20
39:13, 39:17
39:24, 87:10
96:15, 98:3
**caused**
108:1
**cautious**
127:1
**CEO**
99:4
**certain**
28:17, 29:1, 33:10
42:3, 47:1, 47:3
48:19, 73:7
141:22, 142:20
142:22, 149:5
**certainly**
25:3, 40:10, 71:8
112:13, 124:21
**certificate**
153:21
**CERTIFICATION**
153:9
**Certified**
2:13, 4:15, 5:7
153:12, 154:17
**certify**
57:24, 153:14
154:2, 154:12
**cetera**
25:15, 27:15
112:1, 138:22
**chair**
113:5, 113:13
**challenging**
23:5
**chance**
146:23
**change**

47:4, 96:16, 99:24
113:22, 144:7
149:6
**changed**
37:15, 45:21, 96:2
96:6, 96:9, 96:12
96:15, 96:20, 97:6
97:20, 149:2
149:24
**changes**
154:8, 154:9
**changing**
45:25
**charge**
3:12, 28:24, 36:4
49:25, 50:1
**Charles**
9:18, 9:21
**checking**
148:1
**chemicals**
110:17
**children**
49:16
**choice**
70:9
**choose**
69:6, 69:24
**choosing**
67:7, 68:25, 69:2
69:5, 70:3
**Christi**
50:2
**circle**
29:5
**circumstance**
136:21
**circumstances**
70:21, 108:6
140:23, 141:1
**citizen**
10:5
**citizenship**
10:6
**Civil**
1:4, 5:13, 153:4
**claim**
103:9, 103:18
**claimed**
103:24

**clarification**
36:14, 66:2, 85:18
134:19, 135:10
**clarification-of-the**
16:19
**clarify**
29:1
**clarifying**
3:20, 3:22, 4:3
92:24, 100:15
**class**
10:21
**classes**
14:3
**clear**
36:20, 37:3, 37:19
37:24, 74:20
77:25, 81:2, 89:18
90:21, 95:20
116:3, 141:2
141:4
**clearly**
37:9, 94:14
**client**
40:17, 40:22
145:4
**clinical**
135:7
**closely**
151:2, 151:8
**coaching**
79:20, 147:4
**coemployers**
143:13
**colleague**
28:24, 36:6, 65:24
126:15, 126:23
**colleagues**
126:15, 126:18
**Colony**
50:3
**come**
11:1, 11:4, 32:10
67:21, 74:5, 82:1
82:4, 124:15
149:25
**comes**
11:18, 21:16
25:14, 61:2, 93:3
127:1, 140:10

**coming**
13:7, 130:8
**comment**
127:6
**comments**
113:6, 113:7
117:2, 126:25
130:21, 144:4
150:13
**Commission**
3:9
**committed**
131:25
**common**
13:16, 33:12
**communicate**
25:12, 25:16, 31:6
73:2
**communicated**
121:20
**communicating**
22:25, 23:20
59:22, 59:24, 75:6
112:4
**communication**
25:14, 26:6, 39:9
65:13, 88:22
**communications**
35:23, 93:19
99:11
**Communicator**
94:15
**Companion**
84:11, 84:12
**company**
7:12, 7:12, 14:1
21:6, 24:8, 32:20
49:13, 59:13
60:21, 60:24
62:21, 63:16
70:20, 70:24, 72:8
74:3, 74:8, 75:13
76:15, 91:3, 91:4
93:10, 93:13, 99:7
102:23, 104:25
107:17, 108:2
108:14, 109:11
109:14, 109:22
111:3, 111:11
111:13, 111:15

116:9, 119:3
119:8, 120:22
120:23, 123:7
123:13, 127:15
129:18, 134:15
136:2, 137:25
139:14, 139:15
139:23, 144:11
144:21, 144:23
145:14, 150:4
154:21
**company's**
25:17, 70:17
70:23, 105:6
112:17, 117:4
**companywide**
107:2
**compare**
8:2
**compared**
8:1
**complained**
104:21
**complaint**
112:23, 112:25
145:16
**complaints**
112:18, 147:2
**complete**
14:1, 14:12, 37:22
**completed**
6:20, 7:7, 8:4
36:17, 85:19
94:16, 95:4
100:16
**completely**
24:13, 25:5, 43:4
**completion**
154:5, 154:11
**complex**
11:17, 12:3, 12:6
**compliance**
10:25, 12:19
12:25, 15:15
16:24, 17:13, 18:2
26:6, 31:3, 38:20
59:15, 60:24, 62:9
63:10, 76:13
90:18, 108:21
151:2, 151:3

**comply**
33:16, 33:24
34:22, 35:14
**compromise**
62:24
**computer**
32:12
**concerns**
105:23, 143:12
**condemn**
130:21
**condition**
37:10, 56:19
64:23, 66:3, 83:15
84:2, 84:6, 84:13
84:22, 85:1, 85:21
89:2, 89:14, 95:5
126:2, 128:8
142:1, 142:20
144:6
**conditions**
38:3, 42:4, 90:1
104:2, 106:4
106:7, 108:18
111:23, 124:15
128:19
**conduct**
118:6, 131:21
132:4, 132:20
132:24, 133:2
133:5
**confirm**
19:3, 28:16, 28:18
57:12, 66:8, 83:1
85:9, 87:12
102:13, 102:21
106:10, 116:4
122:21, 124:3
139:7, 152:7
**confirmed**
102:23, 130:9
**conjunction**
17:12, 18:2
**connection**
11:8, 11:11, 91:15
**consider**
6:25, 7:11, 8:11
10:10, 104:3
145:6
**consideration**

93:8, 136:25
138:3
**consistent**
46:7, 68:20
**constraints**
74:5
**consult**
111:16
**contain**
120:6, 154:9
**contains**
119:11
**contend**
91:5, 143:15
**contended**
103:3, 134:11
**control**
110:23
**conversations**
132:25
**convoluted**
23:17
**copy**
26:2, 26:3, 27:24
30:18, 116:11
153:21
**Corey**
112:22, 151:1
**corporate**
51:2, 52:14, 53:19
55:23, 57:2, 58:4
58:17, 60:13
88:11, 96:22
98:11, 98:12
**corporation**
1:6, 5:4, 99:8
153:6
**Corpus**
50:2
**correct**
39:18, 47:8, 69:8
80:17, 80:23, 81:6
83:7, 84:24, 101:3
102:24, 107:9
126:18, 149:13
**corresponding**
114:5, 130:23
**counsel**
79:13, 154:12
**counseling**

111:24
**counselors**
80:11
**count**
23:18, 122:14
**couple**
22:21, 40:7
**course**
20:25, 59:13
113:10, 113:14
151:23
**court**
1:1, 5:6, 5:17, 5:17
5:21, 7:21, 19:12
21:21, 21:24, 22:2
22:22, 26:1, 28:10
64:8, 153:1
**courteous**
147:9, 147:10
147:11, 147:20
147:21
**courthouse**
100:11
**cover**
152:2, 152:6
**coverage**
70:5
**covered**
20:7, 127:23
**covers**
152:4
**coworker**
127:12, 129:6
130:18, 145:17
**coworkers**
121:4, 121:20
127:1, 127:14
128:9, 128:11
133:11, 133:15
**crazy**
113:8, 115:5
115:16, 115:25
116:12, 116:17
117:13, 117:15
118:22, 118:23
125:24, 126:1
127:6, 127:9
127:12, 129:1
129:6, 130:18
**crazy-guy**

117:2, 117:2
**crazy-people**
150:13
**crew**
122:4
**crews**
118:15, 118:20
119:6, 120:19
122:2
**CSR**
154:20
**Cultural**
141:11
**current**
7:25, 99:4, 137:1
137:1, 141:3
**cycle**
149:6

## D

**d'etudes**
7:20
**Dallas**
2:7
**danger**
145:10
**Daniel**
131:14, 133:7
**date**
10:3, 13:5, 36:2
36:16, 40:22
41:12, 77:3, 94:17
150:6, 154:7
154:21
**dated**
3:10, 3:17, 3:18
3:24, 4:1, 4:5
35:20, 151:19
152:5
**dates**
45:12, 87:23
93:25, 94:6
**David**
3:11, 22:1, 22:3
44:8, 44:11, 55:19
57:6, 75:21, 78:19
79:16, 98:19
127:19, 145:4
151:8

**Davis**
2:6, 5:20, 8:20
17:16, 18:16, 19:8
20:2, 21:18, 24:15
24:19, 25:8, 26:25
27:2, 27:7, 29:8
29:11, 33:15
33:23, 34:16
34:19, 35:2, 35:10
38:17, 39:1, 39:19
40:13, 41:2, 41:6
41:21, 42:16
42:20, 42:23, 44:6
46:3, 50:20, 51:1
51:12, 52:13
52:23, 53:18
55:14, 55:21, 56:5
56:21, 57:1, 57:21
58:3, 58:16, 58:24
59:1, 59:10, 59:23
59:25, 60:12
66:11, 66:20
67:23, 68:17, 69:9
69:11, 69:18, 72:7
72:14, 73:20
74:14, 74:16
76:19, 76:23
78:16, 79:1, 79:5
79:9, 79:14, 80:4
81:9, 81:21, 82:19
82:21, 85:16, 86:8
86:13, 87:17, 88:6
88:10, 94:5, 94:12
96:21, 97:10
97:23, 98:25
101:6, 102:5
103:1, 103:5
103:25, 104:10
104:22, 104:24
106:2, 107:4
107:21, 108:4
109:4, 109:18
110:2, 110:12
111:8, 115:7
115:17, 116:1
116:18, 117:16
119:19, 119:22
122:24, 123:19
124:8, 125:21
127:17, 128:22

129:16, 132:2
132:6, 132:12
133:17, 134:17
136:22, 137:9
137:14, 139:6
139:21, 140:5
140:22, 140:24
142:5, 142:17
143:6, 143:23
144:9, 144:17
145:1, 146:3
146:13, 147:18
148:5
**davisw@jacksonl...**
2:8
**day**
5:9, 23:19, 35:15
44:2, 44:5, 45:8
45:21, 46:2, 46:10
47:7, 122:14
154:17
**day-shift**
45:10, 45:16
**days**
43:24, 45:6, 45:7
46:9, 47:7, 104:13
148:19, 154:7
**daytime**
104:13
**deal**
10:18, 14:3, 21:6
**dealing**
13:12, 15:9, 20:17
**dealings**
147:17
**deals**
16:21
**dealt**
15:16, 21:8, 26:11
58:10, 130:23
**Dear**
3:18
**December**
152:3
**decide**
20:23, 20:24, 38:1
59:19, 63:4, 63:25
133:20, 134:1
136:19, 138:13
140:19

**decided**
45:7, 90:25
113:13, 113:16
113:20
**decides**
17:9, 21:12, 21:15
63:14, 63:22
**deciding**
93:6
**decision**
17:11, 17:22
17:25, 18:3, 18:5
18:9, 18:13, 18:24
45:18, 60:21
61:25, 62:19
62:22, 64:5, 75:8
75:15, 76:1, 81:25
90:20, 91:3, 93:12
96:8, 96:11, 98:4
99:19, 99:24
100:4, 100:19
101:2, 101:3
101:12, 102:8
102:24, 103:3
104:12, 105:3
107:11, 108:14
108:16, 123:16
123:24, 134:3
137:10, 138:4
138:14, 143:3
143:4, 144:11
144:12
**decision's**
144:21
**decision-making**
64:3
**decision-taking**
96:10, 100:8
108:6, 137:23
139:9
**decisionmaker**
59:12, 62:25
124:1
**decisionmakers**
123:22, 136:15
137:19
**decisions**
17:6, 19:5, 19:13
19:24, 20:13
63:17, 75:10

75:17, 134:8
137:20, 138:12
142:25
**dedicated**
85:22, 111:19
111:20
**deem**
139:23
**Defendant**
1:7, 2:9, 5:5, 153:7
**defined**
47:24
**definitely**
49:12, 114:5
118:25, 148:16
**definition**
46:14, 46:24
**degree**
7:9
**degrees**
7:17
**deliver**
66:9
**delivered**
153:19
**demanded**
66:4
**denied**
53:4, 56:8, 81:10
133:22, 137:8
**Dennis**
4:4, 100:16
**deny**
17:8, 17:11, 56:13
56:14, 138:17
139:7, 140:21
**denying**
37:2, 52:10, 52:20
55:12
**depart**
100:25
**department**
36:7, 64:23, 118:9
122:4, 122:12
122:19, 126:6
**departments**
122:10
**depending**
48:21
**depicted**

113:13
**deponent**
96:14, 154:3
154:4, 154:10
**deposition**
1:13, 5:1, 6:13
17:16, 22:19, 27:4
30:25, 39:3, 40:1
52:24, 79:22, 80:5
116:10, 153:9
153:17, 153:19
153:25, 154:5
154:11
**depression**
111:25
**derogate**
47:1
**derogation**
47:25
**describe**
11:19, 12:3, 13:22
15:25, 31:15
83:11
**described**
7:16, 11:7, 12:9
104:5, 113:2
115:21
**describing**
80:17
**description**
48:9, 84:14
**desire**
65:7
**despite**
90:9, 144:13
**detailed**
13:14, 48:8
**details**
147:12
**determination**
3:9, 34:2, 34:14
35:1, 35:6, 35:16
35:20, 38:14
38:16, 38:22
39:18, 42:22, 43:1
98:3, 101:15
**determinations**
39:13
**determine**
57:15, 114:11

115:24, 116:15
117:14, 143:4
**determined**
141:7
**develop**
127:2
**diabetes**
128:21
**diagnose**
85:11, 86:3, 86:18
**diagnosing**
85:15
**diagnosis**
82:24
**difference**
78:9
**different**
7:5, 11:22, 18:3
20:10, 20:18
20:19, 25:12
27:14, 31:22
60:23, 63:1, 64:4
73:6, 75:12, 75:24
77:15, 91:4
116:24, 121:11
122:4, 122:10
122:16, 126:20
126:25, 135:9
135:11, 140:12
141:12, 144:14
145:19
**differentiate**
111:22
**differently**
46:1
**difficult**
110:9, 111:6
**difficulties**
83:17
**direct**
11:25, 64:21
65:13, 76:6
121:21, 129:8
148:21
**directives**
48:12
**directly**
64:20, 65:8, 78:14
122:11
**disabilities**

10:19, 11:15
11:20, 11:21, 12:5
13:15, 13:20
13:23, 14:9, 14:19
15:5, 15:6, 15:9
15:23, 38:24
73:11, 90:2
**disability**
11:18, 14:18
16:11, 17:23
18:11, 18:15, 20:1
21:17, 33:10, 35:8
48:2, 49:7, 53:15
53:21, 53:24, 62:1
62:20, 73:18
74:11, 102:4
102:7, 106:21
111:16, 119:16
125:20, 125:23
127:9, 127:11
129:2, 137:22
138:25
**disability's**
19:6, 136:20
**disagree**
41:11, 41:15
42:25, 43:4, 86:2
94:13, 124:6
146:11, 146:15
**disagreed**
39:24, 143:4
**disagreeing**
138:25
**disagrees**
41:1
**disciplinary**
114:6, 130:23
**disclose**
128:2, 128:8
**disclosed**
72:10, 133:15
**discovered**
26:12
**discriminate**
111:22
**discriminated**
33:7
**discrimination**
33:9, 33:9, 34:3
**discuss**

66:19, 67:6
112:22, 114:19
115:8
**discussed**
29:16, 117:6
125:17
**discussing**
120:3, 148:23
**Discussion**
112:16
**dishonor**
20:24
**disorder**
71:21, 102:4
140:4
**dissatisfied**
93:17, 94:10
94:19, 94:22
**distress**
87:11
**district**
1:1, 1:1, 5:5, 5:6
51:8, 153:1, 153:1
**division**
1:2, 5:7, 122:9
147:5, 153:2
**doctor**
4:2, 37:12, 38:4
3:18, 36:18, 66:24
70:25, 71:4, 77:6
77:8, 83:12, 84:3
84:15, 84:20, 85:1
134:12, 140:13
**doctor's**
83:17
**doctors**
80:7, 87:2, 89:7
144:14, 145:19
**document**
26:4, 35:9, 35:17
39:7, 40:3, 40:10
42:24, 76:24, 77:4
77:22, 80:16
81:12, 91:15
91:24, 92:10
94:24, 100:21
119:21, 135:11
**documentation**
18:1, 36:13, 37:6
43:4, 62:5, 62:7
62:8, 63:9, 68:3

68:21, 81:1, 82:13
87:5, 90:19, 91:19
93:18, 93:19
94:23, 96:17, 97:8
98:18, 98:22
98:24, 119:12
119:17, 120:2
126:14, 135:21
135:25, 136:7
143:19, 149:9
**documented**
63:24, 105:16
116:8, 134:4
**documenting**
149:11
**documents**
27:16, 28:14
30:20, 31:13
31:15, 31:18
31:19, 31:23, 32:6
37:3, 37:15, 45:15
65:25, 73:1, 75:5
81:23, 81:24
88:13, 92:15
119:23
**dog**
4:2, 37:12, 38:4
41:19, 42:12
43:15, 43:22, 45:2
45:3, 47:7, 48:3
48:5, 48:16, 49:2
49:5, 49:5, 49:6
49:8, 49:9, 49:13
49:19, 50:8, 50:24
51:7, 52:9, 52:11
52:19, 52:21, 53:1
53:4, 53:14, 53:16
53:23, 54:1, 54:16
54:21, 55:10
55:12, 55:15, 56:2
56:12, 56:16
56:18, 56:23, 57:3
57:10, 57:13, 58:2
58:6, 58:8, 58:14
58:19, 60:3, 60:9
60:10, 60:11
60:14, 60:20
64:19, 65:4, 67:21
68:15, 80:23, 81:5
81:7, 81:12, 81:17

81:19, 82:1, 82:4
82:9, 82:11, 82:14
82:17, 87:15, 91:1
91:16, 91:21, 93:3
93:4, 93:8, 96:6
96:8, 96:18, 96:19
97:9, 97:20, 97:22
98:5, 99:13, 99:21
100:5, 100:19
101:2, 101:9
101:9, 102:11
102:17, 103:12
104:19, 105:8
105:13, 106:1
106:5, 106:12
106:15, 106:20
106:25, 107:12
108:2, 108:23
110:7, 110:9
110:10, 110:22
110:24, 111:4
111:4, 111:6
111:7, 121:5
121:6, 121:12
121:13, 121:14
121:19, 121:19
123:17, 123:25
124:2, 124:6
124:15, 124:22
125:2, 127:18
127:21, 127:25
128:5, 128:12
128:15, 128:23
129:2, 129:13
129:23, 130:6
133:12, 133:16
136:7, 136:10
136:13, 136:17
140:16, 140:17
143:5, 143:11
143:17, 143:21
144:5, 144:15
144:25, 146:7
150:17
**dog's**
114:12, 114:14
118:23
**dogs**
47:11, 47:13, 48:7
48:11, 48:14

49:17, 67:16
67:18, 109:2
109:8, 109:12
109:14, 109:15
109:22, 111:14
128:19, 139:5
**doing**
45:24, 46:1, 46:17
48:17, 61:18
81:15, 115:6
115:18, 117:4
117:12, 121:13
140:18
**downtown**
101:1, 101:22
**Dr**
3:21, 4:4, 77:13
80:16, 84:9, 90:15
90:25, 91:5, 91:8
92:21, 92:25
93:17, 94:2, 94:10
94:19, 94:22, 95:4
95:9, 95:13
134:20, 135:12
135:18
**drugs**
80:8, 142:19
**dual**
10:6
**due**
5:13, 16:25, 49:17
106:3, 110:15
118:9, 121:18
125:23
**duly**
6:2, 153:16
**Dunn**
75:21, 151:8
**duration**
83:20
**duties**
148:8, 148:25
**duty**
148:24

**E**

**e-mail**
3:24, 90:17, 94:13
95:1, 105:17

105:20, 121:23
154:25
**e-mails**
4:7, 27:16
**earlier**
131:18
**East**
5:11
**easy**
18:19
**Economics**
8:1
**education**
6:24, 7:15
**EEOC**
32:24, 33:4, 33:5
33:12, 33:14
33:17, 33:22
33:25, 34:3, 34:10
34:15, 35:5, 35:23
38:22, 39:9, 40:16
42:14, 42:25
**EEOC's**
35:16, 39:17, 98:2
**effective**
40:23, 41:13
41:17, 41:20, 42:6
43:18
**effects**
83:6
**effort**
24:8, 64:4, 88:22
95:22, 114:13
115:22
**efforts**
44:4, 114:17
115:23, 116:15
117:3
**eight**
29:13, 29:18, 30:1
**either**
18:13, 23:15, 49:5
71:2, 78:25, 79:2
86:1, 88:1, 92:6
98:24, 115:18
119:20, 123:25
142:12
**elaborate**
127:10, 129:19
**electronically**

31:24, 31:25
**Elizabeth**
3:17, 3:24, 4:1, 4:6
26:19, 28:21, 29:6
29:25, 30:8, 36:6
36:24, 42:1, 65:12
65:18, 75:20, 94:9
94:14
**emotional**
87:11
**employed**
45:6, 154:13
**employee**
16:17, 19:17
43:25, 47:4, 48:2
48:6, 48:21, 62:5
63:7, 68:1, 68:22
72:24, 73:3, 74:1
74:6, 74:21, 82:15
83:2, 83:9, 84:18
87:8, 87:22, 89:18
105:11, 105:12
105:21, 110:24
111:21, 132:14
147:9
**employee's**
84:6, 85:21, 87:3
141:23
**employees**
21:7, 25:13, 33:6
38:4, 46:7, 47:12
47:16, 48:25
95:23, 105:2
110:20, 111:22
113:4, 113:7
113:12, 114:23
124:17, 126:4
128:8, 132:16
143:13, 150:5
**employer**
10:11, 10:13
10:14, 11:12
16:11, 16:15, 33:8
46:7, 66:25, 67:2
67:8, 74:21, 90:4
**employer's**
12:1, 67:7, 68:25
69:5, 70:2, 128:7
**Employment**
3:8

**empty**
32:10
**enables**
33:6
**encountered**
146:24, 149:7
**endeavor**
23:9
**ended**
9:13
**engage**
16:16, 26:15, 39:8
43:5, 63:8, 71:23
74:8
**engaged**
35:24, 36:11
36:24, 43:3, 53:6
53:25, 107:23
**engagement**
144:22
**engages**
62:4
**engaging**
73:6
**Enrico**
133:1
**ensure**
38:3, 72:23
113:25, 115:1
**ensuring**
63:7
**entail**
150:2
**entails**
13:11
**enter**
88:8
**entire**
67:10, 99:5, 139:5
151:24
**entitled**
80:7, 128:14
**environment**
46:18, 47:17
48:20, 48:22, 49:1
64:22, 65:7
110:16, 137:1
138:4, 141:24
147:2
**environments**

47:14
**episode**
122:21
**Equal**
3:8
**equipment**
21:8, 37:13, 49:16
51:21, 51:23
51:25, 51:25
110:17, 110:20
**especially**
21:5, 130:9
**Esq**
2:2, 2:6
**essential**
65:23, 71:18
73:19, 74:13
125:14
**et**
25:15, 27:15
111:25, 138:22
**evaluated**
148:18, 148:20
151:23, 151:23
151:25, 151:25
152:1
**evaluation**
97:16, 151:19
151:20, 152:2
**evaluations**
148:3, 148:9
151:24
**event**
16:5, 60:19
**events**
118:11, 126:13
**everybody**
46:6, 110:21
113:23, 127:13
127:24, 128:16
**evidence**
20:25, 36:1, 36:3
36:20, 37:4, 37:10
37:20, 37:24, 53:7
54:1, 54:2, 56:15
68:3, 74:20, 75:8
77:25, 81:2, 81:11
89:8, 90:22, 91:10
92:1, 92:8, 92:16
93:21, 95:21

107:24, 114:15
118:10, 132:8
136:25, 141:2
141:4, 141:19
141:21, 141:25
142:19, 142:24
142:24, 144:5
**exact**
13:5, 31:10, 31:19
31:22, 70:21
108:6
**exactly**
14:10, 21:19, 22:8
42:18, 72:9, 72:20
88:16, 108:9
150:19
**exam**
83:23, 83:24
**examination**
3:1, 3:2, 5:1, 6:4
102:1
**example**
114:12, 136:5
**exceed**
148:11, 148:12
**exceeded**
148:3, 148:10
148:15
**exceptionally**
44:4
**exchanges**
90:17
**excuse**
4:13, 21:12, 29:8
42:10, 79:2
102:14, 106:18
115:22, 138:16
150:16
**executive**
76:20
**exemption**
46:8
**exhibit**
3:6, 3:7, 3:8, 3:10
3:14, 3:15, 3:17
3:18, 3:20, 3:22
3:24, 4:1, 4:3, 4:5
4:7, 4:9, 4:12, 4:13
22:15, 23:25, 24:5
24:14, 25:6, 25:21

25:23, 26:2, 32:18
32:22, 34:9, 38:17
38:18, 39:3, 39:14
40:1, 42:18, 50:18
51:9, 51:16, 64:12
64:17, 66:7, 68:23
74:9, 76:24, 91:12
91:13, 94:7, 94:8
98:3, 98:15, 98:16
100:13, 100:14
101:25, 102:10
102:19, 104:5
111:18, 119:11
119:16, 120:2
120:11, 147:15
149:8, 149:9
149:14
**exhibits**
5:16, 64:11, 78:15
**expect**
114:3, 132:16
150:4
**expectations**
148:4, 148:10
148:12
**expected**
84:7, 139:20
**experience**
87:8, 137:25
138:2, 140:3
**expert**
69:23, 71:4
128:23
**expertise**
67:16, 67:20
140:3
**experts**
139:4
**Expiration**
154:21
**explain**
18:12, 25:16, 37:1
52:7, 52:17, 93:20
114:10, 128:14
137:18, 142:20
**explained**
18:9, 19:4, 128:14
**explaining**
47:22, 141:21
**explains**

65:21, 65:24
**explanation**
53:11, 53:13
54:20, 55:9, 55:15
67:19, 77:23
81:12, 91:11
92:16, 141:25
**explore**
122:8
**expression**
61:4, 61:8
**Expressway**
154:22
**extensive**
25:9
**extent**
16:25, 48:19
**external**
138:19, 139:1
139:4, 139:10
139:24
**eye**
109:16

## F

**face-to-face**
147:23
**Facebook**
3:14, 50:22, 57:19
**facilitate**
17:25, 19:18
**facilities**
106:20, 110:18
**facility**
37:13, 106:6
146:17
**fact**
35:13, 38:23
80:17, 87:14
106:3, 124:9
125:11, 129:14
133:12
**factors**
137:3, 137:6
**facts**
72:25, 126:13
144:20
**failing**
35:7

**fair**
89:8
**fall**
150:8
**familiar**
59:6, 61:9, 100:8
**family**
36:18, 77:6, 77:8
77:15, 78:9
**far**
35:22, 37:23, 39:8
113:2, 141:3
141:4, 147:19
**father**
6:19
**Fax**
154:24
**feasibility**
21:5, 74:7, 137:2
**feasible**
46:20, 138:4
**February**
130:9
**Federal**
5:13
**feel**
23:19
**feet**
110:22
**felt**
96:3
**figure**
60:7
**Fiido**
50:8, 50:8, 50:9
50:12, 57:18
**Fiido's**
3:14
**file**
27:16, 28:14
145:17
**files**
27:15
**filled**
16:20, 66:2, 92:19
**film**
113:11
**final**
61:25, 62:18
62:25

**finally**
94:3, 96:4, 96:19
97:8, 97:21, 98:5
100:4, 100:25
101:8, 108:2
**financial**
111:25
**financially**
154:15
**find**
40:17, 57:18
114:14, 114:18
115:4, 115:15
117:4
**finding**
39:24
**fine**
23:14
**finish**
22:11, 23:12, 55:7
56:6, 61:10, 61:20
61:23, 79:15
127:17, 127:19
**finished**
6:23, 23:8, 23:8
23:10
**finishing**
43:16
**fired**
148:19, 151:17
**Firm**
154:22
**first**
6:2, 6:11, 10:8
12:10, 13:14
13:23, 14:8, 15:21
22:15, 22:20
23:23, 25:21
25:21, 25:25, 26:1
26:8, 26:24, 27:6
27:22, 27:24, 34:2
35:15, 35:17
39:15, 40:4, 41:4
41:23, 48:24
54:17, 56:2, 62:4
64:13, 64:15
71:20, 72:5, 72:12
72:13, 72:17
72:23, 73:25
89:23, 93:14

94:18, 94:21
94:25, 100:12
100:23, 106:22
122:17, 126:7
127:13, 146:21
146:22, 148:22
**fit**
122:12
**five**
29:13, 30:10
30:15, 44:15
147:24, 152:8
**five-minute**
71:9
**flares**
87:10
**flashback**
109:24, 110:1
110:9, 111:5
**flashbacks**
87:14, 88:2, 88:13
129:14, 130:4
**FMLA**
16:8
**focus**
7:8, 8:12, 15:4
54:17, 121:9
**focusing**
15:7
**folks**
30:3, 30:17
138:11
**follow**
114:7, 144:12
**follow-ups**
73:2
**followed**
44:2, 119:4
120:23, 149:20
149:22
**following**
37:7, 93:9, 144:3
151:2, 151:8
153:14
**follows**
6:3, 153:25
**Foreign**
7:6
**Forget**
19:22, 20:11

**forgot**
66:16
**forgotten**
50:4
**form**
3:20, 3:22, 4:3
16:20, 18:16, 19:8
21:18, 24:15
24:21, 25:8, 26:25
27:2, 27:7, 33:8
33:15, 33:23
34:16, 34:17, 35:2
35:10, 36:14
36:20, 39:1, 41:21
42:16, 46:3, 52:13
52:23, 53:18, 54:2
55:22, 56:5, 56:21
57:1, 57:8, 57:21
58:3, 58:16, 58:24
59:1, 59:10, 60:12
66:1, 66:2, 66:11
66:20, 67:23
68:17, 68:24, 69:9
69:11, 69:18, 72:7
72:14, 73:20
74:14, 74:16
76:19, 76:23
77:20, 78:16, 79:1
80:4, 81:9, 81:21
82:23, 82:24
83:16, 85:16
85:19, 86:8, 87:17
92:25, 94:5, 94:12
94:16, 95:4, 97:10
97:23, 98:19
100:15, 101:6
102:5, 103:1
103:5, 103:25
104:10, 104:22
104:24, 106:2
107:21, 108:4
109:4, 109:18
110:2, 110:12
111:8, 113:17
114:1, 114:25
115:7, 115:17
116:1, 116:18
117:16, 119:19
122:24, 123:19
124:8, 125:21

128:22, 129:16
132:2, 132:6
132:12, 133:17
134:17, 135:10
136:22, 137:9
137:14, 139:6
139:21, 140:5
140:22, 140:24
142:5, 142:17
143:6, 144:9
144:17, 145:1
146:3, 146:13
147:18, 148:5
**formal**
147:25
**forms**
92:18, 95:17
134:19
**forwarded**
65:11
**found**
42:14, 72:16
110:18
**four**
29:12, 44:20
112:8, 147:24
**fourth**
10:11, 10:13
**frame**
123:1
**framework**
17:1
**France**
7:3, 10:18, 11:13
11:17
**FRCP**
154:2
**free**
112:13, 146:10
**French**
7:2, 7:23, 10:5
10:7, 11:19, 12:4
**Frenchman**
141:13
**frustrating**
93:15
**full**
6:6, 6:8, 152:4
**fully**
24:12, 25:5, 33:16

35:13, 53:6, 94:16
**function**
7:14
**functioning**
83:10
**functions**
65:24, 71:18
73:19, 74:13
125:14
**further**
3:4, 11:16, 28:16
35:25, 36:12
36:22, 45:4, 56:15
75:7, 80:24, 81:11
91:10, 92:1, 93:20
94:23, 102:1
107:24, 114:4
114:20, 129:19
149:16, 154:2
154:12, 154:15
**fussing**
17:18
**future**
61:10

## G

**gather**
89:13, 90:1
**gathered**
81:6, 138:13
**Gaynor**
36:25, 75:20, 76:5
76:7, 76:7
**general**
25:15
**gentleman**
128:11
**gentlemen**
52:18, 127:7
**geographic**
49:24
**German**
7:1, 7:2, 10:6
**Germany**
6:18
**getting**
29:1, 30:18
106:10, 138:8
139:16, 140:9

**give**
11:24, 15:12, 17:7
24:8, 58:20, 59:15
69:6, 69:16, 70:13
70:16, 70:25, 71:4
73:1, 77:23, 79:23
93:25, 96:12
121:4, 140:11
142:3, 142:7
142:11
**given**
16:5, 21:10, 21:14
22:19, 31:16, 32:6
36:3, 37:6, 69:3
79:22, 108:18
114:2, 117:8
121:17, 124:15
132:21, 138:18
152:3, 153:17
**gives**
74:1
**giving**
32:17, 139:12
**go**
11:16, 12:9, 13:9
22:10, 29:11, 45:7
60:9, 64:9, 65:8
71:7, 93:14
100:10, 100:25
101:23, 112:14
117:13, 119:23
122:15, 129:22
137:13, 151:21
152:8
**God**
82:22
**going**
11:4, 17:15, 17:17
22:11, 23:11, 29:5
40:6, 55:8, 57:20
60:19, 61:6, 66:7
79:13, 79:24
80:19, 82:23
100:10, 103:16
110:8, 111:5
126:16, 126:21
130:14, 131:20
136:15, 141:5
145:8, 145:23
148:23, 149:14

**Goldie**
2:10, 38:5, 42:3
42:5, 42:7, 42:11
43:10, 43:12
43:19, 45:10
45:14, 88:8
102:17, 103:11
103:22, 105:7
105:8, 105:10
105:25, 106:11
106:14, 106:14
108:14, 110:14
110:19, 133:12
133:15, 145:10
146:5, 146:9

**good**
6:6, 20:10, 87:2
121:14, 136:12
136:18, 138:9
140:15, 140:16
142:10

**good-faith**
145:24

**grant**
17:7, 19:5, 19:6
35:7, 63:23, 63:23
63:25, 64:1, 87:2
92:12, 93:6, 102:9
103:3, 107:11
108:10, 110:6
122:19, 134:15
136:16

**granted**
62:20, 63:14
63:15, 101:17
102:18, 103:19
104:21, 107:12
107:13, 109:21
129:15, 133:22
134:1, 134:8
134:9, 137:7
141:8, 141:18
143:13, 145:11

**granting**
38:24, 102:10

**grants**
102:20

**grease**
113:5, 113:13
116:24, 117:25

118:3, 118:6
118:22, 150:12

**Great**
6:15, 9:1, 22:21
23:23, 29:4, 29:20
49:24, 118:5

**Griffin**
2:2, 2:2, 3:3, 3:4
5:19, 6:5, 18:6
19:20, 20:4, 25:18
27:18, 33:18
34:23, 38:6, 38:18
39:11, 44:7, 44:10
44:13, 46:22, 53:9
54:3, 57:5, 57:8
57:24, 60:17
62:11, 63:20, 64:6
64:9, 64:25, 65:15
66:13, 68:5, 71:8
72:2, 74:24, 78:1
78:5, 79:12, 79:15
79:17, 81:14
82:22, 85:25
89:10, 90:23, 92:3
93:22, 97:2, 102:2
104:16, 106:8
111:1, 112:2
115:12, 127:4
130:12, 135:5
135:16, 138:6
139:25, 152:8
153:20, 154:1

**group**
5:10, 76:10
131:22, 134:7
134:7

**guess**
7:24, 12:6, 34:11
108:20, 109:11
111:13, 149:1

**guidance**
17:8, 67:12, 136:5
136:14, 137:7
137:12, 138:11
138:17, 138:20
138:22, 139:2
139:4, 139:11
139:24

**guide**
137:19

**guidelines**
18:20

**guy**
113:8, 115:5
115:16, 115:25
116:12, 116:17
117:15, 118:23
129:6

**guys**
43:9

# H

**half**
7:12, 72:19

**hand**
16:23, 16:23
23:11, 60:23
60:23

**hand-over**
124:14

**handbook**
48:6

**handed**
28:2, 28:7

**handle**
19:15, 25:13
25:14, 124:17

**handled**
124:20

**handling**
19:16

**hands**
32:10, 74:18

**handwriting**
83:18

**hang**
50:20, 51:12
55:19, 55:21
55:21

**happen**
12:15, 26:20
45:17, 93:24

**happens**
24:17

**happy**
94:10

**harassed**
113:3

**harassment**

112:19, 112:23
119:13, 119:17
120:4, 125:20
125:23, 149:18
150:3, 150:8
150:11, 150:24

**Harassment-Free**
4:10

**hard**
113:14, 126:16
144:18

**hardship**
124:23, 124:25
125:4, 146:6

**harm**
110:24

**harm's**
145:10

**head**
22:4, 22:24, 22:24
51:3, 51:5, 66:21
69:20, 80:12
86:11, 122:14
126:21, 134:14

**headquarters**
12:14, 62:9, 90:18

**health**
48:20, 64:22, 65:6
80:2

**hear**
22:8, 22:10, 92:5
138:8

**heard**
105:1, 124:24
125:1, 126:16
131:6, 131:11

**hearing**
18:8, 49:18

**heart**
131:5

**heavy**
21:7, 37:13, 49:15
110:17, 110:20

**help**
22:22, 25:16
29:16, 37:21
37:22, 52:12
53:21, 53:23, 54:2
56:15, 68:13
68:22, 69:25, 73:9

81:24, 82:13, 89:8
95:22, 133:20
138:21, 142:11
142:21, 143:17
145:20, 146:9

**helpful**
143:21

**helps**
47:4, 136:11
143:10

**Hernandez**
132:23, 133:4

**highest**
76:4

**highest-ranking**
75:25

**him...from**
84:6

**HIPAA**
90:3

**hire**
69:6, 69:16, 70:8
70:18

**hired**
70:24, 71:3

**hold**
9:11, 71:12, 81:25
82:1

**honest**
59:16, 132:17
147:16

**honor**
17:9, 17:11, 17:22
18:10, 18:13
18:14, 18:25
18:25, 19:13
19:14, 19:24
19:24, 20:14
20:14, 20:24
21:16, 136:20
138:14, 138:16

**hope**
32:25

**hours**
5:12, 104:12
154:1

**Houston**
12:14, 13:25
15:18, 16:1, 16:5
20:7, 20:12, 32:25

33:11, 36:25
100:9
**HQ**
108:21, 108:21
**HR**
7:6, 7:8, 7:14, 8:13
10:23, 11:1, 13:9
14:4, 15:7, 16:23
18:4, 18:4, 26:16
28:22, 38:20
49:25, 51:18, 59:3
59:14, 60:22
60:23, 62:3, 62:8
62:9, 63:6, 64:21
65:8, 65:12, 65:19
67:15, 71:24
76:10, 76:13
90:18, 100:6
105:12, 105:17
108:20, 112:21
118:13, 120:7
120:10, 120:16
124:4, 133:20
139:19, 145:22
151:11, 151:21
**HSE**
36:6, 48:20, 48:22
48:25, 49:20
65:11, 65:22
122:12, 122:18
122:19
**human**
48:23, 130:20
145:21
**hurt**
136:13, 140:17
**hypothetic**
58:20

**I**

**idea**
7:21, 95:9, 108:23
114:24, 136:13
136:18, 140:16
**identified**
40:23, 41:12
130:22
**identify**
51:10, 51:15

73:10, 73:17
91:14, 114:16
118:10, 119:21
149:16
**identity**
115:24, 116:15
117:14
**illness**
85:11, 85:15
128:20
**imagination**
128:10, 128:13
**imagine**
93:12, 128:11
**impact**
141:23
**impairments**
106:25
**implemented**
95:22, 119:2
**implication**
11:25
**implies**
132:13
**importance**
121:5
**important**
74:19, 115:4
115:6, 115:15
115:18, 115:20
**impression**
147:8, 147:14
**improve**
141:22
**Inadvertently**
4:12
**inappropriate**
85:13
**incapacitation**
87:8
**incident**
113:6, 117:24
118:22, 123:5
**incidents**
87:19, 114:4
114:8, 130:10
145:17, 149:17
150:12
**included**
90:3

**includes**
33:8, 50:2
**incorrect**
39:18, 103:4
**independent**
33:5
**INDEX**
3:1, 3:6
**indicated**
22:23
**Indicating**
100:3, 112:5
**indirectly**
123:11
**individual**
114:16, 137:20
139:19
**individuals**
113:17
info@jordanrepo...
154:25
**inform**
62:4, 64:20, 65:6
74:6, 94:15
**information**
28:16, 28:18
28:19, 66:9, 66:25
69:7, 70:13, 70:25
75:8, 81:6, 83:23
89:13, 90:1, 90:4
90:11, 93:20
96:12, 98:14
99:23, 107:16
108:5, 119:12
121:24, 124:19
135:23, 138:13
139:17, 140:11
149:5, 149:10
**informed**
36:6, 64:22
120:22, 121:18
124:10
**informing**
42:2, 45:1, 98:16
98:23
**informs**
94:9
**inherited**
28:24
**initiate**

65:13
**initiative**
65:13
**injured**
105:25, 106:11
106:14
**inside**
108:14, 121:12
**insist**
22:9
**insofar**
16:10
**instance**
14:25, 16:19
27:14
**Institut**
7:20
**institution**
8:16
**institutions**
7:16
**instruction**
79:23, 79:24
**insurance**
49:12, 49:14
**insured**
49:13
**intention**
25:17
**interact**
76:6
**interacting**
63:7
**interactive**
16:17, 19:17
36:12, 53:6, 62:4
63:8, 71:23, 72:22
72:23, 73:5, 73:6
73:9, 73:17
107:23
**interest**
110:19
**interested**
154:16
**interesting**
53:20, 85:8
**intermission**
102:22
**internal**
77:12, 77:15, 78:9

85:10, 85:14, 86:2
86:17, 116:2
135:13
**international**
10:23
**internship**
10:10, 11:10
**internships**
10:12, 10:12
**interpretation**
49:23, 70:5, 70:7
77:17, 77:18
**interpreted**
121:11
**interrupt**
61:6, 61:8, 79:17
**interrupted**
79:22
**interrupting**
55:6, 59:25, 61:7
**intervene**
109:24, 111:6
**interview**
132:14
**interviewed**
132:17, 132:19
133:1, 133:4
**interviews**
132:10
**introduced**
146:21
**introduction**
5:18
**invade**
69:19
**invading**
67:24
**invasion**
68:18, 69:12
**investigate**
60:20, 117:13
118:6, 125:19
**investigating**
150:9
**investigation**
60:16, 113:14
116:3, 116:5
116:6, 116:7
116:11, 118:8
150:25, 151:2

**involved**
26:5, 27:13, 31:10
47:16, 62:14, 63:2
63:6, 63:18, 70:12
76:1, 89:5, 96:10
96:24, 113:4
115:10, 118:11
124:4, 131:21
137:23, 139:8
141:18, 143:3
144:19, 150:24
**involves**
12:6, 59:13
**Iowa**
50:3
**Iraq**
52:21
**issue**
45:10, 45:16, 85:7
105:24, 116:24
116:25, 117:1
117:2, 130:14
**issued**
34:3, 39:14
**issues**
111:24, 111:25
120:3, 130:7
146:24, 149:7
**items**
27:8

**J**

**J.R**
6:10, 6:12, 70:17
70:24, 95:2, 110:7
120:8, 121:3
125:17, 144:10
150:7
**JACKSON**
2:6
**Jan**
130:6, 152:3
**January**
41:11
**Jean-Remy**
1:14, 2:11, 5:2, 6:1
6:8, 153:10
153:15
**job**

10:8, 16:13, 26:15
26:17, 31:10
37:23, 46:17, 47:3
47:5, 65:7, 65:22
65:24, 71:18
71:23, 73:19, 74:1
74:3, 74:21, 74:22
84:14, 125:15
125:20, 126:22
126:23, 130:10
143:10, 146:11
148:17, 151:10
151:11
**jobs**
10:10, 47:3
**John**
2:2, 153:20, 154:1
**joint**
62:23, 62:24, 64:4
75:12, 95:22
**jointly**
18:3, 91:4
**jokes**
115:25
**JORDAN**
154:21
**Juan**
1:3, 2:10, 3:17
3:19, 3:24, 4:1, 4:5
5:3, 34:11, 35:14
35:24, 36:23, 37:1
37:7, 37:21, 38:4
39:9, 41:18, 41:25
42:2, 42:3, 43:3
43:6, 43:10, 43:13
44:3, 44:24, 45:1
46:9, 52:11, 53:3
56:8, 56:17, 58:11
60:3, 64:18, 64:20
65:3, 65:13, 65:20
66:5, 66:18, 66:23
67:21, 68:14, 69:3
69:8, 70:1, 70:11
71:17, 71:21, 72:6
75:4, 75:7, 76:25
77:4, 77:24, 80:17
81:16, 85:23
87:21, 91:6, 91:9
91:15, 91:19
92:23, 93:17

93:20, 94:3, 94:10
94:15, 94:19
94:21, 95:9, 95:14
96:5, 98:16, 98:23
99:14, 102:15
103:23, 104:12
105:8, 105:20
106:3, 108:15
110:16, 112:18
112:21, 112:23
113:2, 113:7
113:12, 113:17
113:25, 114:24
115:5, 115:9
115:16, 115:25
116:12, 116:16
117:5, 117:9
118:1, 119:12
120:4, 122:12
122:21, 124:14
125:11, 125:13
126:5, 126:7
126:15, 126:21
126:22, 127:1
128:15, 128:16
129:14, 130:8
130:18, 131:21
132:1, 132:11
132:24, 133:2
133:5, 133:10
133:14, 135:3
139:3, 143:10
143:17, 143:19
143:22, 144:3
145:10, 146:9
146:16, 146:20
146:21, 146:23
147:8, 147:9
147:14, 147:23
148:22, 150:8
150:23, 151:17
153:3
**Juan's**
27:14, 35:7, 38:24
66:8, 67:5, 67:6
67:13, 69:17, 72:1
88:19, 89:2, 92:19
99:11, 100:20
117:22, 118:21
121:4, 124:10

125:19, 144:6
148:2, 149:9
151:19
**judge**
58:12, 60:8, 94:18
137:18
**judgment**
89:9
**Judy**
2:13, 5:7, 12:22
31:5, 31:6, 31:6
31:8, 64:7, 75:21
76:5, 76:12, 151:4
153:12, 154:20
**JULIE**
154:21
**July**
14:13, 14:14, 94:9
95:1
**June**
37:16, 77:5, 94:14
94:25
**jury**
19:12, 44:23, 50:7
52:8, 52:18, 54:20
55:17, 60:8, 63:24
94:17, 127:8
129:10, 137:18
**justified**
46:21, 74:18
74:19
**justify**
36:1, 81:2
**jwg@lawmgk.com**
2:4

**K**

**keep**
24:25, 32:13, 45:8
109:16
**kennel**
49:6, 108:15
108:24, 110:8
110:10, 110:15
111:4, 111:7
114:12, 114:14
118:2, 118:23
150:13
**kept**

45:3, 143:11
**kettle**
45:3
**Keystone**
13:10, 14:12
25:11
**Kibsgaard**
99:3, 99:12
**kind**
48:12, 62:22, 87:6
87:19, 126:25
150:5
**KNAUPP**
2:2
**knew**
20:11, 124:12
128:16
**know**
10:23, 11:1, 13:7
15:1, 15:6, 16:21
16:25, 19:16
19:22, 19:23
20:11, 20:12
20:20, 23:7, 23:11
28:9, 35:22, 37:14
37:22, 37:23
41:16, 41:25, 42:5
42:10, 42:10, 44:3
44:20, 45:14
45:18, 45:19
46:21, 48:8, 48:9
48:24, 58:7, 58:20
58:22, 58:25, 59:4
59:16, 69:15, 70:7
70:21, 71:5, 72:10
72:15, 78:6, 79:5
79:10, 80:13
80:14, 84:15, 86:2
86:5, 86:6, 86:14
86:15, 86:16
88:24, 90:16
90:17, 95:12
95:15, 100:6
100:21, 105:22
108:13, 108:22
108:25, 111:14
112:9, 112:11
114:17, 114:20
115:6, 115:18
116:14, 116:20

119:1, 119:7
120:22, 121:8
121:9, 121:13
121:14, 122:6
126:17, 129:3
130:7, 130:11
131:4, 135:25
137:16, 139:13
139:16, 140:8
143:12, 144:12
148:20
**knowledge**
13:17, 24:12, 29:3
33:12, 36:3, 36:23
39:7, 43:2, 48:6
48:10, 50:9, 57:3
80:10, 86:25
88:12, 97:5, 97:6
97:12, 98:7, 98:10
98:10, 98:12
99:23, 103:2
105:6, 105:7
106:13, 106:16
106:17, 106:18
106:22, 107:1
107:18, 115:9
120:13, 121:3
133:6, 133:23
137:24, 139:17
140:7
**knowledgeable**
11:2, 85:20
**known**
7:25
**knows**
86:7, 86:17
125:18

**L**

**lack**
118:10, 132:8
144:5
**ladies**
52:17, 127:7
**Land**
17:14, 76:11
76:14, 151:12
**language**
23:16

**Laredo**
50:3, 50:5, 50:6
50:12, 50:14
50:24, 51:8, 51:19
52:5, 52:8, 52:19
53:1, 53:2, 53:16
54:16, 55:11
56:18, 56:23, 57:4
57:10, 57:13, 58:1
58:14, 58:19, 60:4
60:9, 60:15, 60:20
146:17
**large**
14:11, 93:13
**late**
130:8
**latest**
134:22
**law**
5:10, 10:20, 11:13
11:18, 11:19, 12:8
79:10, 138:23
**lawful**
6:1
**laws**
11:3, 12:4
**lawsuit**
71:4
**Lawton**
12:22, 31:5, 75:21
76:5, 76:12, 151:4
**lawyer**
22:7, 24:7, 28:4
31:11
**lawyers**
26:7, 143:25
**LCS**
135:8
**lead**
126:25
**learn**
72:11, 89:1, 89:3
89:14
**learned**
72:12, 72:17
**leash**
110:11
**leave**
84:19, 128:4
128:10, 128:13

148:23
**lecture**
11:7
**lectures**
10:23
**left**
44:18
**legal**
31:3, 31:5, 37:1
59:15, 60:25
62:10, 63:11
138:21
**Leigh**
12:25, 38:19
75:21, 151:4
151:5
**letter**
3:10, 4:1, 4:5
32:24, 40:14
40:16, 41:8, 42:1
43:16, 45:1, 45:14
65:10, 65:17
65:18, 66:6, 70:8
90:15, 90:25
95:13, 98:16
102:10, 102:15
102:20, 104:2
110:4, 120:7
120:11, 121:25
**letters**
134:12, 135:9
136:8
**level**
17:12, 63:17
63:17
**LEWIS**
2:6
**liability**
37:12
**liaise**
26:18
**liaised**
146:25
**liaising**
75:7
**Liberty**
2:3
**licensed**
135:6
**life**

126:19
**lifetime**
83:20
**Likewise**
142:10
**line**
4:16, 4:16, 15:20
64:21, 69:4
**link**
129:9
**list**
28:7, 30:4, 39:20
41:3, 41:8, 42:24
44:19, 83:7
**listed**
23:25, 24:5, 26:5
26:9, 26:23, 29:17
32:18, 39:2, 76:1
76:4
**little**
6:15, 103:17
**local**
16:23, 18:4, 59:14
62:3, 62:8, 63:6
63:17, 90:18
108:20, 108:21
121:17
**location**
26:17, 28:24
50:24, 52:9, 52:19
52:22, 53:15
53:16, 55:11
56:12, 57:10
57:11, 57:20, 58:2
122:4, 146:6
**location's**
50:25
**locations**
21:7
**logo**
52:2
**London**
8:1, 8:2, 13:7
123:21
**long**
38:12, 54:7, 84:7
84:9, 93:16, 104:2
143:10
**longer**
54:24

**look**
16:15, 16:24
20:20, 21:4, 25:24
25:25, 29:4, 34:11
40:6, 44:18, 44:20
46:15, 48:24, 49:1
51:21, 60:16
63:11, 73:7, 74:5
74:23, 77:20
114:15, 131:4
141:2, 148:7
149:12
**looking**
113:12, 126:13
**looks**
91:23
**Loop**
5:11
**loose**
52:9, 53:17, 54:16
**lose**
126:23
**lot**
15:6, 147:12
**Luttrell**
5:10
**Lynn**
31:9

**M**

**M-hm**
21:22, 22:13, 27:9
31:1, 47:9, 60:5
90:8, 134:2
135:20, 142:13
**magic**
20:21
**main**
37:7, 63:6, 90:19
113:6, 149:7
**maintenance**
43:25, 49:15
56:16, 110:17
113:19, 114:3
117:17, 118:15
118:20, 119:6
120:19, 122:2
126:5, 131:12
147:5

**makers**
90:20
**making**
19:18, 75:16, 76:2
79:20, 98:4, 99:19
100:4, 100:19
113:7, 115:25
123:25, 138:12
142:25, 143:3
**manage**
52:12
**management**
10:23, 64:21
76:20, 105:4
105:5, 108:21
121:18, 136:19
150:9
**manager**
12:19, 31:3, 65:9
75:23, 76:10
76:13, 112:22
113:19, 114:3
114:19, 114:22
117:18, 118:9
120:7, 122:18
147:5, 148:21
151:1, 151:11
**managers**
10:22, 121:21
**mandatory**
118:15, 119:5
120:18, 122:1
**map**
137:17
**March**
10:4, 130:9
**MAREK**
2:2
**Maria**
30:13, 30:14
**mark**
64:10
**marked**
3:7, 3:9, 3:12, 3:14
3:15, 3:19, 3:21
4:8, 4:10, 5:16
22:14, 32:22, 64:6
64:11, 64:12, 74:9
91:13, 94:7, 98:15
100:13, 101:25

111:18, 147:15
149:8
**mascot**
50:25, 51:7, 52:20
53:1, 60:10
**master**
7:7, 7:8, 7:9, 7:10
7:18, 8:4, 8:10
8:11, 9:15
**materials**
16:6
**matter**
69:23, 93:9, 124:9
**MB**
8:10
**MBA**
8:9
**MD**
135:13, 136:8
140:12
**mean**
6:25, 7:24, 8:10
8:19, 12:5, 14:1
14:16, 14:21
15:11, 15:16
25:25, 26:3, 31:8
38:17, 39:5, 41:4
45:21, 45:24
46:25, 49:14
92:21, 95:10, 99:7
104:11, 104:13
109:6, 115:8
121:22, 122:16
127:11, 128:2
135:10, 141:14
147:3, 150:6
152:1
**means**
47:1, 72:22, 72:23
73:5, 73:6
**measures**
83:10, 145:20
**mechanic's**
125:14
**media**
25:14
**medical**
20:25, 35:25, 37:3
37:20, 37:24, 43:4
53:7, 56:15, 66:1

66:24, 66:25, 68:2
70:3, 75:8, 77:25
81:2, 81:11, 82:14
83:15, 84:6, 84:8
85:7, 89:6, 89:8
90:21, 91:10, 92:1
92:8, 92:16, 93:21
95:20, 107:24
128:8, 135:23
136:7, 136:25
140:11, 140:12
141:2, 141:4
141:15, 141:16
141:19, 141:20
141:25, 142:3
142:7, 142:11
142:18, 142:23
143:16, 144:1
**medically**
36:20
**medicine**
77:13, 77:15
78:10, 78:24
79:10, 80:3, 80:7
83:3, 85:10, 85:14
86:2, 86:17
135:13, 142:16
142:19
**meet**
146:23
**meeting**
28:6, 112:8
113:21, 113:21
114:9, 121:22
**meetings**
90:14, 90:16
96:24, 108:20
117:5, 117:8
117:9, 133:11
147:1, 147:23
**Memo**
3:17, 3:18
**memory**
16:5, 17:3
**memos**
48:12
**mental**
85:11, 85:15
126:1, 128:20
**mention**

37:17, 48:7
136:24
**mentioned**
9:1, 47:7, 63:19
64:21, 124:16
126:23, 131:18
139:1, 148:22
**mentioning**
58:9
**Merit**
2:14, 5:9, 153:14
**message**
114:2
**met**
6:11, 12:2, 24:6
112:20, 148:3
148:10, 148:11
148:14, 148:15
**methodology**
17:21, 21:11
140:19
**Microsoft**
94:15
**mid-October**
122:22
**military**
126:6, 146:23
148:24, 148:25
**mind**
7:15, 7:16, 26:1
44:19, 46:21, 68:7
73:21, 78:5, 94:20
96:16, 120:1
131:2, 147:12
**mine**
50:6
**minimum**
12:2
**Ministry**
7:5
**minutes**
154:1
**Miranda's**
36:4, 37:8
**Miscellaneous**
4:7
**missed**
122:22, 136:23
**missing**
81:23, 82:13

**mistake**
101:16
**mistaken**
77:5
**misunderstand**
9:12, 27:3
**mitigating**
83:10
**modifying**
46:1
**module**
14:5, 14:6, 14:8
14:10
**modules**
13:11, 13:11, 14:2
14:3, 14:11, 15:12
15:13
**moment**
11:6, 12:10, 44:19
141:6
**month**
94:1
**months**
52:10, 53:13
55:12, 93:5
103:10, 103:20
103:20, 107:18
123:25
**MOORE**
2:13, 5:7, 153:12
154:20
**MoPac**
154:22
**morning**
6:6, 27:23, 28:6
**move**
110:20

### N

**N-e-z**
131:16
**N/A**
85:4
**name**
6:7, 6:8, 8:16
12:21, 14:20
31:19, 31:22
75:14, 117:23
131:6, 131:11

16

**132:22**

**named**
50:8

**names**
14:22, 14:24
75:18, 75:19
75:23, 115:10
117:7, 132:21

**Nate**
130:25, 131:8
131:9, 131:10

**Nations**
7:7

**Natividad**
131:10, 132:22
133:4

**necessarily**
129:5, 150:3

**necessary**
23:1, 139:23

**need**
16:12, 19:3, 20:19
20:25, 21:20, 22:1
41:6, 41:10, 48:24
57:22, 62:5, 65:7
66:21, 69:20, 74:3
77:18, 78:17
82:16, 84:19, 90:2
93:20, 111:17
122:13, 122:17
126:12, 139:13
141:14, 149:5

**need-to-know**
124:19

**needed**
21:3, 37:25, 90:4
114:6, 121:10
128:11, 128:15

**needs**
21:8, 62:1, 63:1
63:13, 65:20, 73:1
74:7

**neither**
92:11, 154:12

**never**
36:16, 41:9, 50:12
53:4, 56:8, 81:10
90:10, 106:11
124:24, 125:4
125:4, 131:6

**132:23**

**new**
37:16, 122:4
150:1, 150:2

**Nez**
131:16, 133:8

**Nichols**
12:25, 38:19
75:21, 151:4
151:5

**Nick**
131:7

**night**
44:2, 45:7

**nod**
22:3, 22:24

**nodded**
66:21, 69:20
134:14

**Nonapplicable**
85:5

**nonresponsive**
18:7, 19:21, 25:19
27:19, 38:7, 39:12
46:23, 53:10
60:18, 63:21, 65:1
72:3, 74:25, 78:2
81:14, 85:25
89:11, 90:24, 92:4
93:23, 104:17
111:2, 112:3
127:5, 130:13
138:7

**normal**
54:14, 115:1

**normally**
47:12

**North**
2:3, 2:7, 5:10
10:21, 12:19
17:13, 76:10
76:13, 151:12
154:22

**notary**
154:6

**note**
83:3

**notes**
37:9, 37:9, 87:2
144:2

**notice**
3:7, 5:13, 27:4
39:3, 51:2, 52:14
52:24, 53:19
55:23, 57:2, 58:4
58:17, 60:13, 80:5
85:17, 86:9, 102:6
109:19, 110:3
110:13, 111:9

**November**
35:20, 37:18, 38:1
42:2, 44:25, 45:14
56:11, 67:11, 75:3
75:16, 76:2, 81:17
81:19, 82:17, 88:9
93:5, 95:25, 96:4
96:8, 96:18, 97:1
97:8, 97:20, 98:4
99:20, 100:5
101:2, 101:8
101:17, 102:8
103:10, 103:19
103:20, 107:11
107:14, 108:8
123:16, 124:1
129:23, 130:1
134:16, 135:22
141:8, 143:1
145:12, 150:18

**number**
4:12, 29:12, 30:10
30:10, 30:15
30:16, 44:20
82:24, 84:5, 85:6
87:7, 97:15

**numerous**
14:21, 14:23

---

## O

**o'clock**
5:12, 5:12, 152:8

**O-b-s-e-r-v-e**
109:8

**oath**
6:3

**object**
17:17, 18:6, 19:20
20:5, 25:18, 27:18
33:18, 34:23

35:13, 38:6, 39:11
46:22, 53:9, 54:3
57:5, 57:8, 60:17
62:11, 63:20
64:25, 65:15, 68:5
72:2, 74:24, 78:1
79:12, 81:14
89:10, 90:23, 92:3
93:22, 97:2
104:16, 106:8
111:1, 112:2
115:12, 127:4
129:21, 130:12
138:6

**objected**
25:2

**objection**
17:16, 18:16, 19:8
21:18, 22:7, 24:15
24:17, 24:21, 25:3
25:8, 26:25, 27:2
27:7, 33:15, 33:23
34:16, 34:17, 35:2
35:10, 39:1, 39:19
41:2, 41:21, 42:16
42:20, 42:23, 46:3
51:1, 52:13, 52:23
53:18, 55:14
55:22, 56:5, 56:21
57:1, 57:21, 58:3
58:16, 58:24, 59:1
59:10, 60:12
66:11, 66:20
67:23, 68:17, 69:9
69:11, 69:18, 72:7
72:14, 73:20
74:14, 74:16
76:19, 76:23
78:16, 79:1, 80:4
81:9, 81:21, 85:16
85:25, 86:8, 87:17
88:6, 88:10, 94:5
94:12, 96:21
97:10, 97:23
98:19, 98:25
101:6, 102:5
103:1, 103:5
103:25, 104:10
104:22, 104:24
106:2, 107:4

107:21, 108:4
109:4, 109:18
110:2, 110:12
111:8, 115:7
115:17, 116:1
116:18, 117:16
119:19, 122:24
123:19, 124:8
125:21, 128:22
129:16, 132:2
132:6, 132:12
133:17, 134:17
136:22, 137:9
137:14, 139:6
139:21, 140:5
140:22, 140:24
142:5, 142:17
143:6, 143:23
144:9, 144:17
145:1, 146:3
146:13, 147:18
148:5

**objections**
24:23, 24:24
105:1

**obligations**
16:10

**observe**
109:3, 109:6
109:7, 109:8
109:10, 109:16
109:23, 113:10
113:15

**observes**
111:4

**obtain**
35:25, 36:12, 62:7
74:8, 75:7, 90:4
107:24, 139:10

**obtained**
7:9, 7:17, 7:19
12:17, 90:11

**obtaining**
18:1

**obvious**
36:9

**obviously**
55:5, 65:11, 85:22
85:23, 109:17
109:20, 128:18

130:6

**occasion**
12:24, 126:20

**occasions**
112:20

**occur**
114:8, 115:2

**October**
107:13, 107:14
123:2

**offense**
6:12

**offer**
24:4, 43:11

**offered**
44:24

**Office**
94:15

**officer**
153:16

**officers**
63:4, 76:15, 76:17
76:18, 100:7

**offices**
5:10

**official**
14:6, 14:7, 149:17

**Oh**
24:18, 45:13

**oil-and-gas**
21:6

**Oilfield**
4:9

**okay**
15:9, 21:23, 22:5
22:12, 23:2, 23:13
23:21, 23:22, 25:1
34:21, 40:12
41:25, 42:7, 53:12
55:6, 60:4, 61:11
61:13, 61:22
68:25, 71:13
71:15, 78:13
78:18, 86:21, 96:5
98:1, 108:12
109:9, 121:16
126:11, 129:3
129:7, 131:3
134:24, 141:20
142:3, 146:20

148:1, 150:15
150:15

**old**
6:23, 8:3, 9:6

**once**
61:7, 62:7, 63:8
63:10, 74:3
103:22, 113:9
124:4, 129:12
129:23, 130:14
132:19, 137:6
138:13, 138:14
144:11, 149:4

**ones**
15:23, 75:25
134:20, 135:12

**ongoing**
26:6

**online**
13:11, 13:11, 14:2
14:3, 14:5, 14:8
15:12

**opened**
26:18

**openings**
122:9

**operations**
75:23

**opinion**
11:23, 11:24
69:23, 139:13
141:6, 143:9

**opinions**
70:23, 144:14
145:19

**opportunity**
3:8, 74:1

**opposed**
110:11

**oral**
1:13, 5:1, 153:9
153:17

**order**
62:5, 65:23, 65:25
75:7, 89:14
108:19

**orders**
146:24, 149:1
149:2

**ordinary**

123:13

**organization**
18:4, 33:21

**organized**
12:18

**organizing**
12:20

**orientation**
150:2

**original**
153:19

**Ormy**
26:16, 26:17, 50:2

**outcome**
59:18, 74:8, 99:25
105:18, 105:19
154:16

**outside**
39:2, 39:19, 41:2
41:7, 42:20, 42:23
51:1, 52:13, 52:23
53:18, 55:22, 57:2
58:3, 58:16, 60:12
80:4, 85:16, 86:8
88:6, 88:10, 96:21
97:10, 102:5
103:5, 107:4
107:5, 109:4
109:18, 110:2
110:12, 111:8
122:10, 140:5
140:24, 143:6

**overview**
17:13

**owned**
52:3

---

**P**

**P-o**
8:24, 8:25, 9:1

**p-s-y-c-h**
83:24

**p.m**
5:12

**Paal**
99:2

**page**
3:2, 3:14, 4:16
4:16, 50:22, 86:23

86:24, 120:6
120:11

**Pages**
154:8

**paid**
10:12

**panic**
87:14, 87:20, 88:2
88:15, 88:16
109:24, 110:1
110:8, 111:5
122:23, 129:15
146:10

**paper**
85:24

**papers**
37:8

**paragraph**
40:15, 69:2, 69:4
95:2, 120:15

**paralegal**
31:9

**parallel**
85:22

**parameters**
134:3

**paraphrase**
131:19

**pardon**
29:22, 112:6
135:16

**parent**
99:7

**Paris**
6:17, 6:21, 7:14
8:8, 8:15, 9:5

**part**
12:20, 28:25
54:17, 56:2, 56:7
89:23, 89:23
152:6

**participate**
138:10

**participated**
75:15

**particular**
47:6, 75:1, 109:11
139:2

**parties**
63:1, 91:4, 93:15

139:10, 153:22
154:13

**parts**
18:3, 55:20, 56:1

**party**
120:17, 153:24
154:4, 154:11

**pathology**
141:22

**patient**
109:3, 109:10
109:16, 109:23
109:25, 109:25
110:8, 111:5
111:7, 136:11
145:20

**patient's**
110:10

**patients**
85:15, 109:15
142:16

**pay**
149:5

**payroll**
146:24, 149:3
149:4, 149:4

**PC**
2:6

**peers**
76:6

**pending**
5:5

**people**
11:8, 11:20, 12:4
12:20, 15:22
28:15, 36:25, 45:5
46:16, 47:3, 48:4
58:13, 60:8, 62:14
63:4, 63:18, 75:22
89:5, 90:15
106:24, 113:24
115:24, 116:11
116:16, 117:11
117:14, 121:12
126:6, 126:25
128:20, 131:4
131:21, 131:25
132:3, 133:20
136:19, 137:23
137:24, 138:1

138:9, 138:20
140:8, 142:11
142:14, 144:1
151:22
**people's**
128:13
**Perfect**
32:13, 32:16
**perfectly**
23:14
**perform**
16:13, 65:23
73:18, 84:23
95:23, 125:14
148:8, 148:17
**performance**
74:13, 74:22
124:18, 130:7
141:23, 148:6
151:20
**performing**
71:18
**period**
56:10, 67:10, 75:6
92:24, 107:22
123:6, 151:25
**permission**
60:11
**permitted**
54:21, 88:8
**perpetrator**
118:6
**person**
15:18, 46:10, 49:7
59:3, 62:21, 63:6
66:3, 71:21, 74:2
75:25, 76:4, 91:2
91:24, 106:20
111:20, 115:10
118:10, 125:24
125:25, 125:25
126:1, 127:7
127:8, 127:9
127:12, 129:1
129:1, 130:19
130:22, 139:19
145:23
**person's**
12:21
**personal**

11:23, 11:24
13:16, 71:24, 97:5
98:9, 120:13
123:12, 143:9
147:13
**personnel**
10:22
**persons**
73:6, 116:16
**perspective**
104:23, 117:4
145:22
**perspectives**
141:13
**pertaining**
24:14, 25:6
**pet**
52:9, 52:19, 53:16
54:21, 55:10
57:10, 57:13, 58:2
58:14, 60:10
121:19
**phone**
28:15
**phonetic**
6:20
**photographs**
3:15, 4:8, 51:10
52:5, 118:2, 118:3
**physical**
142:20
**physician**
16:21, 36:4, 36:13
67:7, 67:12, 68:24
69:1, 69:5, 69:16
69:25, 70:3, 70:9
83:7, 84:8, 85:14
85:20, 86:17, 87:7
87:9, 89:17, 90:5
91:6, 91:9, 91:25
92:9, 95:5, 135:13
**physicians**
66:8, 66:19, 70:18
77:15, 77:16, 78:9
78:10, 80:6, 85:11
86:3, 88:25, 89:3
111:15, 142:8
**picture**
126:12
**pictures**

51:22, 57:12
113:12
**place**
9:4, 9:15, 12:13
13:3, 47:10, 81:8
90:14, 93:10
100:9, 113:15
113:22, 114:5
122:16, 126:24
**plaintiff**
1:3, 2:5, 5:2, 5:4
72:17, 153:3
**plan**
118:13, 120:16
**play**
100:18
**Pleasanton**
50:3
**please**
6:6, 57:25, 79:17
**Po**
7:19, 8:17, 8:19
8:24
**point**
43:19, 81:12
125:1, 126:17
134:11, 137:2
**pointed**
31:21
**points**
28:17, 29:1, 110:5
**policies**
49:20, 101:4
101:13, 109:13
**policy**
4:10, 36:11, 45:25
47:2, 47:23, 48:4
48:17, 49:21
109:12, 149:17
149:25, 150:3
150:4
**polite**
147:9
**politics**
8:25
**Politiques**
7:20
**portion**
39:12, 53:10
60:18, 92:4

**portray**
113:13
**pose**
47:15
**position**
28:12, 28:22
32:18, 43:25, 45:5
45:6, 46:8, 46:9
46:16, 65:3, 70:16
70:17, 72:12, 91:8
95:17, 101:1
104:8, 124:22
129:1, 137:1
143:16, 143:21
**positive**
141:23
**possibility**
110:24
**post-traumatic**
71:21, 102:3
140:3
**postpone**
112:9
**PPS**
151:11
**practice**
47:2, 47:10, 47:25
**practices**
48:9
**precise**
87:23, 122:25
**precisely**
131:12
**preclude**
84:2, 84:6, 84:13
**predecessor**
26:15
**prefer**
6:9, 142:24
**premises**
50:25, 52:10
53:17, 56:3, 58:2
58:15, 82:17
87:16, 88:9, 96:9
96:19, 97:9, 98:6
99:14, 99:21
100:5, 101:3
101:10, 102:12
103:12, 103:23
104:20, 121:6

121:13, 123:18
124:5, 144:16
**preparation**
31:11, 116:10
**prepare**
23:24, 24:4, 24:8
24:12, 25:5, 26:14
27:12, 28:11, 30:4
30:21, 31:13
31:16, 32:6
**prepared**
107:7
**prescribe**
78:23, 79:10, 80:2
80:7, 142:15
**present**
2:10, 105:7, 117:6
143:12
**presents**
136:7
**presidents**
7:25
**pretty**
38:12, 85:8
**prevent**
109:25
**previous**
10:12, 10:21
11:12, 26:16
27:16, 68:10
119:18
**principle**
61:13
**print-screen**
50:22
**prior**
13:17, 26:21
28:23, 126:13
127:23
**privilege**
67:24, 68:18
69:12, 69:19
143:24, 145:4
**probably**
101:21
**problem**
15:3, 16:4, 40:21
47:6, 73:23
105:24, 107:10
120:2, 121:3

129:11, 143:15
147:16, 148:14
151:22
**problems**
105:7
**Procedure**
5:14
**procedures**
4:10, 12:7, 93:9
133:19
**proceed**
22:22, 36:21
72:25, 79:25
**proceeding**
24:25, 154:14
**process**
16:17, 17:25
19:15, 19:16
19:17, 36:12
36:24, 43:2, 53:6
53:25, 60:8, 62:3
62:4, 62:16, 63:8
63:22, 64:2, 64:3
67:25, 68:19
70:10, 70:12
71:23, 73:7, 73:9
73:16, 73:17, 74:7
75:3, 75:12, 88:21
89:5, 93:10, 96:11
100:8, 107:23
108:7, 134:11
137:24, 139:5
139:9, 143:18
**processes**
27:14
**product**
143:24, 145:5
**Production**
76:10
**professional**
13:9
**professionalism**
118:14, 118:21
119:5, 120:18
122:2
**professionals**
11:1
**profile**
122:18
**program**

13:10, 13:10
25:10
**progression**
124:18
**promise**
79:18
**pronounced**
131:14
**proper**
36:4, 81:25, 93:9
**properly**
63:8, 81:23, 82:6
82:8, 92:16
**protecting**
12:4, 110:19
110:20
**protections**
11:20
**prove**
129:8
**provide**
28:16, 30:20
31:12, 37:3, 40:17
68:2, 81:1, 90:21
92:15, 95:10
97:13, 98:13
139:18
**provided**
37:15, 68:21
92:23, 94:16
119:12, 120:17
135:23, 136:1
**provider**
70:4
**providers**
67:6, 80:2, 88:20
90:12, 92:19
143:16
**provides**
81:12
**providing**
82:14
**Psy-Com**
111:21
**psychiatric**
83:24, 85:7, 85:9
**psychiatrist**
36:13, 37:7, 37:16
37:17, 85:23
85:24, 100:17

135:1
**psychiatrists**
144:3
**psychological**
83:23, 142:21
142:24
**psychologist**
136:10, 136:12
140:13
**psychologists**
80:9, 136:17
142:3, 142:7
142:15, 145:18
**PTSD**
36:5, 37:8, 52:12
67:12, 67:16
67:18, 67:20, 69:7
69:17, 70:19
70:25, 72:1, 72:6
72:18, 80:17
82:25, 85:21, 86:4
86:18, 87:10
87:21, 88:3, 88:17
88:20, 89:2, 89:4
95:9, 95:14
100:20, 102:7
109:3, 109:15
110:1, 111:23
122:21, 124:7
124:10, 124:16
124:19, 125:11
126:1, 126:3
126:8, 127:8
127:14, 128:3
129:6, 129:14
133:12, 133:16
136:6, 139:4
144:6
**public**
154:6
**pursuant**
5:13, 154:2
**push**
110:6
**put**
44:5, 58:21, 121:9
134:10
**puts**
49:6
**putting**

113:4

## Q

**qualified**
125:13
**quality**
74:22
**quarter**
101:20
**queries**
25:13
**question**
4:15, 17:20, 18:11
20:6, 21:15, 23:6
23:7, 23:10, 23:13
23:17, 23:20, 24:2
24:3, 24:21, 25:2
25:4, 27:10, 30:23
31:12, 34:5, 34:20
34:24, 35:4, 38:8
38:10, 38:11
38:12, 38:13
38:15, 39:22, 40:3
40:10, 44:8, 44:9
44:14, 46:4, 51:14
52:16, 53:11, 54:4
54:6, 54:13, 54:18
54:19, 54:19
54:22, 54:24, 55:2
55:8, 55:18, 56:1
56:7, 57:7, 57:24
60:6, 61:10, 61:21
62:13, 62:18
62:18, 65:17
66:16, 66:17, 68:7
69:14, 70:8, 73:22
74:15, 78:3, 78:4
78:6, 79:21, 81:15
82:24, 83:2, 84:1
84:5, 84:18, 84:22
86:19, 91:18
93:24, 94:20, 96:1
96:15, 97:14, 98:8
98:20, 100:1
101:7, 103:15
107:8, 111:3
115:14, 115:22
116:21, 117:24
119:25, 127:23

132:13, 135:21
136:24, 144:19
**questioning**
15:21
**questions**
6:5, 15:7, 23:2
24:13, 25:6, 26:14
27:12, 28:12
28:20, 29:2, 30:5
30:21, 31:20
36:19, 40:7, 54:7
55:24, 77:21
78:14, 79:24
102:2, 105:2
119:18, 146:19
**quick**
40:8
**quickly**
71:7
**quotas**
11:25
**quoting**
126:24

## R

**racial**
33:9
**raised**
6:16, 6:17
**range**
111:25
**reach**
68:1, 68:13, 70:22
88:19, 88:23, 89:2
89:17, 89:25
111:23, 122:11
139:3
**reached**
90:10, 139:10
**reaching**
69:22
**read**
28:14, 35:12
35:15, 35:17
35:19, 35:22
63:25, 68:9, 73:23
73:24, 78:7, 83:17
83:18, 88:18
100:21, 103:14

126:14, 139:25
**reading**
68:7, 82:23, 83:19
87:9
**ready**
119:25
**realized**
37:7
**really**
48:8, 109:13
**reason**
16:22, 28:25
47:14, 70:21
78:13, 84:8, 89:12
91:25, 96:25
106:6, 110:14
121:15, 146:11
146:14
**reasonable**
34:12, 36:1, 36:7
36:14, 40:18
42:14, 89:15
102:9, 103:4
103:13, 104:6
104:20, 107:12
107:20, 108:3
108:12, 121:15
123:17, 124:6
125:3, 125:6
125:7, 129:13
134:16, 135:22
137:21, 138:15
140:15, 141:8
143:2, 143:5
144:8, 144:15
144:25, 145:7
145:11
**reasons**
49:17, 154:9
**recall**
13:4, 14:10, 14:20
14:22, 14:23
14:25, 16:3, 31:10
31:19, 75:22
113:6, 117:7
118:18, 131:12
147:13
**receipt**
154:7
**receive**

25:11, 26:3, 36:16
36:17, 68:21, 77:3
108:1, 115:10
**received**
15:15, 26:1, 38:22
80:20
**receiving**
119:13
**Recess**
44:17, 71:10
101:24
**recipe**
20:21
**reciprocity**
61:14
**recognize**
52:4, 52:6, 109:2
**reconsider**
95:17
**record**
40:13, 40:21, 68:9
73:24, 78:7
101:23, 112:14
112:16, 113:11
152:9, 153:17
**recorded**
105:14
**records**
130:15
**refer**
70:3
**Referenced**
3:7, 3:9, 3:13, 3:14
3:16, 3:19, 3:21
4:8, 4:11
**referred**
67:8
**referring**
26:19, 123:1
141:2, 142:18
142:19
**refers**
68:24
**refresh**
131:1
**refusal**
61:2
**refuse**
79:9, 79:16, 93:15
**refused**

40:17, 79:21
80:22, 81:7, 81:18
**refusing**
79:7, 79:7
**regard**
80:7, 117:25
**regarding**
34:3, 66:9, 67:12
68:15
**regardless**
141:6
**regards**
27:14, 30:10
30:15, 31:21
34:10, 39:10
46:17, 46:18
48:11, 53:3, 53:24
63:12, 68:20
74:21, 85:20
121:16, 147:2
148:6, 150:3
**Registered**
2:14, 5:8, 153:13
**Registration**
154:22
**reiterate**
51:13, 52:15
58:18, 99:22
101:7
**reiterating**
73:21
**related**
126:1, 127:11
129:5, 154:13
**relates**
149:17
**relating**
27:16
**relationship**
130:17, 146:20
**release**
66:1, 90:7
**reluctance**
131:24, 132:3
132:8
**remain**
110:15
**remedial**
118:13, 118:25
120:16

**remember**
15:13, 15:14
16:10, 31:22, 38:8
54:4, 54:8, 54:9
54:12, 62:13, 78:3
112:21, 113:2
117:23, 131:22
**remind**
114:3
**rep**
51:2, 52:14, 53:19
55:23, 57:2, 58:4
58:17, 60:13, 62:3
65:12, 96:22
**repeat**
30:6, 34:5, 38:12
69:13, 73:12, 78:4
91:7, 98:20
119:15
**repeating**
94:20
**rephrase**
18:11, 21:13, 34:7
34:8, 103:17
106:18
**reply**
112:7
**replying**
98:11
**report**
94:2, 94:11, 94:19
94:22, 96:3, 97:21
125:19, 150:9
150:25
**reported**
105:11, 120:4
130:8, 150:23
**reporter**
2:13, 2:14, 5:8, 5:9
5:17, 5:17, 5:21
7:21, 21:21, 21:24
22:2, 22:22, 64:8
153:13, 153:14
**REPORTER'S**
153:9
**reporting**
118:21
**reports**
96:6, 149:18
150:7

**representative**
26:16, 28:22
30:25, 59:14
65:19, 70:20, 88:4
88:11, 97:19, 98:1
98:11, 98:13
99:10, 99:16
102:23, 120:9
120:10, 122:20
124:5, 130:20
136:2, 139:14
139:15, 144:23
**represented**
28:4
**representing**
53:1
**request**
3:25, 4:2, 16:15
16:19, 17:10
18:14, 18:25, 19:6
19:14, 19:19
19:25, 20:14
20:24, 21:1, 21:4
21:16, 34:11
34:12, 35:14, 36:1
36:7, 36:9, 37:2
37:17, 37:21, 38:2
38:24, 39:10
40:25, 41:14
41:18, 43:7, 43:13
44:4, 46:20, 49:1
49:3, 52:11, 52:21
53:3, 53:6, 53:8
54:15, 56:8, 59:20
62:6, 63:12, 63:23
64:23, 65:3, 65:7
65:12, 65:22
65:25, 66:10
66:23, 67:13
67:14, 68:1, 68:3
68:4, 68:14, 68:20
70:19, 73:3, 74:6
74:23, 75:9, 77:1
81:3, 81:10, 81:22
87:3, 89:9, 91:16
91:20, 92:17
93:10, 93:13
93:21, 95:21
97:16, 97:17
101:17, 102:16

104:9, 107:25
108:19, 109:21
133:21, 136:16
136:20, 138:15
138:16, 139:24
140:11, 140:20
143:14
**requested**
17:23, 40:19
64:18, 152:10
154:4, 154:10
**requesting**
149:11
**requests**
43:14, 49:4, 62:22
62:23, 90:20
136:6, 137:21
138:1
**require**
65:25, 94:23
118:19
**required**
36:10, 62:7, 77:25
81:13, 138:14
138:21, 147:3
**requirement**
19:18
**requirements**
12:2, 72:24
**requires**
89:15
**requiring**
37:2
**research**
37:20, 77:12
**resource**
130:20
**resources**
137:19
**respect**
33:14, 33:22
33:24, 45:20
68:14, 88:20
95:17, 96:18
117:24, 118:14
118:20, 119:5
120:17, 122:2
144:22
**respected**
104:3, 106:4

106:7
**respond**
128:24, 129:19
144:18
**responded**
19:2
**responding**
56:7
**responds**
112:14
**response**
20:16, 34:10
40:24, 41:14
41:18, 58:18
97:13, 99:22
102:15, 112:18
113:1
**responses**
31:20, 97:17
**responsibilities**
73:9, 73:16, 74:11
**responsibility**
51:18
**responsive**
17:18, 54:3
129:22
**responsiveness**
33:19, 34:23
62:12, 65:16, 68:6
97:3, 106:9
115:13
**rest**
23:7, 83:25
**restriction**
84:7
**result**
44:3, 88:3, 118:21
119:14, 149:3
**resulted**
108:19
**results**
137:17
**retaliation**
113:17
**retired**
126:6
**return**
115:1
**returned**
154:6, 154:8

**review**
25:21, 30:21
31:13, 31:16
36:22, 38:14
56:14, 62:6, 64:4
65:25, 72:25, 82:3
82:4, 82:10, 91:3
151:13
**reviewed**
16:22, 27:10
27:15, 27:17
28:14, 35:20, 37:5
38:16, 59:12, 62:8
62:23, 63:9, 63:10
81:23, 151:19
**reviewing**
18:1, 28:11
**reviews**
108:20, 151:20
**Reyes**
30:13, 30:14
**Richard**
75:20
**Richardson**
36:25, 75:21, 76:5
**right**
15:7, 15:17, 15:20
17:4, 18:8, 18:17
19:9, 20:7, 21:21
26:22, 27:1, 27:8
30:24, 42:12
42:15, 43:19
47:24, 49:14
49:18, 56:4, 56:7
59:16, 60:22
61:24, 67:3, 67:8
68:16, 69:10
69:17, 70:5, 70:15
74:2, 75:1, 80:20
81:4, 81:8, 82:2
82:5, 82:8, 82:9
82:12, 82:25, 83:4
83:13, 84:16
84:20, 85:2, 85:4
85:7, 87:10, 90:7
92:10, 92:14
101:10, 101:12
102:19, 102:24
104:1, 107:7
114:17, 117:2

118:16, 120:8
121:1, 121:12
123:22, 125:11
128:7, 128:17
129:25, 133:25
134:1, 134:13
134:16, 135:1
135:3, 135:9
135:12, 135:19
135:24, 137:5
139:5, 141:12
142:4, 144:10
144:16, 144:23
146:12, 148:2
148:19, 151:14
**rightful**
18:1, 37:3
**rightfulness**
89:7
**rights**
35:7
**Roach**
3:21, 77:13, 80:16
84:9, 91:5, 91:9
92:21, 92:25, 94:2
95:4, 95:9, 95:13
134:21, 135:18
**Roach's**
90:15, 90:25
93:17, 94:11
94:19, 94:22
135:13
**Rochelle**
4:4, 100:16
**role**
33:4, 75:2, 100:18
121:5, 123:12
123:15, 123:20
130:5, 150:9
**roles**
75:18
**rollout**
150:1
**Ronald**
3:23
**Ross**
31:9
**roundtables**
25:13
**Ruchira**

112:22, 122:8
151:1
**rule**
45:20, 45:21
45:23, 45:25, 46:5
46:11, 47:2, 47:10
47:25, 48:4, 49:11
49:19, 67:15
67:17, 89:12
89:16, 154:3
**rules**
5:13, 46:12, 48:20
48:22, 48:25
49:12, 57:9, 58:1
58:8, 58:13, 58:23
58:25, 59:4, 59:4
59:6, 60:6, 79:19
133:19
**run**
51:25, 93:13
**running**
25:3, 52:9, 52:20
53:17, 54:16
55:11, 57:10
58:14, 147:25
**runs**
57:19, 149:4

**S**

**S-c-i-e-n-c-e-s**
8:24
**S-e-a**
10:2
**S-u-b**
10:1
**S-u-b-s-e-a**
9:24
**safe**
49:1, 110:21
**safely**
84:23
**safety**
38:4, 48:20, 49:17
64:22, 65:6
143:11, 143:12
**Salzberg**
8:18
**San**
1:2, 5:6, 5:11

**28:22, 45:13, 50:2**
52:22, 53:15
56:12, 113:19
121:6, 122:10
122:11, 153:2
**satisfaction**
95:18
**satisfactory**
92:11, 96:4, 97:13
98:13
**satisfied**
98:17, 98:23
**satisfy**
92:6
**Saved**
32:4
**saw**
26:23, 27:3, 27:6
144:13
**saying**
18:17, 19:9, 23:1
47:21, 69:10, 75:2
77:9, 85:6, 92:5
92:7, 92:14
102:19, 109:14
120:7, 121:1
126:9, 126:10
127:11, 129:5
132:22, 138:8
144:10, 144:24
**says**
35:9, 42:18, 42:22
42:25, 43:16, 48:4
49:6, 67:5, 77:12
83:3, 83:7, 83:9
83:20, 83:22
83:23, 84:3, 84:15
84:20, 85:1, 87:2
87:10, 89:13, 95:2
95:3, 95:13
136:12, 136:18
140:16, 146:9
**scenario**
140:9
**scenes**
52:4
**schedule**
43:23, 46:6, 46:12
104:15
**scheduled**

130:11
**Schlumberger**
1:6, 3:12, 4:9, 5:4
7:13, 7:14, 9:8
9:17, 9:25, 10:9
10:13, 10:14
10:22, 11:8, 12:14
13:8, 14:6, 14:7
15:8, 15:22, 17:9
17:21, 18:9, 18:13
19:5, 19:12, 19:23
20:13, 20:23
21:11, 21:12
21:15, 23:24, 24:3
24:11, 25:4, 27:11
28:4, 30:20, 33:13
33:22, 34:1, 34:4
34:13, 34:15, 35:1
35:6, 35:19, 35:23
36:11, 37:12
38:15, 38:21
38:23, 39:14
39:16, 39:23
40:14, 41:1, 41:11
41:17, 41:20
42:11, 43:17
43:21, 44:24
44:25, 45:24
46:11, 47:11
47:12, 48:1, 48:4
48:18, 50:24
51:11, 51:16
51:17, 51:22
51:24, 52:1, 52:3
52:9, 52:19, 53:16
55:10, 56:12
56:13, 57:9, 57:10
58:13, 59:5, 59:7
60:9, 61:1, 62:1
63:16, 63:22, 65:2
66:9, 66:19, 67:3
67:8, 67:10, 67:15
67:19, 68:12
68:24, 69:6, 69:7
69:15, 69:22
69:24, 70:4, 70:8
70:15, 71:3, 71:17
71:20, 71:22, 72:5
72:12, 72:17, 73:8
73:15, 73:25

74:10, 75:4, 76:3
76:25, 77:3, 80:15
80:20, 80:22, 81:6
81:18, 82:9, 82:16
85:10, 85:13, 86:6
86:16, 87:1, 87:13
87:15, 87:20
87:22, 87:24, 88:1
88:3, 88:4, 88:19
89:1, 89:12, 89:13
89:24, 90:10
90:14, 91:5, 91:8
91:20, 92:6, 92:12
92:20, 93:4, 93:6
93:7, 93:16, 94:2
94:3, 94:4, 94:18
94:21, 95:3, 95:12
95:16, 96:3, 96:4
96:7, 96:16, 96:19
97:8, 97:19, 97:21
98:1, 98:2, 98:4
98:17, 99:5, 99:10
99:17, 99:20
100:2, 101:1
101:8, 101:16
102:3, 103:3
103:9, 103:18
103:24, 104:6
104:25, 106:1
106:12, 106:19
107:7, 107:19
108:22, 109:1
112:19, 113:1
114:11, 114:13
115:4, 115:5
115:15, 115:16
115:24, 116:11
116:15, 116:16
117:13, 118:2
118:5, 118:19
119:13, 120:4
121:4, 121:6
122:5, 122:7
122:20, 124:5
124:23, 124:24
125:1, 125:10
125:13, 125:18
125:18, 129:12
130:15, 131:19
133:10, 133:14

133:20, 134:5
134:9, 134:9
134:11, 136:19
138:11, 139:3
140:1, 140:2
140:10, 140:18
140:19, 141:7
143:15, 144:24
145:11, 145:23
145:23, 146:5
146:6, 146:11
146:16, 149:10
149:17, 149:21
149:23, 151:17
151:22, 153:6
**Schlumberger's**
22:6, 24:7, 28:12
30:25, 32:17
47:11, 58:13, 61:2
69:1, 69:2, 70:16
75:2, 76:25, 95:18
96:8, 97:5, 97:16
98:10, 98:23
99:12, 99:13
100:19, 101:4
101:13, 102:11
103:12, 104:23
123:15, 136:14
143:4
**school**
7:2, 7:24, 8:1, 8:1
10:9, 11:11
**schooling**
11:7, 11:8
**science**
37:20
**Sciences**
7:19, 8:17, 8:19
8:24
**scope**
39:2, 39:19, 41:2
41:7, 42:23, 51:1
52:14, 52:24
53:19, 55:22, 57:2
58:4, 58:17, 60:13
80:5, 80:10, 85:17
86:9, 88:7, 88:10
96:21, 97:11
102:6, 103:6
107:4, 107:5

109:5, 109:19
110:3, 110:13
111:9, 140:6
140:25, 143:7
**se**
142:19
**sea**
9:19, 9:20
**second**
23:5, 56:3, 56:7
69:2, 69:4, 69:4
71:12, 91:14
91:19, 92:10
94:25, 95:2
100:11, 120:6
120:10, 121:25
135:18, 152:9
**secure**
32:14
**see**
26:8, 27:22, 36:9
40:4, 40:16, 40:19
40:20, 43:4, 50:20
51:12, 51:22, 55:1
61:18, 64:15
64:17, 64:20, 66:6
66:12, 66:13
66:17, 66:23
68:23, 68:25, 73:8
73:15, 77:20, 83:3
83:24, 83:25
83:25, 95:6
105:23, 110:7
120:15, 120:19
121:12, 121:16
141:12, 141:19
148:12
**seek**
33:6, 67:11, 67:20
68:12, 138:19
**seeking**
67:16
**seen**
22:15, 26:10
27:21, 34:2, 36:3
36:5, 37:14, 39:8
39:13, 40:2, 41:9
50:12, 64:13
64:16, 93:19
100:23, 105:16

136:3, 136:4
141:3, 144:2
144:4, 149:12
**sees**
74:11
**segment**
9:16, 9:24
**send**
112:10
**sense**
12:6
**sensitivity**
121:23
**sent**
16:18, 31:24
38:19, 41:25, 42:1
44:25, 45:14
93:19, 105:17
**sentence**
40:19, 40:21
**separate**
12:24, 69:23
**September**
9:15
**serve**
92:1, 92:7, 109:7
**served**
153:21
**service**
41:18, 42:11
43:15, 45:2, 52:11
52:21, 53:14, 54:1
55:12, 56:12
56:16, 64:18, 65:4
67:16, 67:18
67:21, 68:15, 81:7
87:15, 89:4, 91:16
91:21, 96:5, 96:18
98:5, 99:13, 100:5
100:19, 101:2
101:9, 102:11
102:17, 103:11
103:23, 104:19
105:8, 106:1
106:12, 106:15
106:20, 106:25
107:12, 108:2
109:2, 109:12
109:14, 111:14
111:20, 114:12

118:23, 121:5
121:6, 121:19
123:17, 124:6
124:15, 124:22
127:25, 128:5
128:12, 128:19
128:23, 129:2
130:6, 133:12
133:16, 136:7
136:10, 139:4
143:5, 143:21
144:5, 150:17
**Services**
4:9
**serving**
106:1, 106:15
**session**
147:4
**set**
118:13, 119:4
120:16, 120:23
**seven**
29:13, 84:5
**shake**
22:24
**share**
13:24
**shared**
66:25, 90:19
111:11, 116:9
119:3, 120:21
133:11
**Sheila**
3:11
**shift**
44:2, 44:2, 44:3
44:5, 45:4, 45:7
45:8, 45:21, 46:2
46:10, 113:22
133:11
**shook**
51:3, 51:5, 80:12
86:11
**shoot**
126:24
**shop**
52:6, 113:4
131:12
**short**
60:1

**shorter**
73:14, 103:17
**Shorthand**
2:13, 5:7, 153:12
**show**
22:14, 32:22, 40:1
50:18, 51:9, 64:12
91:12, 104:13
141:3, 149:14
**showed**
148:7, 148:9
148:16
**shown**
153:22
**shows**
40:22, 74:2
**sic**
45:3, 113:8
**side**
31:21, 51:3, 51:4
80:12, 80:12, 83:6
88:23
**side-bar**
20:5, 79:12
**sign**
36:14, 37:8, 69:3
85:24
**signature**
152:10, 154:3
154:6, 154:8
**signed**
36:17, 36:17
65:17, 65:18, 66:1
66:3, 66:18, 77:6
85:19, 92:8, 92:25
100:16
**significance**
34:14, 34:25
**signing**
85:9, 91:24
**similar**
11:14, 46:6, 47:2
**simple**
47:14
**single**
91:2
**sir**
6:14, 10:3, 32:12
54:7, 54:24, 60:14
72:15, 73:22, 80:1

91:7, 98:21, 131:1
**sit**
63:11
**situation**
58:9, 58:10, 60:20
67:6, 69:17, 73:7
105:10, 113:3
137:4
**six**
29:13, 30:10
30:16, 107:18
122:22, 123:25
**six-step**
13:9
**Skierka**
147:5
**skipped**
4:12
**slash**
113:8
**SLB**
31:11, 140:1
**sleeping**
130:10
**slightly**
135:11
**slips**
4:13
**Slow**
42:5, 59:21
**snapped**
105:12
**soc**
135:10
**social**
135:7
**social-worker**
136:9
**SOIM**
113:21
**solution**
122:3
**somebody**
49:4, 133:25
**somebody's**
121:10
**soon**
40:9
**sorry**
7:23, 22:2, 35:3

47:19, 50:3, 56:22
71:12, 76:16
127:20, 131:1
133:13, 139:15
142:6
**sort**
87:9, 132:4
132:20, 132:24
**sought**
62:19, 74:12
**south**
50:1, 71:25, 107:1
112:22, 122:9
**speak**
114:23
**speaking**
17:3, 32:20, 36:20
70:15, 72:8, 79:20
99:16, 123:13
**speaks**
42:24
**special**
8:12
**specialist**
13:1, 31:9, 70:22
151:4
**specialized**
111:14
**specific**
16:18, 20:18
20:19, 24:1, 24:2
25:13, 38:3, 45:2
58:9, 58:10, 59:8
90:16, 93:25
113:16, 113:24
115:10, 117:7
132:21
**specifically**
10:24, 14:17
15:11, 15:16
16:21, 54:17
67:17, 118:18
130:5
**speech**
79:18
**spell**
8:23
**spent**
6:18
**spoke**

28:21, 30:9, 30:13
30:17, 113:18
117:17, 118:8
**stake**
90:19
**stakeholders**
59:13, 60:24, 64:4
75:12
**stakes**
49:5
**stand**
18:4
**start**
22:9, 22:10, 23:9
71:11, 71:14
152:3
**started**
7:13, 9:8, 9:13
9:16, 10:2, 14:12
15:20, 25:23
26:18, 71:23
**starts**
62:3
**state**
5:8, 6:6, 41:10
153:13
**stated**
46:15, 104:2
105:20, 105:20
**statement**
40:16, 43:5
109:12
**statements**
39:17, 79:20
116:4, 140:12
**states**
1:1, 5:5, 11:5
13:15, 33:4, 77:14
78:23, 80:1, 94:14
153:1
**stating**
47:23, 88:13
102:16, 103:8
143:19
**status**
3:25, 73:3
**stay**
116:23
**staying**
86:23

**step**
11:16
**stick**
68:10, 128:25
**sticking**
129:4
**stipulate**
82:19, 82:21
**stop**
61:2
**stops**
61:5
**stored**
32:11
**straight**
36:10
**straightforward**
147:16
**Street**
2:3
**stress**
71:21, 102:4
140:3
**strict**
48:20
**strong**
11:25, 137:24
**stronger**
11:19, 11:23
**studies**
6:20, 6:22, 9:13
10:18
**sub**
9:19
**Sub-C**
9:18
**subject**
20:10
**submitted**
91:15, 92:11, 94:2
96:17, 97:7
122:18
**submitting**
149:10
**Subsea**
9:16, 9:19, 10:9
10:15
**subsidiary**
10:9
**substantially**

11:14
**substantiate**
21:1, 21:1, 93:21
**successful**
74:13, 146:1
146:10
**successfully**
73:11, 73:18
**sued**
70:25
**suffered**
122:23, 129:14
**suffering**
109:25
**sufficient**
92:15, 94:4
134:13
**suggest**
43:10, 43:11
43:17, 43:22
**suggested**
44:23, 45:9, 119:1
**suggesting**
125:25
**suggestions**
41:19
**suicide**
126:17
**Suite**
2:7, 5:11, 154:23
**summarize**
16:14
**Super**
22:14
**supervisor**
117:22
**supplied**
92:19
**supply**
118:2
**support**
33:7, 37:10, 53:23
68:3, 91:20, 126:7
**supporting**
126:10
**supposed**
58:22, 58:25, 59:3
59:4, 60:8, 79:19
112:8, 138:12
149:20, 149:22

**sure**
7:18, 11:2, 16:14
24:23, 30:7, 30:23
34:6, 39:23, 48:25
51:15, 52:17
57:17, 66:13
69:15, 73:1, 73:13
86:23, 94:21
96:25, 98:22
101:8, 104:18
110:21, 123:11
130:16, 136:12
144:12, 144:22
145:9, 145:22
146:2
**suspects**
132:4, 132:20
132:24
**suspicions**
132:9
**sworn**
6:2, 153:16
**symptom**
88:15
**symptoms**
87:21, 88:17

**T**

**take**
6:12, 9:4, 12:13
14:8, 22:3, 25:25
29:4, 40:6, 40:10
41:22, 41:23, 43:9
44:11, 44:14, 49:9
63:17, 71:8, 72:12
91:8, 93:16, 101:1
114:5, 124:22
136:24, 138:3
**taken**
5:2, 17:11, 17:12
18:3, 39:7, 93:12
99:24, 100:6
110:5, 137:3
137:5, 137:6
154:15
**takes**
65:2, 74:23, 91:3
113:22, 143:20
**talk**

13:18, 22:9, 22:10
28:18, 30:7, 30:11
55:7, 130:14
141:5, 147:12
149:15
**talked**
21:19, 29:5, 29:6
114:21, 116:24
135:12
**talking**
22:9, 24:7, 25:20
26:22, 27:20
45:12, 47:3, 60:2
60:3, 117:11
117:12, 119:17
127:6, 130:16
134:18, 138:23
138:24, 143:25
143:25
**talks**
69:1, 69:4
**target**
131:20, 131:24
132:3
**targeted**
113:25, 114:24
125:19, 132:10
**targeting**
113:16, 113:24
**tasks**
37:22, 84:14
**taught**
17:9, 19:4, 19:13
19:15, 19:23, 33:3
33:11, 73:4
**taxes**
12:1
**team**
10:25, 15:15
16:24, 17:13, 18:2
26:6, 31:3, 31:5
37:1, 38:20, 59:15
60:25, 62:10
62:10, 63:10
63:11, 64:22, 65:7
65:11, 65:22
90:18, 118:13
120:16, 137:12
151:2, 151:3
**technical**

12:8, 138:20
139:10
**technician**
44:1, 110:17
**Technology**
1:6, 5:4, 153:6
**Telford**
3:17, 3:25, 4:2, 4:6
26:19, 28:21
29:25, 30:8, 36:6
36:24, 42:1, 65:12
65:18, 66:4, 75:20
94:14, 95:3, 95:13
**tell**
6:15, 6:22, 13:21
16:9, 18:24, 19:11
20:3, 20:12, 23:18
24:20, 25:25
27:10, 28:10, 30:3
31:15, 32:23, 39:6
40:25, 43:1, 44:23
50:7, 50:21, 51:24
52:2, 54:12, 55:16
58:12, 59:7, 59:9
59:17, 59:24, 60:7
61:1, 61:21, 65:2
65:20, 72:20
72:21, 79:9, 81:16
81:17, 82:16
83:19, 93:16, 94:8
94:19, 94:21
97:18, 98:2, 99:11
99:19, 101:20
112:17, 112:25
116:7, 119:23
131:20, 132:10
132:14, 139:1
141:14
**telling**
7:16, 48:10, 62:17
79:14
**tells**
24:24, 140:10
**templates**
16:18
**tempted**
22:23, 23:8
**ten**
6:18
**ten-minute**

44:15
**term**
141:17
**termination**
72:1
**terms**
11:6, 13:13, 15:8
17:2, 17:6, 21:5
95:18, 101:19
**testified**
6:3
**testify**
30:24, 31:16
**testimony**
24:4, 24:9, 71:4
131:18, 153:17
**Texas**
1:1, 2:3, 2:7, 5:6
5:8, 5:11, 6:10
50:1, 56:13, 71:25
107:1, 112:22
122:9, 149:25
153:1, 153:13
154:23
**text**
112:10, 112:15
**thank**
5:21, 11:4, 15:3
21:23, 32:16
32:16, 33:3, 44:14
44:16, 62:17
66:14, 82:22
84:12, 103:16
135:16, 150:14
150:16
**the...medical**
84:1
**therapist**
134:12, 135:2
135:8, 136:9
140:14
**therapists**
80:11, 142:10
142:15, 145:18
**therefor**
154:9
**thing**
48:24, 49:14, 87:9
**things**
22:21, 75:4, 85:2

115:1, 116:24
**think**
11:24, 19:2, 21:20
24:20, 25:15, 26:5
31:20, 38:13, 42:1
54:14, 74:1, 79:23
84:9, 85:10, 85:13
99:15, 112:4
120:21, 123:10
124:17, 125:24
126:3, 126:7
126:21, 127:13
128:7, 129:10
130:21, 134:20
135:2, 135:8
145:8
**thinking**
75:22, 126:17
**third**
40:15, 120:17
140:16
**third-party-provi...**
52:1
**Thomas**
147:4
**thought**
13:2, 96:7, 127:7
127:8, 127:24
143:2
**threat**
47:15
**threatened**
105:25, 106:5
**three**
10:12, 29:12, 45:7
83:6, 116:23
131:25, 132:9
136:8, 140:12
140:14, 148:18
150:12
**till**
26:5, 93:11, 95:20
130:6
**time**
6:12, 6:23, 7:12
7:13, 15:4, 21:19
22:8, 22:20, 23:19
26:24, 27:6, 35:12
35:17, 39:15
45:13, 52:20

53:25, 55:12, 60:1
65:9, 65:19, 67:4
67:14, 70:12
70:22, 72:13
72:24, 75:6, 75:24
80:22, 81:22
82:11, 92:24
94:25, 95:1, 96:2
96:17, 96:23, 97:7
100:23, 112:21
113:20, 115:9
117:22, 122:13
123:1, 123:21
143:9, 144:20
145:9, 145:14
146:17, 146:22
149:2, 149:15
151:1, 151:11
151:25, 153:24
**times**
17:15, 22:6, 22:23
23:15, 126:16
141:18, 147:6
147:22, 149:10
**title**
15:12, 31:10, 76:9
76:12, 120:8
151:10, 151:11
**today**
19:22, 19:23
20:11, 20:12
31:17, 32:9, 32:17
35:15, 38:14
39:17, 95:20
104:8, 122:20
136:6, 139:18
140:9, 141:18
143:21, 144:24
**toilet**
71:7
**told**
18:22, 25:10, 28:9
28:10, 39:16, 69:5
71:3, 94:3, 119:8
127:7, 127:16
127:21, 127:24
**tool**
33:6
**tools**
46:17, 113:5

136:18
**top**
14:2, 25:11
104:14
**topic**
10:24, 16:8, 39:20
41:3, 41:7, 42:24
44:19, 44:20
71:14, 96:22
97:15, 140:6
147:11
**topics**
13:12, 14:4, 14:25
23:24, 24:4, 24:9
24:14, 25:6, 25:12
26:8, 26:14, 26:22
26:23, 27:4, 27:11
27:12, 27:13
27:24, 28:7, 28:11
28:13, 28:15
28:20, 29:4, 29:6
29:15, 29:17
29:24, 30:4, 30:12
30:18, 30:22
32:18, 39:2, 88:11
96:15, 97:11
117:6, 140:25
146:25
**totally**
130:20
**touch**
29:1, 147:7
**trained**
17:21, 17:24
17:25, 20:7, 72:21
86:3, 109:10
109:15, 109:23
**trainee**
44:1
**training**
10:24, 11:5, 12:10
12:17, 12:18
12:20, 12:25
13:10, 13:13
13:14, 13:18
13:23, 13:24, 14:6
14:7, 14:9, 14:12
14:15, 14:17
14:20, 15:8, 15:14

15:22, 15:25, 16:6
16:10, 17:3, 17:6
18:8, 18:12, 19:4
25:10, 25:11
25:15, 32:25
118:14, 118:18
118:20, 119:4
120:17, 120:24
121:4, 121:17
121:17, 121:23
122:1, 122:1
124:18
**trainings**
7:5, 14:16, 14:21
**trains**
11:1
**transactions**
126:22
**transcript**
153:16, 154:7
**transfer**
122:19
**transferring**
122:3
**transition**
13:5, 13:6
**Transitioning**
13:7
**travel**
84:2
**treat**
85:11, 86:3, 86:18
**treating**
66:3, 85:15, 91:6
91:9, 95:5, 95:9
95:14
**Treatment**
4:13
**tried**
53:22
**true**
43:17, 43:20
68:23, 75:5, 75:5
81:19, 82:20
87:18, 90:6, 94:1
95:12, 153:17
**truth**
20:22, 132:11
**try**
23:12, 43:6, 46:19

55:8, 74:4, 103:17
131:20, 131:24
**trying**
15:24, 18:23
19:18, 35:14
35:25, 36:12, 43:8
53:7, 60:7, 68:13
86:22, 94:17
104:18, 106:10
107:23, 119:20
127:10
**turned**
114:12, 114:14
118:2, 118:23
**turning**
20:10, 102:8
150:13
**turning-the-kenn...**
116:25
**twenty**
151:15
**twice**
18:23
**two**
12:16, 29:12, 45:9
55:20, 55:24, 56:1
76:4, 83:2, 92:22
95:17, 96:6
112:20, 116:23
117:5, 118:11
134:12, 134:18
135:9, 136:2
136:4, 136:10
140:14, 142:14
142:22, 144:3
**two-year**
7:7
**type**
67:25, 68:20
90:20, 111:24
113:23, 126:9
127:2, 132:15
138:1, 146:25
149:7
**types**
111:23
**typical**
20:17, 20:17

**U**

**Ugoletti**
133:1
**ultimately**
125:8, 134:15
**unable**
97:18
**unclear**
24:16
**underneath**
9:19
**understand**
20:6, 21:2, 23:6
23:17, 24:21
30:23, 32:17
32:19, 32:21, 34:9
34:20, 35:4, 35:5
35:8, 35:24, 39:21
42:7, 46:4, 46:5
53:7, 53:22, 56:15
61:11, 61:19
76:18, 77:14
82:14, 94:18, 97:4
97:15, 98:9
107:24, 109:22
111:3, 118:12
123:11, 125:9
125:10, 126:8
126:11, 126:12
134:4, 137:5
138:10, 141:20
141:25, 142:2
142:8, 142:21
142:23, 148:18
**understanding**
12:8, 23:21, 61:21
78:8, 79:19, 81:18
94:24, 126:10
151:17
**understood**
13:2
**undue**
124:23, 124:25
125:4
**unevasively**
24:13, 25:5
**uniforms**
51:10, 51:11
51:15, 51:16

51:17
**union**
15:1
**unions**
14:25, 15:1
**United**
1:1, 5:5, 7:7, 11:5
13:14, 33:4, 77:14
78:23, 80:1, 153:1
**unreasonable**
103:19, 103:24
104:4
**unrelated**
129:2
**unsatisfactory**
96:7
**update**
149:3, 149:6
**upside**
114:12, 114:14
118:3, 118:24
150:13
**US-specific**
11:3, 13:12, 14:4
**use**
46:18, 56:12, 61:8
83:9, 106:25
140:19

**V**

**valid**
96:25
**validate**
57:13
**various**
25:12, 28:15
31:22, 35:22, 39:8
59:12, 148:25
**verbal**
23:2
**version**
12:4
**veteran**
136:6
**veteran's**
52:21
**veterans**
126:6
**Victoria**

2:3
**view**
137:3, 144:7
144:7
**Villarreal**
5:10
**violate**
46:11, 49:11
49:12
**violated**
35:6, 38:23
**violating**
48:17
**vis-a-vis**
48:18, 100:19
**vision**
106:25
**visit**
148:22, 149:15
**visited**
29:24, 30:3
**visits**
52:5
**Volume**
1:14, 153:11
**Von**
26:16, 26:17, 50:2
**vote**
143:1
**VPs**
100:7
**VS**
1:4, 153:4
**Vuknapas**
6:19

**W**

**wait**
93:11, 149:5
**waiting**
81:4
**Waive**
5:17
**Waived**
5:19, 5:20
**walks**
110:22
**want**
8:2, 8:22, 14:16

28:9, 28:10, 40:25
43:1, 49:6, 54:25
55:5, 55:16, 75:18
78:4, 79:18, 81:17
100:11, 112:10
121:9, 121:13
123:11, 126:8
129:3, 130:17
138:25
**wanted**
37:1, 54:16, 56:14
89:1, 89:8, 91:10
106:6, 113:24
114:25
**wants**
44:11, 48:3, 49:8
**war**
52:21
**Ward-Reyes**
3:11
**way**
15:20, 22:25
23:10, 33:8, 37:23
47:4, 47:5, 52:8
75:16, 85:14
86:22, 101:22
105:15, 105:25
106:5, 113:25
114:25, 126:10
134:10, 137:13
145:10, 146:6
**ways**
121:11, 140:17
**we've**
6:11, 20:7, 37:14
53:25, 55:6
101:21, 116:24
119:17, 120:3
**weeks**
12:16, 122:22
**well-being**
53:24, 141:24
**went**
7:2, 7:2, 7:25
13:25, 25:9
108:15, 148:25
**western**
1:1, 5:6, 6:18
153:1
**whatsoever**

130:4
**William**
2:6, 3:11
**willing**
32:13
**witness**
2:12, 5:2, 6:1, 7:23
8:22, 22:5, 24:16
25:9, 29:10, 29:12
33:16, 33:24
34:17, 34:21, 35:3
38:19, 39:4, 39:21
41:4, 41:22, 42:17
44:16, 51:3, 51:13
52:15, 52:25
53:20, 55:20, 56:6
56:22, 58:5, 58:18
59:11, 60:14
67:25, 68:10
68:19, 69:13
72:15, 73:21
73:25, 74:17
78:18, 78:20, 79:6
80:6, 80:12, 81:10
81:22, 85:18
86:10, 86:15
88:12, 94:6, 94:13
96:23, 97:12
98:20, 99:1, 101:7
102:7, 103:7
103:14, 104:11
104:25, 106:3
107:5, 107:22
108:5, 109:6
109:20, 110:4
110:14, 111:10
111:19, 115:8
116:2, 116:19
117:17, 122:25
123:14, 124:9
125:22, 127:20
128:23, 129:17
132:7, 132:13
133:18, 134:14
134:18, 136:23
137:15, 139:7
139:22, 140:7
141:1, 142:6
142:18, 143:8
144:18, 145:6

146:14, 147:19
148:6, 153:15
153:18, 153:22
**witnesses**
116:3
**word**
12:3, 46:25, 47:1
72:22, 77:22
141:12
**words**
19:11, 25:24
84:10, 103:22
106:24, 107:13
114:13, 119:8
120:10, 121:15
123:24, 133:14
144:13, 152:5
**work**
4:2, 7:12, 11:24
15:1, 21:7, 41:19
42:12, 43:15
43:24, 44:1, 45:4
45:6, 46:6, 46:10
46:12, 47:14
47:14, 47:16, 48:3
48:5, 48:14, 48:17
48:21, 48:25, 49:5
49:7, 49:8, 49:19
52:12, 53:4, 54:1
61:13, 63:3, 63:5
65:4, 67:13, 67:22
73:11, 80:23, 84:2
84:7, 87:21, 88:2
91:17, 91:22, 93:5
102:17, 105:9
107:6, 110:15
113:5, 122:22
122:22, 122:23
124:15, 130:7
130:11, 137:1
141:23, 143:17
143:24, 145:4
147:2, 148:3
149:11
**worked**
146:17
**worker**
16:11, 16:12
16:13, 17:23
18:10, 18:15, 19:6

19:25, 21:17
48:16, 49:5, 49:19
62:1, 62:20, 73:18
74:11, 111:16
135:7, 136:20
137:20, 138:24
140:10, 145:25
146:10, 149:18
**worker's**
18:14, 18:25
19:14, 19:24
20:14, 63:23
138:15, 138:16
140:20
**workers**
13:15, 13:19
13:23, 14:9, 14:19
15:6, 15:9, 48:13
73:10, 90:1
106:25, 109:2
**working**
6:19, 46:9, 47:7
104:12, 106:11
110:16, 113:4
**workplace**
4:10, 34:3, 42:4
47:13, 56:16, 59:4
59:6, 62:2
**workplaces**
47:11
**works**
48:22, 60:23
131:11
**workspace**
136:13, 136:14
**worried**
126:19, 126:22
**write**
8:20, 8:21, 120:16
**writing**
22:25, 116:5
133:19
**written**
16:5, 47:18, 47:20
48:3, 62:6, 64:2
65:10, 87:1, 89:20
96:3, 105:14
116:8
**wrong**
48:8, 48:18, 56:4

131:19, 150:14
**wrongful**
132:4
**wrote**
83:12, 126:15

---
**X**
---

---
**XXXXX**
154:10
---

---
**Y**
---

**yard**
49:15, 50:16
50:17, 53:2, 56:16
57:14
**Yates**
3:23, 92:21, 93:1
96:2, 96:17, 97:7
134:21, 134:23
135:5, 135:19
**Yates's**
97:20, 98:17
98:24
**yeah**
6:25, 7:23, 8:22
10:13, 15:11, 17:5
24:19, 29:21
29:23, 32:12, 38:5
41:4, 45:24, 49:10
50:4, 50:6, 50:17
51:17, 76:8, 76:22
78:8, 78:22, 83:21
101:14, 108:11
125:7, 135:8
135:8, 148:25
150:5, 150:16
151:6
**year**
7:4, 7:10, 8:13
9:14, 10:25, 11:6
12:1, 12:10, 12:15
13:3, 55:13, 72:19
95:25, 107:15
123:3, 124:10
130:5, 147:6
150:14, 152:2
152:3, 152:4
**years**

6:18, 6:23
**yep**
71:9, 71:9, 71:9
**yesterday**
24:6, 26:4, 26:20
26:24, 27:4, 27:22
28:6, 30:18, 37:5
64:16, 144:2

**Z**

**zero**
36:3, 54:1, 54:2

**1**

**1**
1:14, 3:7, 5:16
22:15, 23:25, 24:5
24:14, 25:7, 25:22
25:23, 26:2, 32:18
39:3, 153:11
**10**
3:24, 94:7, 94:8
**10:30**
5:12
**100**
4:4
**101**
4:6
**10-17-12**
4:1
**102**
3:4
**11**
4:1, 85:4, 98:15
98:16
**111**
4:8
**11-30-12**
4:5
**1-18-13**
3:10
**119**
4:8
**12**
4:3, 85:4, 100:13
100:14, 150:20
**120**
154:23

**12-31-14**
154:21
**13**
4:5, 29:10, 29:11
85:6, 101:25
102:10, 102:19
104:5, 150:20
150:21
**14**
4:7, 87:7, 111:18
119:11, 119:16
120:2
**147**
4:10
**149**
4:11, 4:13
**15**
4:9, 6:23, 97:15
147:15, 149:14
**15th**
12:16
**16**
4:12
**1604**
5:11
**17**
4:13, 149:8, 149:9
**18th**
41:12
**19**
4:16
**1986**
6:17, 10:4

**2**

**2**
3:8, 32:22, 34:9
38:17, 38:18
39:14, 42:18, 98:3
**2,000**
131:4
**2004**
9:10
**2005**
7:9, 9:13
**2009**
9:15, 9:15
**2010**
9:14, 14:13, 14:14

**2012**
3:12, 35:21, 36:5
42:2, 44:25, 45:14
55:13, 56:11
56:11, 64:18, 65:5
65:14, 67:11
67:11, 67:22
68:16, 70:13, 72:9
72:11, 72:13
72:19, 75:3, 75:16
75:16, 76:2, 76:2
77:6, 80:16, 81:17
81:19, 82:18, 88:9
94:9, 95:25, 96:4
96:18, 98:4, 99:20
100:5, 101:2
101:8, 101:17
102:8, 103:10
107:11, 123:4
123:5, 123:16
126:15, 129:24
144:3, 145:12
150:8, 150:11
**2013**
12:11, 13:19
13:25, 41:12
112:19, 126:21
146:22, 150:16
152:4
**2014**
1:15, 5:9, 28:23
29:9, 124:10
151:14, 151:18
151:19, 152:6
153:10, 154:18
**203**
2:3
**208**
5:11
**21**
1:15, 153:10
**21st**
5:9
**22**
3:7
**2236**
154:20
**22nd**
94:14, 94:25
**23rd**

10:4, 94:9, 151:14
151:19, 152:6
**24**
8:6, 9:9
**24th**
94:9, 95:1
**25**
4:16
**2500**
2:7
**25th**
151:18, 154:17
**280**
154:22
**2nd**
35:21

**3**

**3**
3:10, 40:1, 154:1
**30**
27:8, 27:11, 154:7
**30(f)(1**
154:3
**30th**
103:10, 103:19
103:20, 107:11
107:14, 108:8
123:16, 124:1
130:1, 135:23
141:8, 150:18
**31st**
152:3
**32**
3:9
**361**
2:4

**4**

**4**
3:14, 50:18
**40**
3:13
**400**
5:10
**451-7583**
154:24
**451-8243**

154:24
**48**
154:1

**5**

**5**
3:7, 3:9, 3:12, 3:14
3:15, 3:15, 5:16
51:9
**5:02**
5:12
**5:13-CV-01057**
1:5, 153:5
**50**
3:14
**500**
2:7
**51**
3:16
**512**
154:24, 154:24
**57**
4:16, 4:16
**573-5500**
2:4
**5-8-12**
3:17, 3:18

**6**

**6**
3:3, 3:17, 64:7
64:11, 64:12
64:17
**64**
3:17, 3:19
**66**
3:19
**66798**
3:12

**7**

**7**
3:18, 64:10, 64:11
66:7, 68:23
**7-24-12**
3:24
**728-3297**

2:8
**74**
 3:21
**75201**
 2:7
**76**
 3:21
**77901**
 2:3
**7800**
 154:22
**78759**
 154:23

**8**

**8**
 3:20, 74:9, 76:24
**846**
 3:12
**8th**
 65:14, 67:22
 68:16, 72:11
 72:13

**9**

**9**
 3:22, 91:12, 91:13
**91**
 3:23
**94**
 3:25
**972**
 2:8
**98**
 4:2